# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

GREGORY WARREN KELLY,

*Plaintiff - Appellant,*

v.

THE TOWN OF ABINGDON,

*Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ABINGDON

## JOINT APPENDIX

Thomas E. Strelka
Monica L. Mroz
STRELKA EMPLOYMENT LAW
119 Norfolk Avenue, SW, Suite 330
Roanoke, VA 24011
540-283-0802
thomas@strelkalaw.com
monica@strelkalaw.com

*Counsel for Appellant*

Ramesh Murthy
Cameron S. Bell
PENN, STUART & ESKRIDGE
208 East Main Street
Abingdon, VA 24210
276-628-5151
rmurthy@pennstuart.com
cbell@pennstuart.com

*Counsel for Appellee*

LANTAGNE LEGAL PRINTING
801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477

# TABLE OF CONTENTS

Page

District Court Docket Sheet [1:19-cv-00032-JPJ-PMS]............................................1

Complaint with Attachment and Exhibits
    Filed August 18, 2019 [ECF1]............................................................12

        Att. 1:   Civil Cover Sheet [ECF1-1]..............................................27

        Ex. A:   EEOC Dismissal and Notice of Rights
                (May 22, 2019) [ECF1-2] ...............................................29

        Ex. B:   Town of Abingdon, Virginia: Minutes of
                Special Called Council Meeting on September 7, 2006
                [ECF1-3]............................................................33

        Ex. C:   Letter from Strelka Law Office, PC to PennStuart dated
                January 10, 2018 Re: Accommodation Requests [ECF1-4]..........35

Town of Abingdon, Virginia's Motion to Dismiss
    Filed November 1, 2019 [ECF3] ..........................................................39

Brief of Defendant Town of Abingdon, Virginia in
Support of its Motion to Dismiss
    Filed November 1, 2019 [ECF4] ..........................................................41

Transcript of Motion Hearing
Before the Honorable James P. Jones
    On December 30, 2019 [ECF122] ........................................................64

Notice of Electronic Filing
 (ORAL MOTION to Amend [1] Complaint by Gregory Warren Kelly)
    Filed December 30, 2019 [ECF13]......................................................127

Opinion and Order
    Entered February 3, 2020 [ECF14] ....................................................129

Motion for Leave to File Amended Complaint
Filed February 17, 2020 [ECF15]......................................................151

    Ex. A:    Amended Complaint with Exhibits [ECF15-1] ..........................155

            Ex. A:    EEOC Dismissal and Notice of Rights
                    (May 22, 2019) [ECF15-2]...........................................194

            Ex. B:    Town of Abingdon, Virginia - Minutes
                    of Special Called Council Meeting on
                    September 7, 2006 [ECF15-3]......................................198

            Ex. C:    Letter from Strelka Law Office, PC to
                    PennStuart dated January 10, 2018
                    Re: Accommodation Requests [ECF15-4]..................200

Brief of Defendant in Opposition to Plaintiff's
Motion for Leave to File Amended Complaint
Filed March 2, 2020 [ECF16]............................................................204

Opinion and Order
Entered May 20, 2020 [ECF20].........................................................216

First Amended Complaint with Exhibits
Filed May 20, 2020 [ECF21]..............................................................235

    Ex. A:    EEOC Dismissal and Notice of Rights
             (May 22, 2019) [ECF21-1] ..........................................274

    Ex. B:    Town of Abingdon, Virginia: Minutes of
             Special Called Council Meeting on September 7, 2006
             [ECF21-2]....................................................................278

    Ex. C:    Letter from Strelka Law Office, PC to PennStuart dated
             January 10, 2018 Re: Accommodation Requests [ECF21-3]......280

Judgment in a Civil Case
Entered October 7, 2021 [ECF117] ...................................................284

Notice of Appeal
    Filed November 4, 2021 [ECF118] ..................................................285

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,EXH

**U.S. District Court**
**Western District of Virginia (Abingdon)**
**CIVIL DOCKET FOR CASE #: 1:19-cv-00032-JPJ-PMS**

Kelly v. Town of Abingdon, Virginia
Assigned to: Judge James P. Jones
Referred to: Magistrate Judge Pamela Meade Sargent
Case in other court: Fourth Circuit Court of Appeals, 21-02261
Cause: 42:12101 Americans With Disabilities Act of 1990
(ADA)

Date Filed: 08/19/2019
Date Terminated: 10/07/2021
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights:
Americans with Disabilities - Employment
Jurisdiction: Federal Question

**Plaintiff**

**Gregory Warren Kelly**                represented by     **Linda Leigh Strelka**
                                                           Strelka Law Office
                                                           Warehouse Row
                                                           119 Norfolk Avenue, SW, Suite 330
                                                           Roanoke, VA 24011
                                                           540-283-0802
                                                           Email: leigh@strelkalaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Monica Lynn Mroz**
                                                           Strelka Law Office
                                                           Warehouse Row
                                                           119 Norfolk Avenue, SW, Suite 330
                                                           Roanoke, VA 24011
                                                           540-283-0802
                                                           Email: monica@strelkalaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Norvell Winston West , IV.**
                                                           Strelka Law Office
                                                           Warehouse Row
                                                           119 Norfolk Avenue, SW, Suite 330
                                                           Roanoke, VA 24011
                                                           540-283-0802
                                                           Email: winston@strelkalaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Thomas Eugene Strelka**
                                                           Strelka Employment Law

**1**

Warehouse Row
119 Norfolk Avenue, SW, Suite 330
Roanoke, VA 24011
540-283-0802
Email: thomas@strelkalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Town of Abingdon, Virginia**                    represented by    **Cameron Scott Bell**
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, VA 24212-2288
276-628-5151
Fax: 276-628-1730
Email: cbell@pennstuart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ramesh Murthy**
Penn Stuart & Eskridge
P.O. Box 2288
Abingdon, VA 24212-2288
276-628-5151
Fax: 276-628-5621
Email: rmurthy@pennstuart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/18/2019 | 1 | COMPLAINT against Town of Abingdon, Virginia (Filing & Administrative fee $ 400; Receipt #: 0423-3207917.), filed by Gregory Warren Kelly. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(flc) (Entered: 08/19/2019) |
| 09/09/2019 | 2 | WAIVER OF SERVICE Returned Executed by Town of Abingdon, Virginia. Town of Abingdon, Virginia waiver sent on 9/4/2019, answer due 11/4/2019.(Bell, Cameron) |
| 11/01/2019 | 3 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Town of Abingdon, Virginia. (Bell, Cameron) |
| 11/01/2019 | 4 | Brief / Memorandum in Support re 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Town of Abingdon, Virginia. (Bell, Cameron) |
| 11/08/2019 | 5 | MOTION for Extension of Time to File Response/Reply as to 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Gregory Warren Kelly. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order) (West, Norvell) |

**2**

| 11/08/2019 | 6 | ORDER granting 5 Motion for Extension of Time to File Response/Reply. Response to defendant's motion to dismiss due by 12/6/2019. Signed by Magistrate Judge Pamela Meade Sargent on 11/8/2019. (Bordwine, Robin) |
|---|---|---|
| 11/12/2019 | 7 | NOTICE of Appearance by Ramesh Murthy on behalf of Town of Abingdon, Virginia (Murthy, Ramesh) |
| 11/15/2019 | 8 | Magistrate Consent Notice to Parties. (flc) |
| 12/06/2019 | 9 | Brief / Memorandum in Opposition re 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Gregory Warren Kelly. (West, Norvell) |
| 12/13/2019 | 10 | REPLY to Response to Motion re 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . filed by Town of Abingdon, Virginia. (Bell, Cameron) |
| 12/16/2019 | 11 | NOTICE of Hearing on Motion 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : **(CR)** (No Interpreter requested) : Motion Hearing set for 12/30/2019 at 1:30 p.m. in Abingdon before Judge James P. Jones. (flc) |
| 12/30/2019 | 12 | Minute Entry for proceedings held before Judge James P. Jones: Motion Hearing held on 12/30/2019 re 3 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Town of Abingdon, Virginia. (Court Reporter: Donna Prather, OCR) (lml) |
| 12/30/2019 | 13 | ORAL MOTION to Amend 1 Complaint by Gregory Warren Kelly. (lml) |
| 02/03/2020 | 14 | OPINION and ORDER granting in part and denying in part 3 Motion to Dismiss for Failure to State a Claim; the motion is granted as to Counts I, II, III and IV, and it is denied as to Count V; any request to amend the complaint must be filed within 14 days. Signed by Judge James P. Jones on 2/3/20. (flc) |
| 02/17/2020 | 15 | MOTION to Amend/Correct 1 Complaint by Gregory Warren Kelly. (Attachments: # 1 Exhibit A: Amended Complaint, # 2 Exhibit A to Amended Complaint, # 3 Exhibit B to Amended Complaint, # 4 Exhibit C to Amended Complaint)(Strelka, Thomas) Modified on 2/18/2020 to remove referral text from docket entry (flc). |
| 03/02/2020 | 16 | Brief / Memorandum in Opposition re 15 MOTION to Amend/Correct 1 Complaint . filed by Town of Abingdon, Virginia. (Bell, Cameron) |
| 03/06/2020 | 17 | MOTION for Extension of Time to File Response/Reply as to 16 Brief / Memorandum in Opposition by Gregory Warren Kelly. Motions referred to Judge Pamela Meade Sargent. (Strelka, Thomas) |
| 03/09/2020 | 18 | ORDER granting 17 Motion for Extension of Time to File Response/Reply Responses due by 3/16/2020 Signed by Magistrate Judge Pamela Meade Sargent on 3/9/20. (ejs) |
| 03/16/2020 | 19 | Reply re 16 Brief / Memorandum in Opposition . filed by Gregory Warren Kelly. (Strelka, Thomas) |
| 05/20/2020 | 20 | OPINION and ORDER granting in part and denying in part 15 Motion to File Amended Complaint; motion is denied as to Counts I (ADA Discrimination) and IV (ADA Interference); granted as to Counts II (ADA Retaliation) and III (ADA Accommodation); the case will proceed hereafter only as to Counts II (ADA Retaliation), III (ADA Accommodation), and V (Breach of Contract); clerk shall file the First Amended Complaint; defendant shall respond in accord with the Federal Rules of Civil Procedure Signed by Judge James P. Jones on 5/20/20. (flc) |

**3**

| 05/20/2020 | 21 | FIRST AMENDED COMPLAINT against Town of Abingdon, Virginia, filed by Gregory Warren Kelly. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(flc) |
|---|---|---|
| 06/03/2020 | 22 | ANSWER to 21 Amended Complaint by Town of Abingdon, Virginia.(Bell, Cameron) |
| 06/03/2020 | 23 | ORDER finding as moot 13 Motion to Amend/Correct Signed by Judge James P. Jones on 6/3/2020. (JPJ) |
| 06/05/2020 | 24 | NOTICE of Hearing: **(CR)** (No Interpreter requested) Scheduling Conference via conference call set for 6/11/2020 09:30 AM in Abingdon before Judge James P. Jones. (lml) |
| 06/08/2020 | 25 | NOTICE of Appearance by Monica Lynn Mroz on behalf of Gregory Warren Kelly (Mroz, Monica) |
| 06/11/2020 | 26 | Minute Entry for proceedings held before Judge James P. Jones: Scheduling Conference via Conference Call held on 6/11/2020. Jury Trial set for 10/5/21 thru 10/7/21 at 9:00 a.m. in Abingdon, VA; Oral Argument on Dispositive Motions set for 8/2/21 at 10:30 a.m.; Final Pre-Trial Conference set for 9/21/21 at 10:30 a.m.; a proposed order will be circulated to counsel in regards to all other deadlines. (Court Reporter: Donna Prather, OCR) (flc) |
| 06/11/2020 | 27 | NOTICE of Hearing: **(CR)** If this is a video conference click here for guidance re: participation via Zoom: Jury Trial set for 10/5/2021 thru 10/7/2021 at 9:00 a.m. in Abingdon before Judge James P. Jones. **Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.** Oral Argument Hearing on Dispositive Motions set for 8/2/2021 at 10:30 a.m. in Abingdon before Judge James P. Jones. Final Pretrial Conference set for 9/21/2021 at 10:30 a.m. in Abingdon before Judge James P. Jones. (flc) |
| 06/15/2020 | 28 | SCHEDULING ORDER: Oral Argument on Dispositive Motions set for 8/2/2021 at 10:30 a.m.; Final Pretrial Conference set for 9/21/2021 at 10:30 a.m. in Abingdon before Judge James P. Jones. Jury Trial set for 10/5/2021 thru 10/8/2021 at 9:00 a.m. in Abingdon before Judge James P. Jones. **Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.**. Signed by Judge James P. Jones on 6/15/20. (flc) |
| 07/14/2020 | 29 | Rule 26(f) Agreed Written Plan by Plaintiff Gregory Warren Kelly (Mroz, Monica) |
| 09/21/2020 | | **IMPORTANT NOTICE:** The United States District Court for the Western District of Virginia (WDVA) will be going live on the Next Generation of CM/ECF (NextGen CM/ECF) Tuesday, October 13, 2020. Preparing for NextGen CM/ECF is a two-step process. Step One is that each attorney must upgrade their individual PACER account, no shared accounts within firms will be allowed. Check and see if your PACER account is an "Upgraded" PACER account. Many PACER accounts have already been upgraded. If any of the following is true, you have an upgraded PACER account and no action is required until after the VAWD NextGen CM/ECF upgrade on **October 13, 2020:** 1) You have an upgraded PACER account for another NextGen Court or 2) Your PACER account was created after August 10, 2014. If none of these are true, you must upgrade your legacy PACER account before you will be able to link your PACER account to your VAWD CM/ECF account for your new NextGen CM/ECF account. Click here to learn how to upgrade your PACER Account. If you still have questions regarding your PACER account, please contact the PACER Service Center 800-676-6856. Complete information regarding the WDVA NextGen CM/ECF |

| | | |
|---|---|---|
| | | implementation can be found at NextGen Information. (mzc) (ADI) |
| 09/29/2020 | | **IMPORTANT NOTICE:** The Western District of Virginia will be going live on NextGen CM/ECF Tuesday, October 13, 2020. This is a Two-Step process. In Step one each attorney was to make sure they had an upgraded individual PACER account. Now in preparation for Step Two please make sure you know your VAWD CM/ECF username and password. Please manually log in to the VAWD CM/ECF system at https://ecf.vawd.uscourts.gov/cgi-bin/login.pl to make sure you know your current VAWD CM/ECF username and password. (do not rely on the auto-populating in your browser, because you will have to manually enter your CM/ECF username and password during the linking process *after* we go live on NextGen.) If you do not know your username or password please email ecf@vawd.uscourts.gov and include your bar# and contact phone#. (ADI) (mzc) |
| 10/05/2020 | | **IMPORTANT NOTICE:** The Western District of Virginia will be going live on NextGen CM/ECF **Tuesday, October 13, 2020.** The VAWD CM/ECF system will be unavailable from 8:00 am, October 10, 2020, through 8:00 am on Tuesday October 13, 2020. Preparing for NextGen CM/ECF is a two-step process. Step one was to upgrade your PACER account. Each attorney should have their own individual Upgraded PACER account at this time. Step two will be to link your upgraded PACER account to your VAWD CM/ECF account **after** the Court goes live on NextGen CM/ECF October 13, 2020. Instructions for linking you r account can be found by clicking here. Remember you cannot link your accounts until on or after the court goes live on NextGe n October 13, 2020. If you have any additional questions please call the VAWD Clerks Office at 540-857-5100 or email ecf@vawd.uscourts.gov. (ADI) (mzc) |
| 01/20/2021 | 30 | NOTICE to Take Deposition of Gregory Warren Kelly by Town of Abingdon, Virginia.(Bell, Cameron) |
| 01/28/2021 | 31 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on William Greene on 01-19-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 32 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Bob Howard on 01-18-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 33 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Cathy Lowe on 01-15-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 34 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Cathy Lowe, RA for Va Highland Small Business Incubator on 01-15-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 35 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Cindy Patterson on 01-18-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 36 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Rick Humphreys on 01-15-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 37 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Wayne Craig on 01-15-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 01/28/2021 | 38 | AFFIDAVIT of Service for Subpoena *UNABLE TO SERVE* served on Nan Harman, RA for Friends of Abingdon on Unable to Serve as Business is No Longer at Address, filed by Gregory Warren Kelly.(Mroz, Monica) |

| 01/28/2021 | 39 | AFFIDAVIT of Service for Subpoena *to Produce Documents* served on Ed Morgan on 01-18-2021, filed by Gregory Warren Kelly.(Mroz, Monica) |
| 02/01/2021 | 40 | MOTION to Quash *and for protective order concerning third-party subpoenas* by Gregory Warren Kelly. (Mroz, Monica) |
| 02/01/2021 | 41 | Brief / Memorandum in Support re 40 MOTION to Quash *and for protective order concerning third-party subpoenas* . filed by Gregory Warren Kelly. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Mroz, Monica) |
| 02/01/2021 | 42 | Order to Respond re 40 MOTION to Quash *and for protective order concerning third-party subpoenas* Defendant's Response due by 2/11/2021. Plaintiff's reply due seven days from filing of defendant's response. If ether side is requesting to be heard on the motion, counsel shall contact the Clerk's Office within 10 days of the date of entry of this Order to schedule the matter for hearing. Signed by Magistrate Judge Pamela Meade Sargent on 2/1/21. (PMS) |
| 02/02/2021 | 44 | NOTICE to Take Deposition of Gregory Kelly by Town of Abingdon, Virginia.(Bell, Cameron) |
| 02/09/2021 | 45 | RETURN of service of Subpoena to Produce Documents on 01/28/2021 upon Abingdon Primary Care(Bell, Cameron) |
| 02/09/2021 | 46 | RETURN of service of Subpoena to Produce Documents on 01/28/2021 upon McGill Associates, PA(Bell, Cameron) |
| 02/09/2021 | 47 | RESPONSE in Opposition re 40 MOTION to Quash *and for protective order concerning third-party subpoenas* . filed by Town of Abingdon, Virginia. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Bell, Cameron) |
| 02/10/2021 | 48 | NOTICE of Hearing (CONFERENCE CALL) on Motion 40 MOTION to Quash *and for protective order concerning third-party subpoenas* : **(N)** (No Interpreter requested) Motion Hearing set for 2/22/2021 03:00 PM in Abingdon before Magistrate Judge Pamela Meade Sargent. (ejs) |
| 02/10/2021 | 49 | RETURN of service of Subpoena to Produce Documents on 01/29/2021 upon Virginia Tech(Bell, Cameron) |
| 02/16/2021 | 50 | REPLY to Response to Motion re 40 MOTION to Quash *and for protective order concerning third-party subpoenas* . filed by Gregory Warren Kelly. (Mroz, Monica) |
| 02/22/2021 | 51 | Minute Entry for proceedings held before Magistrate Judge Pamela Meade Sargent: Motion Hearing held by telephone conference call with Counsel Mroz and Bell on 2/22/2021 re 40 MOTION to Quash *and for protective order concerning third-party subpoenas* filed by Gregory Warren Kelly. Order forthcoming. (PMS) |
| 02/22/2021 | 52 | ORDER granting in part and denying in part 40 Motion to Quash Signed by Magistrate Judge Pamela Meade Sargent on 2/22/21. (ejs) |
| 03/02/2021 | 53 | MOTION for Extension of Time to File *submit expert witness disclosures* by Gregory Warren Kelly. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order granting motion)(Mroz, Monica) |

| 03/03/2021 | 54 | ORDER granting 53 Motion for Extension of Time to File Document Signed by Magistrate Judge Pamela Meade Sargent on 3/3/21. (ejs) |
|---|---|---|
| 03/15/2021 | 55 | NOTICE to Take Deposition of David Ellis by Town of Abingdon, Virginia.(Bell, Cameron) |
| 03/18/2021 | 56 | MOTION for Extension of Time to File *Defendant's Unopposed Motion For Extension of Time* by Town of Abingdon, Virginia. Motions referred to Judge Pamela Meade Sargent. (Bell, Cameron) |
| 03/18/2021 | 57 | ORDER granting 56 Motion for Extension of Time to File Document Signed by Magistrate Judge Pamela Meade Sargent on 3/18/21. (ejs) |
| 04/15/2021 | 58 | NOTICE to Take Deposition of Stacey Reichler by Town of Abingdon, Virginia.(Bell, Cameron) |
| 04/20/2021 | 59 | NOTICE to Take Deposition of Stacey Reichler by Town of Abingdon, Virginia.(Bell, Cameron) |
| 04/21/2021 | 60 | NOTICE to Take Deposition of Cecile Rosenbaum by Town of Abingdon, Virginia. (Bell, Cameron) |
| 05/07/2021 | 61 | MINUTE ORDER OF RECUSAL. Magistrate Judge Pamela Meade Sargent recused. Entered by Magistrate Judge Pamela Meade Sargent on 5/7/21. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ejs) Modified on 6/28/2021 - VACATED BY ORDER ENTERED 6/28/21 (ejs). |
| 06/04/2021 | 62 | MOTION for Summary Judgment *Defendant's Motion for Summary Judgment* by Town of Abingdon, Virginia. (Bell, Cameron) |
| 06/04/2021 | 63 | Brief / Memorandum in Support re 62 MOTION for Summary Judgment *Defendant's Motion for Summary Judgment Memorandum of Defendant Town of Abingdon, Virginia in Support of Its Motion for Summary Judgment*. filed by Town of Abingdon, Virginia. (Attachments: # 1 Exhibit 1 - Deposition Transcript of Gregory Kelly and select Exhibits, # 2 Exhibit 2 - Excerpt from Deposition Transcript of Kimberly Kingsley)(Bell, Cameron) |
| 06/07/2021 | 64 | MOTION to Exclude *Expert Witness* by Gregory Warren Kelly. (Mroz, Monica) |
| 06/07/2021 | 65 | Brief / Memorandum in Support re 64 MOTION to Exclude *Expert Witness* . filed by Gregory Warren Kelly. (Attachments: # 1 Exhibit A)(Mroz, Monica) |
| 06/07/2021 | 66 | MOTION for Extension of Time to File Response/Reply *to Motion for Summary Judgment (UNOPPOSED)* by Gregory Warren Kelly. (Attachments: # 1 Text of Proposed Order granting motion)(Mroz, Monica) |
| 06/08/2021 | 67 | Letter to the Court in re: copy of Memorandum in Support of Motion for Summary Judgment by Town of Abingdon, Virginia (flc) |
| 06/08/2021 | 68 | ORDER granting 66 Motion for Extension of Time to File Response to Motion for Summary Judgment. Plt's Responses due by 6/29/2021. Signed by Judge James P. Jones on 6/8/2021. (flc) |
| 06/21/2021 | 69 | Response re 64 MOTION to Exclude *Expert Witness Defendant's Response in Opposition to Plaintiff's Motion to Exclude Defendant's Expert Witness* . filed by Town of Abingdon, Virginia. (Attachments: # 1 Exhibit 1 - Robert Jackson's Curriculum Vitae, # 2 Exhibit 2 - Robert Jackson's Report, # 3 Exhibit 3 - Excerpt from Robert |

| | | |
|---|---|---|
| | | Jackson's Deposition Transcript)(Bell, Cameron) |
| 06/28/2021 | 71 | MINUTE Order to Vacate 61 Order of Recusal. Entered by Magistrate Judge Pamela Meade Sargent on 6/28/21. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(ejs) |
| 06/29/2021 | 72 | Brief / Memorandum in Opposition re 62 MOTION for Summary Judgment *Defendant's Motion for Summary Judgment* . filed by Gregory Warren Kelly. (Attachments: # 1 Exhibit 01, # 2 Exhibit 02, # 3 Exhibit 03, # 4 Exhibit 04, # 5 Exhibit 05, # 6 Exhibit 06, # 7 Exhibit 07, # 8 Exhibit 08, # 9 Exhibit 09, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23)(Mroz, Monica) Modified on 7/6/2021 to seal exhibits 1, 4, 5, 6, 7, 8, 9, 10 & 11 pursuant to 76 Order(ar). |
| 06/30/2021 | 73 | Notice Rescheduling Hearing **(CR)** (No Interpreter requested) previously set for 8/2/2021 at 10:30 AM before Judge James P. Jones in Abingdon Oral Argument Hearing on Dispositive Motions reset for 7/30/2021 01:30 PM in Abingdon before Judge James P. Jones. (lml) |
| 07/02/2021 | 74 | MOTION to Seal *(unopposed)* by Gregory Warren Kelly. Motions referred to Judge Pamela Meade Sargent. (Attachments: # 1 Text of Proposed Order granting motion) (Mroz, Monica) |
| 07/06/2021 | 75 | Additional Evidence re 72 Brief / Memorandum in Opposition,, by Gregory Warren Kelly *(refiled exhibits)* (Attachments: # 1 Exhibit 01, # 2 Exhibit 04, # 3 Exhibit 05, # 4 Exhibit 06, # 5 Exhibit 07, # 6 Exhibit 08, # 7 Exhibit 09, # 8 Exhibit 10, # 9 Exhibit 11)(Mroz, Monica) |
| 07/06/2021 | 76 | ORDER granting 74 Motion to Seal. Signed by Magistrate Judge Pamela Meade Sargent on 07/06/2021. (ar) |
| 07/08/2021 | 77 | Notice of Cancellation of Oral Argument Hearing on Dispositive Motions set for 7/30/2021 01:30 PM in Abingdon before Judge James P. Jones **(No Interpreter requested)** (Cancel Court Reporter) (lml) |
| 07/08/2021 | 78 | NOTICE of Hearing on Motion 62 MOTION for Summary Judgment *Defendant's Motion for Summary Judgment*, 64 MOTION to Exclude *Expert Witness* : **(CR)** (No Interpreter requested) Motion Hearing set for 7/29/2021 10:30 AM in Abingdon before Judge James P. Jones. (lml) |
| 07/13/2021 | 79 | Reply re 62 MOTION for Summary Judgment *Defendant's Motion for Summary Judgment Reply of Defendant Town of Abingdon, Virginia in Support of Its Motion for Summary Judgment*. filed by Town of Abingdon, Virginia. (Attachments: # 1 Exhibit 1 - Excertps from Stacey Reichler's Deposition Transcript, # 2 Exhibit 2 - Excerpts from Cecile Rosenbaum Deposition Transcript, # 3 Exhibit 3 - Excerpts from Robert M. Howard's Deposition Transcript, # 4 Exhibit 4 - Letter Dated April 27, 2021, # 5 Exhibit 5 - Excerpt from Deborah Coffey Icenhour's Deposition Transcript, # 6 Exhibit 6 - Excerpts from Merritt Floyd Bailey's Deposition Transcript, # 7 Exhibit 7 - Excerpts from Kimberly Kingsley's Deposition Transcript, # 8 Exhibit 8 - Letter Dated September 27, 2017)(Bell, Cameron) |
| 07/19/2021 | 80 | Cover Letter Re: Reply in Support of Motion for Summary Judgment by Town of Abingdon, Virginia (ejs) |

**8**

| 07/29/2021 | 81 | Minute Entry for proceedings held before Judge James P. Jones: Motion Hearing held on 7/29/2021 re 62 MOTION for Summary Judgment *Defendant's Motion for Summary Judgment* filed by Town of Abingdon, Virginia, 64 MOTION to Exclude *Expert Witness* filed by Gregory Warren Kelly. (Court Reporter: Donna Prather, OCR) (lml) |
| --- | --- | --- |
| 09/07/2021 | 82 | OPINION and ORDER granting in part and denying in part 62 Motion for Summary Judgment; the motion is Granted as to Counts II and III; the motion is Denied as to Count V, which will proceed to jury trial; Denying as moot 64 Motion to Exclude. Signed by Senior District Judge James P. Jones on 9/7/2021. (flc) (Main Document 82 replaced on 9/8/2021) (flc) |
| 09/10/2021 | 83 | MOTION for Extension of Time to File *Joint Motion for Extension of Time* by Town of Abingdon, Virginia. Motions referred to Judge Pamela Meade Sargent. (Bell, Cameron) |
| 09/13/2021 | 84 | ORDER granting 83 Motion for Extension of Time to File Motions in Limine; Parties shall have up to and including 9/17/21, in which to submit motions in limine. Signed by Senior Judge James P. Jones on 9/13/2021. (flc) |
| 09/17/2021 | 85 | MOTION in Limine by Town of Abingdon, Virginia. (Bell, Cameron) |
| 09/17/2021 | 86 | Supplemental MOTION for Summary Judgment *and Second Motion In Limine* by Town of Abingdon, Virginia. (Bell, Cameron) |
| 09/17/2021 | 87 | Brief / Memorandum in Support re 86 Supplemental MOTION for Summary Judgment *and Second Motion In Limine* . filed by Town of Abingdon, Virginia. (Bell, Cameron) |
| 09/17/2021 | 88 | First MOTION in Limine by Gregory Warren Kelly. (Mroz, Monica) |
| 09/19/2021 | 89 | MOTION to Strike *Defendant's Supplemental Motion for Summary Judgment (including supporting argument)* by Gregory Warren Kelly. (Mroz, Monica) Modified on 9/20/2021 to remove referral text from docket entry(flc). |
| 09/20/2021 | 90 | Brief / Memorandum in Opposition re 85 MOTION in Limine . filed by Gregory Warren Kelly. (Mroz, Monica) |
| 09/21/2021 | 91 | Minute Entry for proceedings held before Senior Judge James P. Jones: Motion Hearing held on 9/21/2021 re 89 MOTION to Strike *Defendant's Supplemental Motion for Summary Judgment (including supporting argument)* filed by Gregory Warren Kelly, 86 Supplemental MOTION for Summary Judgment *and Second Motion In Limine* filed by Town of Abingdon, Virginia, 85 MOTION in Limine filed by Town of Abingdon, Virginia, 88 First MOTION in Limine filed by Gregory Warren Kelly; Pretrial Conference held on 9/21/2021. (Court Reporter: Donna Prather, OCR) (flc) |
| 09/21/2021 | 92 | Rule 26(a)(3) Pretrial Disclosures by Defendant Town of Abingdon, Virginia.(Bell, Cameron) |
| 09/21/2021 | 93 | Rule 26(a)(3) Pretrial Disclosures by Plaintiff Gregory Warren Kelly.(Strelka, Thomas) |
| 09/22/2021 | 94 | ORDER as to COVID Precautions. Signed by Senior Judge James P. Jones on 9/22/2021. (flc) |

| 09/22/2021 | 95 | OPINION and ORDER granting in part and denying in part 85 Motion in Limine; granting in part and denying in part 86 Motion for Summary Judgment; granting in part and denying in part 88 Motion in Limine; denying as moot 89 Motion to Strike. Signed by Senior Judge James P. Jones on 9/22/2021. (flc) |
| --- | --- | --- |
| 09/22/2021 | 96 | ORDER Fixing Trial Procedures. Signed by Senior Judge James P. Jones on 9/22/21. (flc) |
| 09/24/2021 | 97 | Rule 26(a)(3) Pretrial Disclosures by Plaintiff Gregory Warren Kelly (Mroz, Monica) |
| 09/27/2021 | 98 | Second MOTION in Limine by Gregory Warren Kelly. (Mroz, Monica) |
| 09/28/2021 | 99 | NOTICE of Hearing on Motion 98 Second MOTION in Limine : **(CR)** (No Interpreter requested) Motion Hearing set via conference call for 9/28/2021 03:30 PM in Abingdon before Senior Judge James P. Jones. (lml) |
| 09/28/2021 | 100 | Objections by Plaintiff Gregory Warren Kelly re 92 Rule 26(a)(3)Pretrial Disclosures (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mroz, Monica) |
| 09/28/2021 | 101 | Proposed Jury Instructions by Gregory Warren Kelly.(Mroz, Monica) |
| 09/28/2021 | 102 | Minute Entry for proceedings held before Senior Judge James P. Jones: Motion Hearing held on 9/28/2021 re 98 Second MOTION in Limine filed by Gregory Warren Kelly. (Court Reporter: Donna Prather, OCR) (flc) |
| 09/28/2021 | 103 | ORAL ORDER granting 98 Second Motion in Limine as noted on the record at the hearing. Entered by Senior Judge James P. Jones on 9/28/2021. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(flc) |
| 09/28/2021 | 104 | Objections by Defendant Town of Abingdon, Virginia re 93 Rule 26(a)(3)Pretrial Disclosures, 97 Rule 26(a)(3)Pretrial Disclosures (Bell, Cameron) |
| 09/28/2021 | 105 | Proposed Jury Instructions by Town of Abingdon, Virginia.(Bell, Cameron) |
| 10/01/2021 | 106 | Proposed Jury Instructions by Gregory Warren Kelly.(Mroz, Monica) |
| 10/05/2021 | 107 | Minute Entry for proceedings held before Senior Judge James P. Jones: Jury Trial - Day 1 held on 10/5/2021. (Court Reporter: Donna Prather, OCR) (lml) |
| 10/05/2021 | 108 | Exhibit List - Jury List - Day 1.(lml) (Entered: 10/06/2021) |
| 10/05/2021 | 109 | Jury List.(lml) (Entered: 10/06/2021) |
| 10/06/2021 | 110 | Minute Entry for proceedings held before Senior Judge James P. Jones: Jury Trial - Day 2 held on 10/6/2021. (Court Reporter: Donna Prather, OCR) (lml) |
| 10/06/2021 | 111 | Exhibit List - Jury Trial - Day 2.(lml) (Main Document 111 replaced on 10/7/2021) (lml). |
| 10/07/2021 | 112 | Minute Entry for proceedings held before Senior Judge James P. Jones: Jury Trial - Day 3 held on 10/7/2021. (Court Reporter: Judy Webb, OCR) (flc) |
| 10/07/2021 | 113 | Exhibit List - Jury Trial Day 3. (Attachments: # 1 Defense Exhibit 110a)(flc) |
| 10/07/2021 | 114 | Refused Jury Instruction.(flc) |
| 10/07/2021 | 115 | Final Jury Instructions.(flc) |
| 10/07/2021 | 116 | Jury Verdict in favor of the Town of Abingdon, Virginia.(flc) |

| | | |
|---|---|---|
| 10/07/2021 | [117](#) | JUDGMENT is granted to the defendant Town of Abingdon, Virginia. Signed by Senior Judge James P. Jones on 10/7/21. (flc) |
| 11/04/2021 | [118](#) | NOTICE OF APPEAL as to [20](#) Order on Motion to Amend/Correct,, [14](#) Order on Motion to Dismiss for Failure to State a Claim, by Gregory Warren Kelly. Filing fee $ 505, receipt number AVAWDC-3824830. (Strelka, Thomas) |
| 11/08/2021 | [119](#) | Transmittal of Notice of Appeal to 4CCA re [118](#) Notice of Appeal<br>NOTE: The Docketing Statement and Transcript Order Form are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24 form(s) are applicable, you must submit a separate Auth-24 for each court reporter from whom you wish to order a transcript through the District Court's eVoucher system. (flc) |
| 11/09/2021 | [120](#) | USCA Notice of Appellate Case Opening re [118](#) Notice of Appeal filed by Gregory Warren Kelly. USCA Case Number 21-2261. Case Manager: Rachel J. Lee. (flc) |
| 12/03/2021 | [121](#) | USCA Appeal Transcript Order Acknowledgment for [12](#) Motion Hearing held on 12/30/2019 before Judge James P. Jones, re [118](#) Notice of Appeal. Court Reporter: Donna Prather. **Appeal Transcript due by 2/8/2022.** (ca) |
| 01/03/2022 | [122](#) | APPEAL TRANSCRIPT of Proceedings: Motion Hearing held on **12-30-19** before Judge James P. Jones. Court Reporter Donna Prather, Telephone number 276-628-5116,,8119 donnap@vawd.uscourts.gov. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov Transcript may be viewed at the court public terminal or purchased through Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 1/24/2022. Redacted Transcript Deadline set for 2/3/2022. Release of Transcript Restriction set for 4/4/2022. (dp)** Appeal added to docket text. 4CCA notified. NEF regenerated. Modified on 1/4/2022 (sad). |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/27/2022 13:01:42 | | |
| **PACER Login:** | lantagne92 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00032-JPJ-PMS |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **GREGORY WARREN KELLY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **TOWN OF ABINGDON, VIRGINIA,** ) | **Case No:** |
| ) | |
| **Serve:** ) | |
| **Hon. Wayne Craig,** ) | |
| **Mayor,** ) | |
| **Town of Abingdon** ) | |
| **133 West Main Street** ) | |
| **Abingdon, VA 24210** ) | |
| ) | **JURY TRIAL DEMAND** |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

COMES NOW, Plaintiff Gregory Warren Kelly (hereinafter, "Mr. Kelly" or "Plaintiff"), by counsel, and states as his Complaint against Defendant Town of Abingdon, Virginia (hereinafter, "Town" or "Defendant"), the following:

### I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter as it arises from the federal questions presented by the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"), and state law claims, to-wit, a breach of contract.

2.    Venue is appropriate as the Plaintiff and Defendant reside in Abingdon, Virginia.

3.     Due to its contacts within the Commonwealth of Virginia, and charter by the Virginia General Assembly, Defendant avails itself to the jurisdiction of this Court.

4.     As it relates to Plaintiff's ADA claims, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around July 27, 2018. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated May 22, 2019, attached hereto as **EXHIBIT A**. Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

5.     Mr. Kelly, a resident of Abingdon, Virginia, was hired by The Town in or around March of 2005, and worked on a consistent, full-time basis for The Town for nearly thirteen (13) years, until his unlawful constructive discharge on or about May 7, 2018.

6.     The Town is an incorporated and chartered town under the laws of the Commonwealth of Virginia.

## III. FACTUAL ALLEGATIONS

7.     In or around March 1, 2005, Mr. Kelly was hired by The Town as Town Attorney and later was appointed Town Manager.

8.     At the time of Mr. Kelly's appointment as Town Manager on September 7, 2006, Mr. Kelly and The Town entered into an employment contract. In relevant part, the contract provided that Mr. Kelly was due nine (9) months' severance, calculated based on Mr. Kelly's annual salary at the time he left employment. *See* Sept. 7, 2006 Town Council Meeting Minutes, attached as **EXHIBIT B**.

9.     During his employment with The Town, Mr. Kelly's work performance was excellent, and met or exceeded The Town's legitimate business expectations.

2

10.     At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

11.     In the alternative, The Town regarded Mr. Kelly as disabled.

12.     These conditions have been exacerbated due to the often unprofessional and occasionally outrageous actions of several of Mr. Kelly's supervisors, the Town Council of Abingdon and the Mayor of Abingdon.

13.     Due to political in-fighting among Council members, Mr. Kelly's disabilities have affected his daily life activities.  Mr. Kelly worked day-to-day in a severe and pervasive hostile working environment.

14.     Despite performing his job exceptionally well, he was continuously threatened with termination if he did not do as certain council members directed despite being bound by law and a strict code of local government ethics to implement only the policies enacted by the collective majority of the council.  These threats were a pretext, masking a discriminatory animus towards Mr. Kelly's disabilities.

15.     Mr. Kelly has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership and has been publicly ridiculed and defamed on several occasions.

16.     Mr. Kelly's health issues became threatening enough for his physician to inform him that he should request accommodations or remove himself from his working environment in order to protect himself from worsening and depleting health.

17.     Mr. Kelly continued to suffer from a discriminatory animus towards his disabilities and retaliation due to his disabilities and for filing Charges of Discrimination

3

on September 13, 2017, Charge No. 438-2017-01164 and December 27, 2018, Charge No. 438-2018-00415.

18.    On January 10, 2018, Mr. Kelly requested several reasonable accommodations for his disabilities.  *See* January 10, 2019 2018 letter, appended to this pleading as **EXHIBIT C**. Twelve possible accommodations were described in the letter as talking points in the interactive process. The Town refused to engage in the interactive process in any meaningful way in order to find accommodations for Mr. Kelly's disabilities.

19.    Mr. Kelly only received a token communication from The Town's legal counsel several months later, in or about April of 2018, stating that The Town would engage in the interactive process. When Mr. Kelly attempted to further communicate with the Town concerning the interactive process, he did not receive further reply from the Town or the Town's legal counsel.

20.    On or about May 7, 2018, due to the severe and pervasive hostile work environment targeting individuals with disabilities, Mr. Kelly had no alternative but to resign his employment. Mr. Kelly attempted to work in an untenable work environment. However, because of the abusive nature of that work environment, Mr. Kelly suffered a constructive discharge.

21.    Upon information and belief, no business-related legitimate reason justified the actions The Town took against Mr. Kelly, as Mr. Kelly's work performance was excellent and, until he requested federally protected disability accommodations to manages his disabilities, he never received any discipline from his employer.

22.    Accordingly, Mr. Kelly's constructive discharge was merely a pretext to unlawful discrimination and retaliation by The Town, as Mr. Kelly's constructive

4

discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or reasonable accommodations.

23.    Indeed, the short temporal proximity between the time Mr. Kelly requested accommodations related to his disability and his constructive discharge supports Mr. Kelly's claims for discrimination and retaliation.

24.    Mr. Kelly suffered a constructive discharge, in violation of the ADA, because The Town:

- discriminated and/or retaliated against Mr. Kelly for filing previous EEOC Charges;

- discriminated and/or retaliated against Mr. Kelly because of his disabilities and/or because of his requests for disability-related accommodations; and/or

- failed to properly accommodate Mr. Kelly's disabilities.

25.    The Town never paid Mr. Kelly the severance he was due under the September 2006 employment agreement.

26.    Because the actions taken by the Mayor, the Town Council, and other Town employees were taken within the scope of their employment and/or role as the statutory decision-makers for The Town, The Town is responsible for the actions of employees based upon the doctrine of *respondeat superior* and strictly liable for the actions of statutory decision-makers, such as the Mayor and Town Council.

5

# IV. CLAIMS

## COUNT I: CLAIM FOR DISCRIMINATION
## IN VIOLATION OF THE ADA

27.     Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

28.     At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

29.     At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

30.     In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

31.     At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function.

32.     Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

33.     Mr. Kelly revealed his disabilities to his supervisors at The Town, and requested the reasonable accommodations.

34.     The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations,

6

ultimately denying Mr. Kelly's accommodation requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

35.    The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

36.    Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

37.    Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

38.    As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

39.    At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

40.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

7

## COUNT II: CLAIM FOR RETALIATION
## IN VIOLATION OF THE ADA

41.     Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

42.     At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

43.     At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

44.     In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

45.     At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function.

46.     Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

47.     Mr. Kelly revealed his disabilities to his supervisors at The Town, and requested the reasonable accommodations.

48.     The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, ultimately denying Mr. Kelly's accommodation requests, threatening and/or harassing

8

him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

49. The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

50. Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

51. Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

52. Moreover, after his termination, The Town refused to provide Mr. Kelly his severance as referenced in the September 7, 2016 minutes.

53. The Town retaliated against Mr. Kelly regarding the denial of severance. The Town would not have denied his severance, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations

54. As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

55. At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

9

56.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

## COUNT III: CLAIM FOR FAILURE
## TO ACCOMMODATE IN VIOLATION OF THE ADA

57.    Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

58.    At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

59.    Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

60.    In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

61.    At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

62.    Mr. Kelly revealed his disabilities to his supervisors at The Town, and requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations.

10

63. Prior to his request for disability accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town, as he had not received negative performance reviews except in retaliation for revealing his disabilities and/or requesting reasonable accommodations.

64. The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

65. The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

66. Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

67. Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodation.

68. As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

69. At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

11

70.     The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute failure to accommodate in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## **COUNT IV: INTERFERENCE IN VIOLATION OF THE ADA**

71.     Plaintiff incorporates by reference herein the preceding paragraphs of his complaint.

72.     At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

73.     Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

74.     In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

75.     At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

76.     Mr. Kelly sought accommodations for his various disabilities. However, The Town's actions coerced Mr. Kelly to forgo accommodations to which he was otherwise entitled.

12

77.     Specifically, Mr. Kelly did not take short breaks, as a reasonable accommodation, as he feared that he would receive written discipline or be terminated for a pretextual reason.

78.     The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

79.     The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

80.     Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

81.     Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful interference based upon his disabilities and/or requests for accommodation.

82.     As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

83.     At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

84.     The Equal Employment Opportunity Commission has issued guidance, pursuant to its authority under 42 U.S.C. § 12203(b), finding that the interference

13

provision of the Americans with Disabilities Act is wider in scope than the anti-retaliation provision, and is, therefore, proven by a similar set of facts as the anti-retaliation provision. *See* Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004 (August 25, 2016), *available at* https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=#III._ADA.

85.     The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute interference with Mr. Kelly's ADA rights in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

## COUNT V: BREACH OF CONTRACT

86.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

87.     Plaintiff and Defendant entered into a legally binding employment contract on September 7, 2006.

88.     The employment contract had been offered by The Town and duly adopted by The Town's statutory decision-makers.

89.     Among several provisions of the employment contract, Mr. Kelly was due to receive nine (9) months' severance, based upon his current annual wage at the time he left The Town's employ.

90.     Mr. Kelly was not paid the severance he was due at the time of his constructive discharge from employment with The Town.

14

WHEREFORE, Plaintiff Gregory Warren Kelly prays for judgment against Defendant Town of Abingdon, Virginia and for equitable relief, compensatory, incidental, liquidated and/or punitive damages, together with prejudgment interest from the date of Mr. Kelly's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**GREGORY WARREN KELLY**

/s/ Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA 24011
Tel: 540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*

15

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GREFGORY WARREN KELLY

**DEFENDANTS**

Town of Abingdon, Virginia

**(b)** County of Residence of First Listed Plaintiff   Washington County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas E. Strelka, 119 Norfolk Ave., SW, Suite 330, Roanoke, VA 24011; 540-283-0802

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine / Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title 42 U.S.C. §§ 12101 et seq.,

Brief description of cause:
Violations of ADA; Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
TBD

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
08/18/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Thomas E. Strelka

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**  **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**  **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**  **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**  **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Gregory W. Kelly | From: | Richmond Local Office<br>400 North 8th Street<br>Suite 350<br>Richmond, VA 23219 |
|---|---|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 438-2018-01524 | Stephanie Hadden,<br>Investigator | (804) 771-2163 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Daron L. Calhoun,
Director

MAY 2 2 2019
*(Date Mailed)*

Enclosures(s)

cc:
| | |
|---|---|
| **Edward Craig**<br>**Mayor**<br>**TOWN OF ABINGDON**<br>**133 West Main Street**<br>**Abingdon, VA 24210** | **Thomas E. Strelka**<br>**STRELKA LAW OFFICE, PC**<br>**Warehouse Row**<br>**119 Norfolk Avenue, S.W., Suite 330**<br>**Roanoke, VA 24011** |

Case 1:19-cv-00032-JPJ-PMS   Document 1-2   Filed 08/18/19   Page 1 of 4   Pageid#: 18

**29**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS  --  Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS  --  Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
<u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION  --  Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Case 1:19-cv-00032-JPJ-PMS   Document 1-2   Filed 08/18/19   Page 2 of 4   Pageid#: 19

Enclosures(s)

cc:     **Ramesh Murthy**
        **PENN STUART**
        **PO Box 2288**
        **Abingdon, VA 24212**

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):** The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

- ➤ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
- ➤ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ➤ **Only one** major life activity need be substantially limited.
- ➤ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ➤ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ➤ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

- ➤ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
- ➤ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ➤ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
- ➤ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

2006- 77
**September 7, 2006**

TOWN OF ABINGDON, VIRGINIA
SPECIAL CALLED COUNCIL MEETING
THURSDAY, SEPTEMBER 7, 2006 – 8:30 P.M.
MUNICIPAL BUILDING

A special called meeting of the Abingdon Town Council was held on Thursday, September 7, 2006 at 8:30 P.M. in the upstairs conference room at the Municipal Building.

A.    ROLL CALL

| Members of Council present: | Mayor Lois H. Humphrey |
| | Mr. Robert M. Howard, Vice Mayor |
| | Dr. French H. Moore, Jr. |
| | Mr. Edward B. Morgan |
| | Mrs. Cathy Lowe |
| | |
| | Comprising a quorum of the Council |
| | |
| Administrative Staff: | Greg Kelly, Town Attorney |

B.    Closed Session Pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

The motion was duly made and seconded to go into closed session pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

| The roll call vote was: | Mr. Morgan – Aye | Mrs. Lowe – Aye | Dr. Moore – Aye |
| | Mr. Howard – Aye | Mayor Humphreys – Aye | |

The motion carried.

* * * * * * *

The motion was duly made and seconded to reconvene in regular session.

| The roll call vote was: | Mr. Morgan – Aye | Mrs. Lowe – Aye | Dr. Moore – Aye |
| | Mr. Howard – Aye | Mayor Humphreys – Aye | |

The motion carried.

The following certification was adopted:

Whereas, the Town Council of Abingdon, Virginia has convened in closed meeting on this date pursuant to an affirmative recorded vote and in accordance with the provisions of the Virginia Freedom of Information Act; and Whereas, Section 2.2-3712(D) of the Code of Virginia requires a certification by the Town Council that such closed meeting was conducted in conformity with Virginia law;

Now, therefore, be it resolved that the Town Council of Abingdon, Virginia hereby certifies that to the best of each member's knowledge (i) only public business matters lawfully exempted from open meeting requirement by Virginia law were discussed in closed meeting to which this certification resolution applies and (ii) only such public business matters as were identified in the motion convening the closed meeting were heard, discussed or considered by Council.

| The roll call vote was: | Mr. Morgan – I so certify | Mrs. Lowe – I so certify | Dr. Moore – I so certify |
| | Mr. Howard – I so certify | Mayor Humphreys – I so certify | |

**33**

**2006- 78**
**September 7, 2006**

The motion carried.

Mr. Morgan made the motion to appoint Greg Kelly to the position of Town Manager, effective November 1, 2006. Mr. Howard seconded the motion.

| The roll call vote was: | Mr. Morgan – Aye | Mrs. Lowe – Aye | Dr. Moore – Aye |
|---|---|---|---|
| | Mr. Howard – Aye | Mayor Humphreys – Aye | |

The agreed terms of the employment between Greg Kelly as Town Manager and the Town of Abingdon include the following

**I.     Compensation**

    a. $100,000.00 base salary with standard Town employee benefits.
       Salary to be reviewed at least yearly upon the adoption of each year's annual budget.
    b. $3,100.00 (or such amount representative of the annual cost of health insurance) to be paid into an ICMA, VRS or equivalent retirement plan as designated by the Town Manager on November 1, 2006 and each fiscal year thereafter.
    c. The guarantee to return to the position of Town Attorney should serving in the capacity of Town Manager not be successful.
    d. Nine (9) Months severance pay at the current amount of the Town Manager's salary and benefits at the time of departure if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available.

**II.     Education Expenses**

    a. The Town will pay all educational and incidental expenses in the pursuit of a Master's Degree in Public Administration or related field.
    b. The cost of all annual Continuing Legal Education and incidental expenses required by the Virginia State Bar to remain actively licensed to practice law in Virginia.
    c. All membership fees, conference costs and incidental expenses for LGA, IMLA, ICMA and VML.

With no further business the meeting was adjourned.

Lois H. Humphreys, Mayor

Linda F.  Wilson, Clerk

**34**





Thomas E. Strelka
thomas@strelkalaw.com
540.283.0775

L. Leigh R. Strelka
leigh@strelkalaw.com
540.283.0776

www.strelkalaw.com

January 10, 2018

**VIA UNITED STATES MAIL AND EMAIL**

Ramesh Murthy, Esq.
PennStuart
208 E. Main Street
Abingdon, Virginia 24210

      Re:    *Proceeding Forward Kelly, Rosenbaum, Icenhour / Town of Abingdon;*
             *Accommodations Requests*

Dear Mr. Murthy,

    In furtherance of our discussions and in accordance with the Americans with Disabilities Act, my clients hereby submit the following accommodations requests. These requests are made collectively herein for purposes of efficiency of implementation. Should these requests warrant further discussion for any reason, I am available to you at your convenience.

    **Accommodation Requests in Theme**

    The following are a number of requests regarding the daily office environment. The overall aim of these requests is to foster a well-running office, based on the principles of mutual respect, clear communication, and having well-defined roles within the organization. These are the three tenants in which these requests are rooted.

    Mutual respect is an easily accomplished goal, and Mr. Kelly, Ms. Icenhour, and Ms. Rosenbaum shall continue to faithfully serve the Town with professional attitudes, tones of voice and choice of words. Despite their best efforts, professional respect has not been mutually received at times during their employment with the Town. At times, they have felt harassed or that they work in a hostile environment. Sometimes, issues of professional respect can be fixed with knowledge of appropriate boundaries and utilizing effective communication systems.

    Clear communication is essential to the fundamental health and well-being of an efficient and productive office environment. The following requests outline options for establishing methods or practices of communication to ensure that all of the parties

540.283.0802    Warehouse Row, 119 Norfolk Avenue, S.W., Suite 330, Roanoke, VA 24011
Case 1:19-cv-00032-JPJ-PMS Document 1-4 Filed 08/18/19 Page 1 of 4 Pageid#: 24

**35**

equally understand one another. We have all experienced a bad result in a situation at one time or another that began as a small miscommunication or misunderstanding. These requests aim to reduce the incidents of miscommunication and misunderstanding between the parties.

Defining the roles of individuals within an office environment can lead to improvements in both communication and mutual respect. When an employee is armed with knowledge, typically in the form of clearly written policies or well-known practices, regarding how to deal with a variety of issues as they emerge, that employee is not only a better worker, but a better co-worker. Thus, the following requests seek to flesh out the roles, duties and responsibilities of the parties in order to facilitate a better overall office environment.

### The Requests

1.     The Town Charter is a fundamental document that outlines the Council/Manager form of governance. The Charter is the bedrock upon which the Town exists today. Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter. It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter. This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

2.     The Town Council adopted a Code of Ethics. This is a Request that the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

3.     This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management. If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

4.     This is a Request for members of Town Council to cease threatening the termination a Town employee's job on a weekly, sometimes daily basis. It is understood that in the course of management, certain situations do indeed warrant the threat of

2

termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

5.        This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

6.        This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

7.        For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management. Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

8.        This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

9.        This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

10.        This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

11.        This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

12.        This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

3

I look forward to hearing your thoughts on the above requests.

Sincerely,

Tommy Strelka

cc:    L. Leigh R. Strelka   (via electronic mail at *leigh@strelkalaw.com*)
        Gregory Kelly         (via electronic mail)
        Cecile Rosenbaum   (via electronic mail)
        Deborah Icenhour   (via electronic mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

GREGORY WARREN KELLY,            )
                                 )
            Plaintiff,           )
                                 )
                                 )
v.                               )        Case No. 1:19CV00032-JPJ-PMS
                                 )
                                 )
TOWN OF ABINGDON, VIRGINIA,      )
                                 )
            Defendant.           )

## TOWN OF ABINGDON, VIRGINIA'S
## MOTION TO DISMISS

Defendant Town of Abingdon, Virginia ("Town"), by counsel, moves to

dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the reasons

stated in the accompanying memorandum in support.

TOWN OF ABINGDON

By Counsel

Ramesh Murthy
 VSB No. 31801
Cameron S. Bell
 VSB No. 47685
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia  24212
Telephone:  276/628-5151
Facsimile:  276/628-5621
cbell@pennstuart.com
By */s/ Cameron S. Bell*
    Cameron S. Bell
    Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2019, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which will

send notification of such filing to counsel of record.

*/s/ Cameron S. Bell*
Cameron S. Bell

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

GREGORY WARREN KELLY,               )
                                    )
        Plaintiff,                  )
                                    )
                                    )
v.                                  )        Case No. 1:19CV00032-JPJ-PMS
                                    )
                                    )
TOWN OF ABINGDON, VIRGINIA,         )
                                    )
        Defendant.                  )

**BRIEF OF DEFENDANT TOWN OF ABINGDON, VIRGINIA
IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Town of Abingdon, Virginia ("Town"), by counsel, submits the

following brief in support of its Motion to Dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).

## I.    INTRODUCTION

Plaintiff, Gregory Kelly ("Kelly"), a former employee with the Town,

resigned his position as Town Manager on May 7, 2018. He never suffered any reduction

in pay or adverse employment action.

He asserts five counts in the Complaint. Count I alleges discrimination in

violation of the Americans with Disabilities Act ("ADA"). Count II alleges retaliation in

violation of the ADA. Count III alleges a failure to accommodate in violation of the ADA.

Count IV alleges interference in violation of the ADA. Count V alleges breach of contract.

1

The Town moves to dismiss all counts for the reasons stated below.

## II.  STATEMENT OF FACTS

According to the Complaint, in or about March 2005, the Town hired Kelly as Town Attorney, and the Town later appointed him Town Manager. (Comp. ⁋ 7.) Kelly provides no information about the specifics of his role as either Town Attorney or Town Manager. Upon his appointment to Town Manager, the Complaint alleges that Kelly and the Town signed an employment contract. (Comp. ⁋ 8, Ex. B.)  No contract was attached to the Complaint however.

On September 13, 2017, Kelly filed a Charge of Discrimination with the EEOC. (Comp. ⁋ 17.)

In the Complaint, Kelly alleges that he filed a second Charge of Discrimination with the EEOC on December 27, 2018. (Comp. ⁋ 17.) This allegation appears to be a typographical error and upon information and belief, this Charge was actually filed on December 27, 2017.

On January 10, 2018, Kelly's attorney sent a letter to the Town requesting twelve possible accommodations for his disabilities. (Comp. ⁋ 18, Ex. C.) Kelly's Complaint does not allege any prior request of accommodation.  These so-called accommodation requests are as follows:

- That all Members of the Town Council and Town Management have a fundamental understanding of the Town Charter;

- That the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis;

Abingdon: 1098351-1

- That the Town Council acknowledge that it is inappropriate for the members of the Town Council to give directives to subordinate employees of Town Management;

- That members of Town Council cease threatening the termination of a Town employee's job on a weekly, sometimes daily, basis;

- That the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions;

- That the Town Council recognize it is the role of the Mayor to act as liaison between Town Council and Town Management;

- That members of Town Council begin working together with Town Management to establish trust between the parties;

- That every member of Town Council utilize courtesy and care in all communications with Town Management;

- That all Town staff be treated equally in the eyes of the members of Town Council;

- That the Town Council be mindful of the bounds of individual employees' roles within the Town structure, or alternatively, that written policies or job descriptions clarify roles, duties, and responsibilities;

- That Town Council acknowledge that this is a team and within the best interest of the Town for Town Council to support and defend Town Management; and

- That Town Council, working with Town Management, work in conjunction to draft written standing policies to provide guidance to all individuals.

Additionally, Kelly alleged that he "revealed his disabilities to his supervisors at the Town, and requested reasonable accommodation." (Comp. ¶ 32.) But again, Kelly fails to identify these supervisors, the disabilities they discussed, when these

3

Abingdon: 1098351-1

Case 1:19-cv-00032-JPJ-PMS   Document 4   Filed 11/01/19   Page 3 of 23   Pageid#: 33

**43**

conversations were allegedly held, or what accommodations he requested at that time.

In April 2018, the Town responded to the January letter, stating that it would engage in the interactive process. (Comp. ¶ 19.)

On May 7, 2018, Kelly resigned his employment. (Comp. ¶ 5.) Kelly alleges that he was constructively discharged because he was "continuously threatened with termination if he did not do as certain council members directed." (Comp. ¶ 14.) But Kelly provides no details as to the nature of the threats, who delivered the threats, when those threats occurred, and whether those threats were related to his alleged disability. Kelly further alleges that throughout the course of his employment with the Town, he was "subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership" and that he had been "publicly ridiculed and defamed on several occasions." (Comp. ¶ 15.) But Kelly again provides no details as to the nature of these actions, who delivered them, when they occurred, and whether they were related to his alleged disability.

On July 27, 2018, Kelly filed his third Charge of Discrimination with the EEOC. (Comp. ¶ 4.) He received a Dismissal and Notice of Rights from the EEOC dated May 22, 2019. (Comp. ¶ 4, Ex. A.)

### III. LAW AND ARGUMENT

#### A. *Standard of Review*

Under Rule 12(b)(6), a court generally accepts all factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court does not have to accept legal conclusions or a "'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting

4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Were it otherwise, Rule 12(b)(6) would serve no function, for its purpose is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint." *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991), *cert. denied*, 503 U.S. 936 (1992) (internal quotation marks and citations omitted).

When reviewing alleged facts in the light most favorable to the plaintiff, "[i]t is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 558 (citations omitted).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court held that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A complaint is insufficient if it offers only "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "tenders 'naked assertions' devoid of 'factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court further stated that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). Facial plausibility occurs "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions "must be supported by factual allegations." *Id.* at 679.

5

In discrimination cases, a plaintiff is "required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute" in compliance with *Iqbal*. *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017).

### B.    Kelly's ADA Claims are Time-Barred.

A civil action under Title VII must be commenced within ninety days of when the EEOC issues a right to sue notice. 42 U.S.C. § 2000e-5(f)(1) ("within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved . . . ."); *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 (1984). "As a general rule, if an action is barred by the terms of a statute, it must be dismissed." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989).

"One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Brown*, 466 U.S. at 151. The Court found it irrelevant that the defendant in *Brown* had not been prejudiced by the plaintiff's late filing, noting that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Id.* at 152. In holding that the plaintiff's claim should have been dismissed as untimely, the Court stressed the importance of strict adherence to procedural requirements like Title VII's ninety-day filing deadline. *Id.*

A plaintiff is barred from asserting claims in a latter EEOC Charge that are based upon discrete acts asserted in a previous EEOC Charge on which the plaintiff had not filed suit within the requisite 90 days, absent a continuing violation. *See Rivera-Diaz*

*v. Humana Insurance of Puerto Rico, Inc.*, 748 F.3d 387 (1st Cir. 2014); *Brown v. Unified School District*, 465 F.3d 1184 (10th Cir. 2006); *Spears v. Missouri Dep't of Corrections and Human Resources*, 210 F.3d 850 (8th Cir. 2000); *SoSo Liang Lo v. Pan American World Airways, Inc.*, 787 F.2cd 827 (2nd Cir. 1986); *Khan v. Jenkins*, 814 F.2d 655 (4th Cir. 1987) (unpub); *Dodson v. Conway Hospital, Inc.*, No. 4:17-CV-01846-RBH, 2019 WL 1434153 (D.S.C. Mar. 31, 2019); *Howard v. American Institute of Certified Public Accountants*, No 1:08-CV-483, 2009 WL 1173017 (W.D.Va. Apr. 27, 2009). "Each discriminatory act starts a new clock for filing charges alleging that act." *Brown*, 465 F.3d at 1186-87. Thus, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.*

In *Dodson*, 2019 WL 1434153 at *2, a Fourth Circuit district court granted a motion for summary judgment because the plaintiff's second EEOC charge was time-barred to the extent that realleged arguments set forth in her first EEOC charge. Specifically, in her first charge in May 2016, the plaintiff alleged age discrimination based on the discontinuation of her benefits and the denial of a promotion in March of 2016. In her second charge, the plaintiff alleged age discrimination and retaliation based on her loss of hours in January 2017. The court found that the plaintiff's claims for age discrimination set forth in in her first charge (discontinuation of benefits and failure to promote) were time-barred, and that the only claims properly before the court were the plaintiff's retaliation claims based on her January 2017 loss of hours. *Id.*

On September 13, 2017, Kelly filed a Charge of Discrimination with the EEOC. (Comp. ¶ 17.) Kelly received his right to sue letter on December 12, 2017. The

Abingdon: 1098351-1

first Charge of Discrimination included claims for disability discrimination and retaliation. Kelly had ninety days from December 12, 2017 to file suit based upon these claims. Kelly had claimed that he was discriminated against at that time. Kelly was therefore required to move forward with suit based upon those claims. Because he failed to do so, his ADA claims are now barred.

In the Complaint, Kelly alleges that he filed a second Charge of Discrimination with the EEOC on December 27, 2018. (Comp. ⁋ 17.) This allegation appears to be a typographical error and upon information and belief, this Charge was actually filed on December 27, 2017. Kelly received his right to sue letter on January 29, 2018. He once again brought claims of disability discrimination and retaliation. Because Kelly had brought these two claims in his first Charge of Discrimination, and failed to timely bring suit following the first right to sue letter, he was barred by the statute of limitations from bringing suit based upon these claims. But to the extent the claims of the second Charge are not barred by the statute of limitations, because Kelly did not file suit based upon any new claims within 90 days of January 28, 2018, those claims are now likewise barred.

On July 27, 2018, Kelly filed his third Charge of Discrimination with the EEOC. (Comp. ⁋ 4.) He received a Dismissal and Notice of Rights from the EEOC dated May 22, 2019. (Comp. ⁋ 4, Ex. A.) He once against brought claims of disability discrimination and retaliation. Because Kelly had brought these two claims in his prior two Charges of Discrimination, he is barred by the statute of limitations from bringing a lawsuit on these claims now.

Consequently, all of Kelly's ADA claims are barred by the statute of limitations.

      **C.**    *Kelly Fails to State Claims for Discrimination and Failure to Accommodate Under the ADA (Counts I and III) Because He Did Not Plead That He Was A Qualified Individual With A Disability And Because He Did Not Plead That He Had Requested A Reasonable Accommodation.*

To establish a prima facie case for disability discrimination, a plaintiff must demonstrate that he (1) had an ADA-covered disability; (2) was **a "qualified individual,"** meaning she was able to perform the essential functions of her job; and (3) her employer took an adverse action against her due to her disability. *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997.) Likewise, to establish a prima facie case for failure to accommodate, an individual must demonstrate that she is (1) disabled within the meaning of the Act; (2) she is **otherwise qualified for the position**, with or without reasonable accommodation; (3) the Town knew or had reason to know about her disability; (4) **she requested a reasonable accommodation;** and (5) the Town failed to provide the necessary and reasonable accommodation. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). The Town combines these inquiries due to the similarity of argument.

A qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). At the motion to dismiss stage, a plaintiff must "allege facts demonstrating that he could have performed his job's essential functions with reasonable accommodation." *Cabrera Mejia v. Wal-Mart*, No. 1:14CV237, 2014 WL 5531432, at *2 (M.D.N.C. Nov. 3, 2014), aff'd, 599 Fed.Appx.

<div align="center">9</div>

520 (4th Cir. 2015). Absent this showing, dismissal of the claim under Rule 12(b)(6) is proper. *Id.* Therefore, to allege that he was qualified for his position, Kelly must assert facts suggesting that: (1) he could perform the essential functions of his job, or (2) if not, whether any reasonable accommodation by his employer would enable him to perform those functions. *Lamb v. Qualex, Inc.*, 33 Fed. Appx. 49, 56 (4th Cir. 2002). "Essential functions" are "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1).

In *Rubino v. New Acton Mobile Industries, LLC*, 44 F. Supp. 3d 616, 622 (D. Md. 2014), the court granted the defendant's motion to dismiss the plaintiff's claims for refusal to accommodate and disability discrimination because the plaintiff had not pled that he was a qualified individual. In that case, the plaintiff pled no factual contents as to the requirements of the job or his qualifications. *Id.* Instead, he merely alleged in a conclusory fashion that he was "capable of performing the essential functions of his job with a reasonable accommodation." *Id.* The court found that this was "merely a legal conclusion that is couched as an allegation of fact" and that his "allegation regarding this threshold requirement of any ADA claim is a threadbare recital of an element of a cause of action that is insufficient to state a claim under Rule 12(b)(6)."

Likewise, in *Chandler v. McKee Foods Corp.,* No. CIV.A. 5:08CV00062, 2009 WL 210858, at *4 (W.D. Va. Jan. 28, 2009), the court granted the defendant's motion to dismiss because the plaintiff failed to allege that any form of reasonable accommodation would have permitted her to continue in her position she held at the time of her discharge, or that she could perform the essential functions of that position without any reasonable

accommodation. Specifically, the court dismissed the claim because the plaintiff did not "suggest any particular reasonable accommodation that [the employer] could have offered, or that was refused, to permit her to perform such a job." *Id.*

In *Cabrera Mejia*, the court granted the defendant's motion to dismiss in the plaintiff's failure to accommodate claim because the plaintiff's complaint alleges "(at best) a request for some unknown accommodation" and because the plaintiff failed to provide "even the most basic details about his job, let alone that he could have performed its essential functions." The court specifically noted that "beyond that vague allegations, the complaint offers no details as to whether the requested accommodation was plausible or even what it was." *Id.*

In *Morgan v. Rowe Materials, LLC*, CIV.A. 3:08CV576, 2009 WL 1321514 (E.D.Va. May 11, 2009), the court dismissed a failure to accommodate claim, in part, because the plaintiff failed to pled "the title of his position, what his job entailed, what his disability prohibited him from doing, and whether he is able to perform the essential functions of his job, with or without accommodation." The court further noted that the plaintiff had failed to allege "even whether with reasonable accommodations he could perform the essential elements of his job." *Id.*

Here, Kelly pleads no factual content as to the essential functions, requirements, or qualifications of his job. He merely alleges in a conclusory fashion that, "At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function." (Comp. ¶ 31.) Much like in

11

*Rubino*, this is merely a legal conclusion that is couched as an allegation of fact. As such, he fails to meet the plausibility standard announced in *Twombley* and *Iqbal.*

Kelly likewise pleads no facts about what <u>reasonable</u> accommodation he requested that would allow him to perform the essential functions of his job, and fails to explain how the so-called accommodations that he did request would assist him in performing the essential functions of his job. The Complaint attaches a list of "accommodations" that Kelly requested. This list, however, does not contain legally cognizable accommodations at all, much less reasonable, in the spirit of "reasonable," or even health-related accommodations. Instead, this list dealt with intangible notions such as following the Town Code of Ethics and requesting the Town Council consider greater diversity. These are not "reasonable" accommodation requests nor did they enlighten the Town of what needed to be accommodated.

For similar reasons, even if this Court finds that Kelly pled sufficient facts to establish that he was a qualified individual, Kelly still failed to plead sufficient facts that he had requested a reasonable accommodation, as is also required under his failure to accommodate claim (although not required under his disability discrimination claim). The ADA clearly provides that "reasonable accommodations" include: (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with

12

disabilities. 42 U.S.C. § 12111(9).

But Kelly pled only a list of vague, general requests that the Town comply with the "Code of Ethics" and hire more diversity. These are not reasonable accommodation requests under the law. And beyond this vague list of twelve so-called accommodations, the Complaint does not set forth any additional reasonable accommodations that Kelly requested. It is therefore impossible for this court to determine whether there is "sufficient factual detail for the court to draw the reasonable inference that [Kelly] could have performed the essential function of h[is] position with the requested accommodation." *See Advanced Home Care*, 305 F. Supp. at 675.

In short, Kelly failed to plead that he is a qualified individual with a disability. The Complaint therefore fails to state an ADA discrimination or failure to accommodate claim. The Town's motion to dismiss this claim should be granted.

### D. Kelly Fails to State Plausible Claims for Disability Discrimination and Retaliation (Counts I and II) Under The ADA Because He Failed To Plead Sufficient Facts to Establish Constructive Discharge.

To establish a prima facie case for disability discrimination, Kelly must demonstrate that he (1) had an ADA-covered disability; (2) was a "qualified individual," meaning he was able to perform the essential functions of her job; and (3) his employer took an **adverse action** against her due to her disability. *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997.) And to establish a prima facie case for retaliation under the ADA, Kelly must allege that (2) he engaged in protected conduct, (2) that he suffered an **adverse employment action**, and (3) that a causal link exists between the protected

conduct and the adverse action. *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001).

Kelly alleges that he has a disability and that his physician recommended he request an accommodation or remove himself from his working environment. (Comp. ℙ 10, 16.). Based on the Complaint, however, Kelly pleads only three events wherein he may have presumably informed the Town of his disability and/or requested an accommodation: (1) filing an EEOC Charge on September 3, 2017; (2) filing an EEOC Charge on December 27, 2017; and (3) submitting a letter to the Town requesting his so-called accommodations on January 10, 2018. (Comp. ℙ 17, 18.) Kelly filed his third Charge after he quit.

Kelly references a string of actions that occurred at some indeterminate time and about which Kelly does not plead he is basing his constructive discharge. These are that he: was continuously threatened with termination if he did not do as council members directed, has been subjected to insults, invasions of privacy, disclosure of confidential information, profane and obscene messages from Town leadership, public ridicule and defamation. (Comp. ℙ 14, 15.) These actions cannot be used to establish constructive discharge because Kelly does not plead that they occurred in conjunction with, because of, or due to his so-called disability or request for reasonable accommodations.

Kelly has pled only five facts that seemingly occurred after he may have informed the Town of his disability and/or alleged request for a reasonable accommodation. These are as follows:

- The Town refused to engage in a dialogue with Kelly with regard to his disability accommodation (Comp. ℙ 34.)

- The Town ultimately denied Kelly's accommodation requests (Comp. ℙ 34.)

Abingdon: 1098351-1

- The Town threatened and/or harassed him (Comp. ¶ 34.)

- The Town treated him less favorably than similarly situated employees (Comp. ¶ 34.)

- The Town gave him a negative performance review after he requested an accommodation (Comp. ¶ 63.)

These five requests do not meet the plaintiff's pleading burden. The Fourth Circuit has "cautioned against finding constructive discharge upon the premise that an employer failed to afford the plaintiff reasonable accommodation," and has emphasized that such a finding is proper only when an employee "presents evidence that the employer intentionally sought to drive him from his position." *Hazel v. Caldwell Cty. Sch.,* No. 3:17-CV-00518, 2018 WL 3340575, at \*3 (W.D.N.C. July 6, 2018); *see also Johnson v. Shalala,* 991 F.2d 126, 131-32 (4th Cir. 1993) (noting that "the consequences of regarding every failure to accommodate an employee as a constructive discharge would be significant").

Kelly must allege facts to support two elements: (1) the deliberateness of the Town's actions and (2) the intolerability of the working conditions. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1355 (4th Cir. 1995).

"Deliberateness exists only if the actions complained of were intended by the employer as an effort to force plaintiff to quit." *Taylor v. Virginia Union Univ.,* 193 F.3d 219, 237 (4th Cir. 1999). To establish the intolerability of working condition, Kelly "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147 (2004). The Fourth Circuit has held that constructive discharge claims must be "strictly cabined" "because constructive discharge claims are susceptible to abuse by those who voluntarily leave their

15

employment." *Alba v. Merrill Lynch & Co.*,198 F. App'x 288, 294 (4th Cir. 2006), *citing Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 187 (4th Cir. 2004).

The Fourth Circuit has affirmed the dismissal of constructive discharge claims at the 12(b)(6) stage. For example, in *Williams v. Giant Food Inc.*, 370 F.3d 423 (4th Cir. 2004), the Fourth Circuit upheld the dismissal of a complaint claiming constructive discharge where the factual allegations supporting the constructive discharge were that the plaintiff's supervisors "yelled at her, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back." The dismissal was upheld because constructive discharge requires more than dissatisfaction with work, unfair criticisms, or unpleasant working conditions. Instead, the conditions must be so intolerable that a reasonable person would resign.

Likewise, in *Bowen v. Maryland, Department of Public Safety and Correctional Services*, 2018 WL 1784463 (D. Md. 2018), the District Court of Maryland dismissed a complaint alleging constructive discharge where the factual allegations supporting the constructive discharge were that the plaintiff "suffered through harsh conditions from the time she sought reasonable accommodations and participated in the EEOC process," which consisted of "consistent discriminatory and retaliatory behavior," COMAR charges, being subject to ridicule and abuse, being denied benefits, and "suffering significant health consequences of elevated levels and anxiety." Plaintiff further pled that "her supervisor spoke to her in a belittling manner, yelled at her, told an Agent Assistant not to assist [the plaintiff] in entering certain documents, and began to require [the plaintiff] to meet with her once a day." The court found that "the record does not show that Plaintiff's

16

conditions were so intolerable that she had no choice but to resign" and that these conditions "do not amount to the high standard of constructive discharge."

In this case, even taking everything that Kelly says as true for the sake of this motion, his Complaint still does not give rise a constructive discharge claim. Kelly has never requested a reasonable accommodation and has not pleaded any facts to support that he did. Regardless, he has not properly alleged a constructive discharge. Kelly has not alleged how the Town's alleged actions related to his disability, impacted his disability or constituted a substantial limitation on his major life activity. Kelly also fails to plead facts that support that conditions were so intolerable that a reasonable person would have resigned. As a result, his claims fail.

> ### E. Kelly Fails to State Plausible Claim for Retaliation Under the ADA Because He Failed to Plead a Causal Link Between the Protected Activity and Alleged Adverse Action.

"A plaintiff claiming unlawful retaliation [under either Title VII or the Equal Pay Act] must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Knoskie v. Va. Dep't of Corr.*, No. 2:16CV00019, 2017 WL 673909, at *7 (W.D. Va. Feb. 17, 2017) (citing *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

Here, Kelly has failed to state facts that support the element of a causal link between the alleged protected activity and adverse employment action. As argued above, Kelly has failed to allege facts that support a constructive discharge. That argument notwithstanding, Kelly has not alleged any facts that provide the link between any

Abingdon: 1098351-1

protected activity and his constructive discharge. As a result, his retaliation claim must fail.

### F.    Kelly Fails to State a Claim for Interference Under the ADA.

Under the ADA interference provision, it is unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]. 42 U.S.C. § 12203(b). The Fourth Circuit has not yet addressed ADA interference. But in the Seventh and Ninth Circuit, which have addressed anti-interference, a plaintiff alleging an ADA interference claim must demonstrate that: (1) he engaged in activity statutorily protected by the ADA; (2) he was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of his protected activity; and (4) the defendants were motivated by an intent to discriminate. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017); *Brown v. City of Tucson*, 336 F.3d 1181 (9th Cir. 2003).

The EEOC has also provided meaningful guidance on the issue, stating that "interference is broader than the anti-retaliation provision, protecting any individual who is subject to coercion, threats, intimidation, or interference with respect to ADA rights." EEOC ENFORCEMENT GUIDANCE ON RETALIATION AND RELATED ISSUES, 2016 WL 4688886, at *26. The statute, regulations, and court decisions have not separately defined the terms "coerce, intimidate, threaten, and interfere" but the EEOC Guidance

Abingdon: 1098351-1

suggests that "as a group, these terms have been interpreted to include at least certain types of action which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference." *Id.* Examples provided by the EEOC include:

- Coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled;

- Intimidating an applicant from requesting accommodation for the application process by indicating that such a request will result in applicant not being hired;

- Threatening an employee with loss of employment or other adverse treatment if he does not "voluntarily" submit to a medical examination or inquiry that is otherwise prohibited under the statute;

- Issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g. a fixed leave policy that states 'no exceptions will be made for any reasons')

- Interfering with a former employee's right to file an ADA lawsuit against the former employer by stating that a negative job reference will be given to prospective employers if the suit is filed; and

- Subjecting an employee to unwarranted discipline, demotion, or other adverse treatment because he assisted a coworker in requesting reasonable accommodation.

*Id.* "The interference provision does not apply to any and all conduct or statements that an individual finds intimidating." *Id.* And in fact, "In the Commission's view, it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of ADA rights." *Id.*

Kelly has not pled an ADA interference claim because he fails to plead what protected right he exercised or in which he was engaged. Even assuming that requesting an accommodation is Kelly's so-called protected activity (which remains wholly unclear

Abingdon: 1098351-1

from the Complaint), then Kelly's Complaint does not establish that he ever requested a reasonable accommodation. Kelly's attorney sent a letter of "Accommodation Requests", but as established, none of these are reasonable accommodations. Moreover, Kelly states that he "did not take short breaks, as a reasonable accommodation, as he feared that he would receive written discipline or be terminated." (Comp. ¶ 77.) But Kelly does not plead that he ever engaged in the protected right of requesting the accommodation of short breaks during the workday. Even the letter from his attorney that Kelly claims includes reasonable accommodations does not mention short breaks.

And even more glaringly, Kelly fails to plead any facts that establish that the Town coerced, threatened, intimidated, or interfered on account of his so-called protected activity, other than the self-serving statement that his "constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful interference based upon his disabilities and/or requests for accommodation." (Comp. ¶ 22.)

There are simply no facts to support Kelly's ADA interference claim.

### G. Kelly Failed to State a Claim for Breach of Contract.

Under Virginia law, "[t]he essential elements of a cause of action for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Albanese v. WCI Communities, Inc.,* 530 F.Supp.2d 757, 760 (E.D.Va.2007); *see also Tessler v. NBC Universal, Inc.,* No. 2:08–cv–234, 2009 WL 866834, at *6 (E.D.Va. Mar.31, 2009) ("the essential elements to plead a cause of action for breach of contract are as follows: (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3)

defendant's failure to perform; and (4) resulting damage"). *Dodge v. CDW Gov't, Inc.,* No. 1:09CV528 (AJT/IDD), 2009 WL 1605010, at *3 (E.D. Va. June 5, 2009)

Kelly cannot establish that he and the Town had a legal or contractual obligation because Kelly was and remained, at all times, an at-will employee of the Town. "All appointments of officers and hiring of other employees shall be **without definite term**, unless for temporary services not to exceed one year or except as otherwise provided by general law or special act." Va. Code § 15.2-1503(A). The Abingdon, Virginia Town Charter is consistent with this enactment. It provides that the Town Council shall appoint a town manager. Charter § 4.1, 4.2. The Charter further provides that "appointments [under this Section 4] shall serve **at all times at the pleasure of council and may be dismissed at any time by the council.**" Charter § 4.8.

In 2010, the Virginia Attorney General addressed this issue in an official advisory opinion in accordance with Virginia Code § 2.2-505. 2010 WL 3800035, at *1 (Va. A.G. Sept. 20, 2010). In that opinion, the Attorney General addressed whether the Town Council of the Town of Christiansburg, Virginia was authorized to initiate negotiations for a multi-year employment contract with the Town Manager. The Attorney General noted that:

> Pursuant to its authority to provide by general law or special act for officers and for the terms of their office, the General Assembly has provided that ... appointments of officers and hiring of other employees by a locality should be without definite term, unless for temporary services not to exceed one year or except as otherwise provided by general law of special act. The Town Charter is consistent with this enactment. It provides that all officers and employees appointed may be removed by the town council at its pleasure. **I therefore**

> **conclude that a contract of employment specifying a term of years would violate the General Assembly's clear intent that the Town Manager, as a municipal officer, serve the Town on an at-will basis.**

*Id. (internal citations omitted) (emphasis added).*

The factual similarities between those presented in this Attorney General opinion and this situation are striking. Here, too, the Town Charter clearly specified that the Town Manager serves at the pleasure of the council. *See* Charter § 4.1, 4.2, 4.8. It therefore follows that any multi-year employment contracts between the Town and an appointed official are impermissible, and would be a violation of the General Assembly's intent. The Town Manager may be removed by the town council at its pleasure. And so, even though the September 7, 2006 minutes indicate that Kelly had some "agreed terms of employment," these minutes are not, and could not be, a contract of employment.

If the Town and Kelly did not have a contract, then it stands to reason that Kelly does not currently have a breach of contract claim. His Count V fails as a matter of law.

But even if the Court finds the Complaint sufficiently alleges that Kelly has a contract, then Kelly still failed to plead sufficient facts to establish a breach of that contract. The Minutes of the Town Council meeting, as cited in the Complaint, state that Kelly would be entitled to nine months' severance pay if serving in the capacity of Town Manager is "not successful." (Comp., Ex. C.) Kelly never pled that his employment with the Town was unsuccessful. And in fact, those Minutes were from 2006. By Kelly's own admission, he served as Town Attorney and then Town Manager until 2018. He fails to

allege how employment for over twelve years was unsuccessful.

<div align="center">CONCLUSION</div>

Kelly has failed to state a claim upon which relief may be granted and consequently this case should be dismissed.

<div align="center">TOWN OF ABINGDON</div>

<div align="center">By Counsel</div>

Ramesh Murthy
 VSB No. 31801
Cameron S. Bell
 VSB No. 47685
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
Telephone: 276/628-5151
Facsimile: 276/628-5621
cbell@pennstuart.com

By _/s/ Cameron S. Bell_
      Cameron S. Bell
      Counsel for Defendant

<div align="center">CERTIFICATE OF SERVICE</div>

I hereby certify that on November 1, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

<div align="center">/s/ Cameron S. Bell
Cameron S. Bell</div>

<div align="center">23</div>

```
 1
 2                IN THE UNITED STATES DISTRICT COURT
 3                FOR THE WESTERN DISTRICT OF VIRGINIA
 4                         ABINGDON DIVISION
 5   Gregory Warren Kelly; Deborah )
     Coffey Icenhour,              )
 6                                 )   Civil Case No.
                  Plaintiffs,      )   1:19-cv-00032-JPJ-PMS
 7                                 )   1:19-cv-00033-JPJ-PMS
     vs.                           )
 8                                 )
     Town of Abingdon, Virginia,   )   Monday, December 30, 2019
 9   et al,                        )
                                   )
10                Defendants.      )
     _____
11
12                  TRANSCRIPT OF MOTION HEARING
                  HONORABLE JAMES P. JONES PRESIDING
13                   UNITED STATES DISTRICT JUDGE
14
15
16                     A P P E A R A N C E S
17
     For the Plaintiff:        Thomas Eugene Strelka
18                             Strelka Law Office
                               119 Norfolk Avenue, S.W. Ste 330
19                             Roanoke, VA  24011
20   For the Defendant:        Cameron S. Bell
                               Ramesh Murthy
21                             Penn Stuart & Eskridge
                               P.O. Box 2288
22                             Abingdon, VA  24212-2288
23   Court Reporter:           Donna Prather
                               180 W. Main St., Room 104
24                             Abingdon, VA  24210
25   Proceedings taken by Certified Court Reporter and transcribed
     using Computer-Assisted Translation
```

1      (Proceedings commenced at 1:30 p.m.)

2          THE COURT:  Good afternoon, ladies and gentlemen.

3  The clerk will call the case.

4          THE CLERK:  Kelly versus the Town of Abingdon,

5  Virginia, civil action 1:19cv32.  And Icenhour versus the Town

6  of Abingdon, et al., civil action 1:19cv33.

7          THE COURT:  We're here today for argument, oral

8  argument, on the motions to dismiss that have been filed by

9  the defendants in these two cases, the Kelly case and the

10  Icenhour case.  Of course, these are separate cases, and

11  obviously they stand on their own, but they have some

12  connection in terms of the allegations.  Since counsel is the

13  same on both sides in both cases, I thought it appropriate to

14  hear them both at the same time.  But I do want to take them

15  up separately.

16          Of course, I've read the complaints and the briefs

17  that have been filed in regard to the motion to dismiss.

18          As counsel knows, in considering a motion to dismiss

19  I must accept as true the factual allegations made in the

20  complaints.  And the question is whether as a matter of law

21  those factual allegations are sufficient to survive going

22  further with the case.

23          I'll be glad to hear from counsel.  And let's take

24  the cases up in order in which they were filed.  The case

25  involving Mr. Kelly was filed first.  And I'd like to hear

1    argument on that case first, and then I'll hear argument on
2    the Icenhour case.
3             Mr. Bell.
4             MR. BELL:  Yes, sir.  Thank you, Your Honor.
5             Good afternoon.
6             May it please the Court.  Your Honor, I'll do
7    introductions for you.
8             THE COURT:  Yes, please.
9             MR. BELL:  I have with me my partner, Mr. Murthy,
10   and our associate, Catie Karczwerczyk, at the end of the
11   table.  And then we have Mayor Wayne Craig and Vice Mayor
12   Cindy Patterson from the Town of Abingdon.  In this case we
13   represent just the Town.  Mr. Kelly has filed five counts, the
14   first four are somewhat overlapping.
15            Your Honor referenced, of course, the Town is well
16   aware of the stage of procedure that we are in at the moment.
17   And we, of course, have cited the *Twombly* and *Iqbal* cases to
18   that effect.
19            And you've seen from our briefs some of the
20   specifics that, even though we realize that it's not a fraud
21   case and doesn't require particularity, that there has to be
22   some facts pleaded beyond what have been stated in the
23   complaints here.
24            The first argument that I'd like to address,
25   Your Honor, is this timing issue that affects the

1    discrimination claim and the retaliation claim.  Mr. Kelly

2    filed three separate charges with the EEOC and received three

3    separate right to sue letters.

4         Because of, in some instance, the lack of

5    specificity as to what it is that he was claiming was the

6    discrimination, the first charge was September 13th, 2017.  At

7    that time he alleged that he was discriminated against and

8    retaliated against at that time.  He received a subsequent

9    right to sue letter.  90 days after that passed and he filed

10   no claim, but instead filed another charge and then a third

11   charge afterwards.

12        Our argument is to the extent that he's claiming

13   discrimination as of the first charge, September 13th, 2017,

14   because he didn't sue on that right to sue letter within

15   90 days, then essentially, it's a statute of limitations

16   argument, Your Honor, that those discrimination claims that

17   existed at that time are now barred.

18        THE COURT:  Well, as you say, though, there's no

19   real specific facts set forth as to what those claims were or

20   whether they're any different.  I mean, it's argued on the

21   other side, as you know, that Mr. Kelly is suing on the last

22   notice of right to sue determination, filed it within 90 days

23   of that.  And everything else is just evidence at trial that

24   would support the claim of violation of the federal statutes.

25        They're not really separate causes of action but

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**67**

1  just evidence, you know, going all the way back in regard to

2  support his present claim, this has been going on a long time

3  and so on.  I mean, there may very well be some statute of

4  limitation question as to damages, although -- and there may

5  be a question about relevancy and admission into evidence of

6  those past things, but I don't understand the claim to be

7  that that relates in terms of compensation for those earlier

8  unsued on claims of discrimination.

9         MR. BELL:  Yes, sir.

10        THE COURT:  What would be wrong with that,

11  theoretically at least?

12        MR. BELL:  Well, this feeds into the argument about

13  the lack of specificity overall.  The plaintiff shouldn't be

14  able to benefit by saying, well, it's just a bunch of stuff,

15  and we're going to figure out all the stuff later on.  And

16  that's only -- don't worry about that right now, Your Honor,

17  we're going to figure all that out in discovery and that will

18  be something for the jury to determine.  We're entitled, and I

19  think under the *Twombly* and *Iqbal* standards, and, in

20  particular, as specific as this 90-day window is, to know what

21  it is specifically that occurred.  Something triggered in

22  Mr. Kelly's mind to file a charge with the EEOC.  So something

23  happened within 300 days of September 13th, 2017, at least

24  according to him, that he was going to -- that he noticed --

25  notified EEOC and perhaps was going to sue on the EEOC

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**68**

1  directly or --

2           THE COURT:  But what would my ruling be at this

3  point on a motion to dismiss?  I mean, even accepting that the

4  statute of limitations has run as to those prior

5  administrative notices that he -- administrative complaints

6  that he filed.  He didn't sue on those.  Can't sue now on

7  those.  But what would I say?

8           MR. BELL:  Well --

9           THE COURT:  I mean, I think Mr. Strelka is going to

10  get up and say just what I said.  I'm not suing on those

11  things, but the evidence of the history of whatever it is is

12  going to be admissible.

13           MR. BELL:  Right.  I don't know.  And it's not clear

14  to me from the complaint, and it's not clear I don't think

15  from the briefing that is true.  But if Your Honor ruled that

16  everything prior to the last notice, last charge, was not a

17  claim, then I think certainly you should rule that.  But I

18  think --

19           THE COURT:  Well, I mean, so I do that.  But, I

20  mean, that doesn't answer the question is it relevant -- I

21  mean, is it going to be relevant evidence at trial?  We just

22  have to see.

23           MR. BELL:  Well, I think what you could rule,

24  Your Honor, is let's say something happened in 2016 that was

25  the subject of this first charge.  And that is -- there --

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**69**

1  it's hard to say, sort of shooting in the dark, what we're

2  even talking about, and I think that's the overall argument on

3  the motion to dismiss.  If that were your ruling, and they

4  said something happened in a meeting in 2016, and that's what

5  my whole case is based on, if Your Honor ruled that was too

6  late, then they have no claim.  I think what they're trying to

7  bootstrap that is saying --

8          THE COURT:  Here's what I think.  And Mr. Strelka

9  can tell us, but I think what the argument is going to be is,

10  so I filed this administrative complaint hoping that it would

11  change the minds of these people who would treat me better.

12  And I didn't want to sue on it, I just felt that them getting

13  this official notice, and so on, would help.  Didn't help.

14  Tried again.  Didn't work.  And then, here we are, and I want

15  my judicial remedies.

16          But I want to go back and tell the jury all what

17  happened at that meeting in 2016.  Even though I can't really

18  sue on that because of the statute of limitations, I want to

19  tell them about that to bolster my story about my claim, my

20  history of trying to change minds, trying to get an

21  appropriate accommodation and lack of discrimination.

22          MR. BELL:  Yes, sir.  And I agree with you under

23  that situation.  If that's the argument, then we would be

24  talking about a motion in limine or something to that effect

25  at that point.

```
 1              THE COURT:  Right.
 2              MR. BELL:  But I think that there has to be some
 3    modicum of what it is that we're talking about before you can
 4    make that decision in a vacuum.  Is the last charge we're only
 5    talking about evidence of those things and what the jury is
 6    going to say?  Or is that what the claim is?  And as to
 7    Mr. Kelly's complaint, there's --
 8              THE COURT:  Well, I mean, the only difference it
 9    would make, I guess practically speaking, is damages.  I mean,
10    if I were -- and whether I would admit it as evidence.
11              MR. BELL:  Well, you have to rule, I think,
12    Your Honor, that the third charge with the right to sue has a
13    basis to it.  And at the moment, I don't think that there's
14    been anything alleged that would allow a support of that
15    ruling.  It's argument, certainly.
16              THE COURT:  Right.
17              MR. BELL:  So I think that's the difference.  If we
18    were saying yeah, there's all these six or seven things we're
19    talking about that occurred over time and this is the argument
20    they built into what ultimately ended up being the final
21    charge, then, sure, I think we can make that argument.  But at
22    the moment, we don't know what we're talking about.
23              THE COURT:  Isn't what you're saying?  That there is
24    such a lack of specificity, factual specificity, that we don't
25    know what the specifics of any of these conclusory allegations
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**71**

1  are?

2          MR. BELL:  Yes, sir.

3          THE COURT:  So we don't know whether everything is

4  barred by the statute of limitations.

5          MR. BELL:  Absolutely.  So that's my point.  If what

6  we're really basing it on is something that happened that

7  should have been sued on after the first charge and now,

8  they're just saying, well, it was constructively discharged

9  and that should revive this one thing that happened, I think

10 the result is there is no claim at all.

11         So that's our argument, Your Honor, on that point.

12         Relatedly, as to the other counts, of course you've

13 seen our briefs on these issues about facts that have not been

14 alleged as to Count 1 and Count 2, the elements of

15 discrimination and retaliation, and the first argument that we

16 make is that Mr. Kelly has not adequately stated that he was a

17 qualified individual.  We've cited some case law that shows

18 sort of both examples of the side that is good enough and

19 cases that show that are insufficiently pled.  And the gist of

20 what the courts say is you have to say what your job is.  You

21 have to say what it is that you were supposed to do and what

22 it was that you couldn't do in order to show that you are a

23 qualified individual.

24         And the only thing that has been alleged in this

25 complaint is that Mr. Kelly couldn't perform the essential

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**72**

1    functions of the job without any other specificity of what it
2    is that we're talking about.

3         We cited some cases that say, for instance, the
4    plaintiff had to use the telephone, and she couldn't use the
5    telephone because of X, Y, and Z.  And that goes into the
6    reasonable accommodation arguments.  Here, there is no
7    description at all of what that job entailed, or what it was
8    that he could do or couldn't have done to make him a qualified
9    individual.  That should be a pretty low bar to meet.  But
10   there is no specificity in the complaint at all to meet that.

11        And then relatedly to the failure to accommodate
12   claim has the same element.  But also, he hasn't alleged that
13   he requested a reasonable accommodation or that he could
14   perform the job with a reasonable accommodation.

15        There are only -- in this case there is an
16   attachment to the complaint of a list of 12 items.  Our
17   argument is, of course, Your Honor --

18        THE COURT:  And this is the letter from Mr. Strelka,
19   January 10, 2018?

20        MR. BELL:  Yes, sir.

21        And, of course, that's attached to the complaint.
22   We can discuss it at the end of the motion to dismiss.  You'll
23   notice in that letter, Your Honor, first, it's the -- the re
24   line is related to Mr. Kelly, Ms. Icenhour, and another
25   individual that's not the subject of these cases.  Nowhere in

1   that letter does it list what the disabilities are.  Nowhere

2   in that does it list what the job specifications are that need

3   to be done.  And nowhere in it does it list what these lists

4   of things would accommodate any of those disabilities.  So we

5   think that it shows on its face that that's what they were

6   relying on, that they haven't requested a reasonable

7   accommodation or that they could have performed those jobs

8   with a reasonable accommodation that they've stated the claim

9   under those counts.

10          As a practical matter, the law gives some

11  suggestions as to what reasonable accommodations might be.

12  Your Honor, of course, has run across several of those in

13  cases.  But the list of things that's supplied is be nice,

14  follow the charter, follow the code of ethics.  They're really

15  a wish list and not a list of reasonable accommodations as to

16  a disability.  And so, Your Honor, that's why we have moved to

17  dismiss Counts 1 and 3.

18          Similarly, Count 1 is discrimination; Count 2 is the

19  retaliation.  The element is that the employer took an adverse

20  action due to the disability.  The claim in the briefs is that

21  the alleged constructive discharge is the adverse action.  But

22  there are no allegations sufficient to show that there was --

23  there is this idea of intolerability under the law that you

24  are forced to quit because the job was so intolerable that you

25  could not stay.  There's just insufficient allegations as to

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**74**

1    that.

2             Overall, you have to keep in mind, of course, that

3    the Town is the defendant in this case.  The Town can only

4    operate through the things that they're talking about.  The

5    Town Manager in his position reported directly to the Town

6    Council.  The Town Council consists by charter of five

7    members.  They can only work by a majority act for that

8    council.  There's no allegation anywhere that the majority of

9    the council did anything.  In Mr. Kelly's complaint there's no

10   allegation specific to any one member at all.  There's some

11   stray comments that are listed in the briefs, of course, we'd

12   argue that shouldn't be considered at all.  But even

13   considering those, Judge, there's no factual allegations that

14   the employer, being the majority of the Town Council, did

15   anything.  So that fails to state a claim as well.

16            Similarly, under the retaliation claim there's a

17   requirement that there be a causal link between the protected

18   activity and the action.  There was no action at all, so there

19   can't be a causal link.  But there's certainly no allegation

20   that the employer did anything as a result of any EEOC filings

21   or anything else that would render a retaliation or

22   retaliatory act.  The argument is that there is a temporal

23   proximity between this letter in January of 2018 and his

24   constructive discharge.  They cited a case, the *Trail* case,

25   which, actually, I think they say in their brief it was a

1  two-month period.  I believe from the case it was actually two

2  weeks.  In any event, the action that they're relying on is

3  this letter from January.  He quit in May.  There's no

4  temporal proximity that Your Honor could read into that based

5  on the pleadings.

6       The fourth count is an interesting --

7       THE COURT:  And, again, I guess, I'm not sure,

8  Mr. Strelka can enlighten us, but I'm not sure how a

9  retaliation operates when you've made claims for years and

10 suddenly that becomes a constructive discharge because of the

11 letter.

12       MR. BELL:  Absolutely.  And that fits into the

13 intolerability argument as well.  If these things have been

14 going on, allegedly, at least in the generic sense, job

15 threats and the non-specific things that have been alleged

16 since 2016 to support that first charge, how do they suddenly

17 become this constructive discharge in May of 2018?  We don't

18 think that states a claim, Your Honor.

19       The fourth count is an interesting one, interference

20 under the ADA.  And there is some interpretation from the EEOC

21 and there is a case from the Seventh Circuit and there's a

22 case from the Ninth Circuit that is sort of, theoretically, a

23 claim.  But the basis of the failure here is that there's no

24 allegation of what specifically of the right is that Mr. Kelly

25 says that he exercised.  And there's certainly no allegations

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**76**

1   of anything that the Town did to interfere with that right.

2   So that Count 4 fails.

3          Count 5 is a state law claim for breach of contract

4   based on a vote that former counsel took when Mr. Kelly was

5   given the job of Town Manager.  Our argument on that is

6   essentially a legal one based on the Dillon's rule.

7          As Your Honor knows, the charter of the Town is

8   actually the General Assembly Act.  Under the Dillon's rule,

9   the Town can only have the powers that are granted to it by

10  the General Assembly.  The Town Charter of Abingdon says that

11  the Town Manager will serve at the will of the Town Council.

12  Purportedly, this vote of Town Council formed a contract

13  between Mr. Kelly and the Town for some severance pay if the

14  job was not successful.  I think, fundamentally, just as a

15  question of law, regardless of the interpretation and some of

16  the things that we might get to down the road, as a legal

17  matter the Town Council is without the power to contract with

18  him for anything other than being at will.  Under Dillon's

19  rule, all they could have done is formed an at-will agreement

20  with him.

21          THE COURT:  But, I mean, assuming that that's

22  correct, that he was an employee at will, can the Town not

23  promise to -- I mean, pay him a certain amount when he leaves?

24  You know, both of them can terminate the arrangement at will.

25  So he can quit.  He can walk out.  And on the other side, the

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**77**

1   Town and council can terminate his employment.

2              MR. BELL:  Right.

3              THE COURT:  But how does that prevent them from

4   agreeing, you know, whenever you leave, we're going to pay you

5   X amount of dollars?

6              MR. BELL:  I think as couched here, the argument --

7   what the minutes say that have been attached to the complaint

8   is that he would be paid, one, if the Town Attorney position

9   was not available and also if his tenure was not successful.

10  So that phrasing in terms of "if it's not successful or not"

11  is switching whether it's at will or not.  Could they agree at

12  some point we're going to go our separate ways --

13             THE COURT:  Maybe that's what it means though.  I

14  mean, it was a -- I mean, it's obviously not a -- it's an

15  imprecise thing.  What does successful mean?

16             MR. BELL:  Right.

17             THE COURT:  That means that he doesn't like the job?

18  It's not successful to him?

19             MR. BELL:  Right.

20             THE COURT:  Or does it mean he didn't work out?  I

21  mean, it sort of sounds like, you know, we don't want to

22  really say what we mean.  We want to sort of fudge this over

23  so it doesn't sound like we're going to fire him at some time.

24             MR. BELL:  Right.  And if so --

25             THE COURT:  I don't know whether -- maybe an

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**78**

1    argument is it's unenforceable of being -- impossible of being

2    determined.

3               MR. BELL:  Right.

4               THE COURT:  Although I suppose if it's ambiguous,

5    there may be questions of fact there about what it meant.

6               MR. BELL:  I think under that argument, though,

7    Your Honor, what is being said is that you're altering his

8    at-will employment.  You're saying that there is a for-cause

9    reason.  And if your -- something happens for something other

10   than at will, we're going to pay you this money.  And that

11   alters that at-will situation --

12              THE COURT:  Well, again, getting back to my point.

13   I mean, suppose successful means he's not successful in that

14   one of the parties to the employment contract decides that

15   they want to leave that employment relationship, either the

16   Town or the Town Manager.

17              MR. BELL:  Right.

18              THE COURT:  So it's not successful in that right.

19   At will, but not successful.  Successful equals at-will

20   termination on either side.  We'll pay you nine months' salary

21   anyway.

22              MR. BELL:  Right.  Well, I think if we're getting to

23   that point, then our fallback argument would be that there's a

24   lack of pleading of the actual agreement to what that is.  If

25   your interpretation is correct, then maybe.  But they've not

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**79**

1    pleaded that was what it is.

2              But I think, even under that scenario --

3              THE COURT:  Right.  I'm just saying that doesn't

4    affect -- he's still terminable at will, but what would be --

5    I mean, suppose it said, you know, in more precise terms, the

6    parties recognize that this position, this relationship,

7    employment relationship, is at will.  It can be terminated by

8    either party for any reason or for no reason.  Nevertheless,

9    if that happens, if it is terminated by either party, then the

10   Town agrees to pay the employee nine months' severance.

11             MR. BELL:  Right.

12             THE COURT:  Would that run afoul of the Dillon rule?

13             MR. BELL:  I don't think so.  If it, in that

14   circumstance, were still adhering to the serve at the pleasure

15   of the council, that was the only thing they're entitled to do

16   under the charter, then, yes.  I don't think that this

17   particular contract that's what it says or that's what's been

18   alleged it says.

19             THE COURT:  Right.  I understand.

20             MR. BELL:  So under your contract, then maybe that

21   would work.  But that's not the alleged contract that we have

22   here.  What is alleged and what is in the minutes is something

23   that lends itself to altering the at-will employment that the

24   Town is not empowered to do.  And alternatively, I don't think

25   the plaintiffs have alleged that a contract was formed at all

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**80**

1    under those circumstances.

2         THE COURT:  Well, what you say, I mean, again, I

3    can't make factual findings here, but it would seem strange.

4    I mean, successful seems to mean that you're terminated by the

5    Town.  Because why would you want -- I mean, he could have

6    left the next day.  I mean, he could have worked two days and

7    decided it's not successful as far as I'm concerned, pay me

8    nine months.

9         MR. BELL:  Right.

10        THE COURT:  And that would seem an unusual

11   arrangement.

12        MR. BELL:  Sure.  Well, and the other condition, if

13   we're calling this a contract, was that the Town Attorney

14   position not be available.  And there's no allegation in the

15   complaint that that was not true.

16        THE COURT:  Right.

17        MR. BELL:  So even if we're considering this a

18   contract, which I don't think that it is, and even if it

19   doesn't violate the charter, that condition has not been met,

20   even under their own allegation, because they failed to state

21   a claim.

22        THE COURT:  All right.

23        MR. BELL:  Thank you, Judge.

24        THE COURT:  Thank you.

25        Mr. Strelka.

1          MR. STRELKA:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MR. STRELKA:  Happy holidays.

4          THE COURT: Yes, sir.

5          MR. STRELKA:  May it please the Court.  Tommy

6     Strelka here to represent the plaintiff, Greg Kelly, in this

7     matter.

8          You know, there's an interesting case I had recently

9     in front of Judge Dillon just a few months ago.  It's called

10    *Dalton versus Lewis Gale*.  And it's a case where an individual

11    had asked for accommodation or accommodations at the

12    workplace.  And there is just a utter complete lack of any

13    interactive process for months.  Very similar to this matter.

14    And in that case Judge Dillon asked everybody in the

15    courtroom, it's kind of a rhetorical question, but she asked:

16    Can a complete and utter failure to accommodate, can a

17    complete lack of engaging in the interactive process required

18    of the ADA, can that underscore and support a constructive

19    discharge.

20         We were on a 12(b)(6) motion, just like today, and

21    she found for us.  She found that the pleadings had

22    established that and she entered an order.  I don't have an

23    opinion.  I'd love to show you an opinion where she went

24    through this, but it's just in the order and the pleadings

25    itself.  It's similar facts.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**82**

1    Because, you know, while there were multiple charges

2  filed in this matter showing a history of an individual having

3  difficulty at his place of employment over a long period of

4  time, it wasn't until the third charge in which we timely

5  placed in it the information regarding the January letter.

6    Now I understand the defendant can point to this

7  adjusted accommodations within the letter and, I don't know,

8  roll their eyes or say that these aren't traditional

9  accommodations.  We're not asking for an orthopedic chair.

10  We're not asking for a ring tone, or something of that -- you

11  know, we're not -- it's different.  But just because it's

12  different, that has no bearing under the ADA.  Is it an undue

13  hardship?  That's the only question.  Is it an undue hardship?

14    And as to the answer whether it's an undue hardship,

15  well, there never was one.  We never got anything back.  We

16  sent these to them.  These are the accommodations requests for

17  these individuals that I represent.  You know that we -- at

18  this point we've already filed EEOC charges alleging Americans

19  with Disabilities Act violations.  We've already filed EEOC

20  charges alleging that they're disabled, and we've listed those

21  disabilities within the charges.  And we filed that -- we sent

22  that in January.  And months pass with nothing regarding

23  accommodations.  Until we get a communication in April saying,

24  they do -- they will intend to engage in the interactive

25  process.  And then nothing else after that.  And so it's a

1   complete failure to engage within the required interactive

2   process of the ADA.  And that firmly cements both the failure

3   to accommodate claim for Mr. Kelly, and it can certainly

4   cement the constructive discharge claim.  Because in the utter

5   absence of --

6           THE COURT:  How do these requests relate to the

7   alleged disability?

8           MR. STRELKA:  As contained within the charges

9   themselves, the activities of the individuals involved were

10  exacerbating the disabilities; the symptoms of the

11  disabilities, the flare-ups of the disabilities.  That these

12  disabilities were having an increased negative health impact

13  upon Mr. Kelly and altered his daily life activities.

14          THE COURT:  So members of the Town Council have

15  consistently second-guessed a vast majority of information

16  provided them -- provided to them by Town management?

17          MR. STRELKA:  Yes.  We put -- this was in --

18          THE COURT:  So how does that work?  In other words,

19  the Town can no longer second guess, in other words, say,

20  Mr. Town Manager, I don't believe that information is correct.

21  Is that the accommodation?  Really?

22          MR. STRELKA:  Your Honor, it's a way of tone,

23  behavior, attitude, word choice, body language.  It's

24  interactions that aren't normal.  They're not courteous.

25          Now, Your Honor, I want to let you consider

1    something regarding this January letter.  Okay.  While I can
2    say here today, yes, this is checking the box on a request for
3    accommodations under the Americans with Disabilities Act, it's
4    also, you know, prior to ever getting into this room, it was
5    also an olive branch.  It was a letter saying, look, maybe we
6    can work this out.  Maybe we can just find a middle ground.
7    As Judge Turk used to say, we can all be friends again.
8            You know, this is something that, you know, was
9    trying to find some level of communication where we could come
10   together, address whatever issues we have, and work toward
11   moving on in a changed, more developed, more evolved role
12   with, you know, perhaps everyone compromising a little bit
13   here or there and coming up with some sort of agreement so
14   this office can work cohesively.  But when we sent that, we
15   got nothing in return.  Nothing.
16           And so, it's a --
17           THE COURT:  Well, how would you expect to respond --
18   how would you expect them to respond to a claim of
19   accommodation?  That they not second-guess your client when he
20   tells them information?
21           No, whatever you say, Town manager, you know, I'm
22   not going to second guess -- I'm not going to say you're
23   wrong.
24           MR. STRELKA:  Right.  If they want to say --
25           THE COURT:  I mean, consider tone of voice and word

1    choice.  I mean --

2          MR. STRELKA:  So tell me it's an undue hardship.

3    Tell me no, can't do that.  It's undue hardship because it's

4    just unfathomable.  Or it doesn't work with nuts-and-bolts

5    day-to-day work in the office.  Tell us that.  Tell us that.

6    Okay.  Now the ball is back in our park, and now we're playing

7    the interactive process.  I can go back to them.  And they

8    say, okay, if you feel that that is undue and you can't do it,

9    it's not going to work, here's something else.  You know,

10   let's keep this conversation going.  That's what ADA requires.

11   It requires a dialogue.  And there was no dialogue.  It was

12   unilateral communication requesting accommodations.  And they

13   can roll their eyes all they want.  Tell me, tell me that

14   you're rolling your eyes.  Tell me why.  Tell me that it is an

15   undue hardship.  Tell me that it's unfathomable, unfeasible.

16   Tell me that it's not going to work.  Tell me if they're

17   willing to consider something else.

18         THE COURT:  Well, that's what they're doing, I

19   assume.  I mean, because he says that they are second-guessing

20   him.  That they used the wrong words.  They didn't use the

21   right words.  They may have raised their voice with him.  Is

22   that --

23         Here's one of the problems.  I mean, I sympathize

24   with the idea that, you know, any level of government ought to

25   work in a congenial, civil way, whether it be United States

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**86**

1    Congress or the, you know, Town Council and government of
2    Abingdon.
3         But, you know, one of the problems with your
4    complaint is it's really -- there are no factual -- there are
5    very few factual details.  I mean, except for the breach of
6    contract, it's -- it is, you know, Mr. Kelly has been subject
7    to insults, invasion of privacy, disclosure of confidential
8    information, and profane and obscene messages from Town
9    leadership, and has been publicly ridiculed and defamed on
10   several occasions.  No facts supporting those conclusions.
11        And, you know, you know better than anyone that
12   that's not the standard now, today, of a federal pleading.  I
13   mean, I have to find that there is plausible claims made based
14   on the facts alleged.  And ridicule and defamed on several
15   occasions?  I mean, again, as Mr. Bell pointed out, was that
16   back in 2016?  When, you know?  Or was that recently?
17        MR. STRELKA:  Sure.
18        THE COURT:  Or when?  By whom?
19        MR. STRELKA:  Right.
20        THE COURT:  I mean, is that just -- are we gonna --
21   do you just file a lawsuit that says those things and then
22   spend a lot of time and effort and money on both sides to take
23   a lot of depositions and come back and see if it's enough?  I
24   mean, the system doesn't work that way now.  I mean, my
25   obligation is to only let cases pass through if they state a

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**87**

1    plausible claim.

2              MR. STRELKA:  Sure.

3              THE COURT:  And without facts, I mean, you know, I

4    don't see how that can be done.  I mean, except for the

5    employment agreement --

6              MR. STRELKA:  Right.

7              THE COURT:  -- which is clear facts there.  We can

8    get to that in a minute.  But I'm just --

9              MR. STRELKA:  Would it be helpful --

10             THE COURT:  -- I'm just concerned about there are

11   more conclusions than are normal in an employment-type case.

12   This is -- it's vague.  It's, you know, it's nothing that I

13   can grasp --

14             MR. STRELKA:  Right.

15             THE COURT:  -- to make a judgment on.

16             MR. STRELKA:  That may be a fact of the length of

17   time that this went on.  Let me ask you this, Judge.  Would it

18   be helpful -- I was looking through this morning all the

19   charges of discrimination that were filed in this matter by

20   Mr. Kelly.  And, I mean, I'm saying, the plaintiff's attorney,

21   of course, but it's clear to me that when you look at these

22   charges of discrimination that it's very much an ongoing,

23   continuous pattern of behavior.

24             Now I know what you said earlier when you were

25   talking with Mr. Bell about issues being time barred, and I

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**88**

1  understand what you were saying about, you know, perhaps these

2  older issues, these older incidents, are kind of part of his

3  story of the whole thing, I think that makes it relevant as

4  part of the jury.  But would it make it helpful for the

5  purposes of the pleadings if we went through, if I put in the

6  pleadings, for instance, exactly what was filed within the

7  EEOC charges and then specific instances of all of these

8  things going up to the time of termination?  I mean, I'm

9  assuming that would help.

10         THE COURT:  Well, I mean --

11         MR. STRELKA:  Constructive --

12         THE COURT:  It depends, I guess, on what these

13 things are.

14         It just seems to me that you just can't, in federal

15 court now, say things like, I've been subjected to insults and

16 defamed and that's enough.

17         MR. STRELKA:  All right.

18         THE COURT:  You know, it's just not enough.

19         MR. STRELKA:  We can put more in there.

20         THE COURT:  You've got to state facts.  Those are

21 not facts.  Those are conclusions.

22         MR. STRELKA:  Your Honor, I'd be happy to provide

23 all the facts needed for --

24         THE COURT:  Well, you don't have to prove your case,

25 but you have to do more it seems to me, than -- and in

1  addition, I guess the question is how does -- how do these

2  things affect -- why does it affect Mr. Kelly's disability?

3          MR. STRELKA:  Right.

4          THE COURT:  I mean, this is not a case where there's

5  some concrete accommodation that can be made.  Like, you know,

6  okay, you could -- you know, we'll make the equipment in the

7  factory so that you can handle it.  We'll let you take off an

8  hour in the afternoon, you know, or something like that.

9  Various accommodations.  I mean, the accommodations here are,

10  you know, as I read your letter, which is the request, are so

11  amorphous, it seems to me.

12          MR. STRELKA:  Why do I have to wait for you to tell

13  me that?  Why do I have to be here for you to say that when

14  the duty is on the Town to get back with us and tell us that?

15  And say hey, we think these are amorphous.  We can't make

16  heads or tails of this.  Can you get us something else?  What

17  about these?  This is what's required under the ADA.

18          THE COURT:  Well, suppose that you just wrote a

19  letter -- and frankly, I'm not -- have no reflection on you at

20  all.  But your letter really boils down to, Town of Abingdon

21  Town Council, please treat me nicer.

22          MR. STRELKA:  I said it was an olive branch.

23          THE COURT:  Please treat me nicer.  You know, is

24  that, is that sufficient to let the employer know what that

25  means?

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**90**

```
 1            MR. STRELKA:  It says in the letter "accommodation
 2    request."  The first paragraph mentions the Americans with
 3    Disabilities Act.  And we previously filed two charges of
 4    discrimination under that act with the EEOC.  This is clearly
 5    within --
 6            THE COURT:  Well, no, I understand that.  But what
 7    I'm saying, there has to be some limit on a request for
 8    accommodation.
 9            MR. STRELKA:  There is.  There is a limit.  It's
10    called the undue hardship.  And if that was -- if that was
11    affected --
12            THE COURT:  No, but I mean on the request.  Treat me
13    nicer, make my job easier, are those legitimate requests for
14    accommodation?
15            MR. STRELKA:  The ADA doesn't put a sort of test or
16    focus like --
17            THE COURT:  No, but there has to be some --
18            MR. STRELKA:  There is.
19            THE COURT:  -- common sense.
20            MR. STRELKA:  The undue hardship.  That's what it
21    is.  There still has to be this give and take.  There has to
22    be a dialogue, Judge.  This was a one-sided conversation for
23    months.  I mean, if they think that these accommodations are
24    requests, that's what I said --
25            THE COURT:  Well, there is just one letter.
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**91**

1          MR. STRELKA:  Right.  But the ball is in their

2    court.  This is an accommodation request.  Where are we with

3    this?  What's going?  Tell us.  Interact.  There is no

4    interaction.  There's nothing.  And we filed charge after

5    charge, and nothing is happening.  So, I mean, what are we to

6    do?

7          I mean, I have to tell you, Your Honor, I want you

8    to understand, that letter was written in a way, like I said

9    earlier, as an olive branch, as a means to let's get together

10   and try to work out some of these personal issues and maybe we

11   can have this whole thing resolved and we're not in a lawsuit

12   a year from now.  That never happened and here we are.

13          THE COURT:  Okay.  So what about this contract

14   claim?

15          MR. STRELKA:  The only thing we're claiming -- you

16   nailed it, Your Honor.  The only thing we're claiming in the

17   contract is he's owed nine months' severance.  We're not

18   claiming it affected the at-will status of his employment or

19   that it gave him a term of employment or anything of the sort.

20   It's purely that there was in existence a contract that

21   provided that when he was leaving -- again, we don't have it.

22   If I had the contract, it would be incorporated into this.  If

23   I had a copy of that written contract, it would be here.  But

24   we believe the Town still possesses it.

25          THE COURT:  Well, the Town minutes set forth the

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**92**

1     understanding.

2          MR. STRELKA:  It supports that this was

3     contemplated.  That's what we're pointing to to show the

4     existence of one.  There's a penumbra of a contract over here,

5     so there must be a contract over there.

6          But the only thing that we're claiming in the

7     count -- the only thing that we're claiming in the complaint

8     is that he had a contract, it was entered into by the Town and

9     himself, that provided nine months' severance.  He never

10    received it.  Breach of contract.  That's it.

11         So it's pretty straightforward.  It's nothing trying

12    to buck the Dillon rule or anything else.

13         THE COURT:  Well, okay.  All right.

14         MR. STRELKA:  And, Your Honor, I am confident that,

15    if required, we could add any number of allegations into this

16    complaint to satisfy what you may perceive to be a lack of

17    notice or pleading in this matter.  And that if the Court

18    feels that any of the ADA claims are in need of additional

19    factual allegations, of course, I just ask for time to amend

20    and provide them.

21         THE COURT:  Well, let's get back to one of the first

22    things that Mr. Bell raised.  I mean, are you agreeing with me

23    that you're not suing on these past things, but -- because you

24    didn't file -- no suit was filed within 90 days, but that they

25    would be admissible and evidence to show the history of the

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**93**

1  relationship?  Is that --

2           MR. STRELKA:  Unless --

3           THE COURT:  Or are you saying that yes, we are suing

4  on these older claims and getting around the statute of

5  limitations some way?

6           MR. STRELKA:  Well, I must say that, you know, it's

7  incorporated in our brief, the Fourth Circuit has embraced the

8  idea of these sort of continuous actions.  And that perhaps --

9  I mean, it's clear -- it's clear to me because I just read it,

10 and I don't think you have the charge of discrimination, but

11 it's clear to me when I look at the charge of discrimination

12 that is nothing but a continuous environment with the same

13 factors and elements affecting the plaintiff the whole way

14 through.

15           That said, I'm not going to look a gift horse in the

16 mouth.  Because what you said earlier about this being part of

17 the story and relevant to the jury, well, that's, of course,

18 music to my ears.

19           THE COURT:  I didn't make any ruling on it; I was

20 just speaking hypothetically.

21           MR. STRELKA:  Sure.  But I will say that if one is

22 to assume or to look at the case in such a way that, you know,

23 the allegations, or the particulars that were contained in the

24 first two charges may be relevant insofar as the jury should

25 hear it but aren't necessarily actionable in and of itself, if

1    that's what we're looking at right now, at the end of the day,

2    well, the third charge incorporated both -- which, you know,

3    the January incident with the letter, the period of months

4    where there was no interactive process, the utter lack of

5    interactive process and the failure to accommodate, and the

6    constructive discharge at the end of that.

7          So, you know, as far as the plaintiffs' case is

8    concerned, the major issues and the things to which we

9    complain about legally, other than the contract, are contained

10   within that third charge.

11         THE COURT:  Well, I guess there's just a legal

12   question here, and I'm not prepared to answer it now, but

13   whether you can file a series of EEOC charges in which the

14   EEOC says, as you know, we're not going to handle this, but

15   you're free to sue if you file suit within 90 days.  The suit

16   is not filed within the 90 days.  You can file a series of

17   those and still claim relief on those earlier ones that you

18   didn't file suit on, even though they all raise the same basic

19   claim.

20         MR. STRELKA:  Right.  It's my understanding --

21         THE COURT:  I mean, is that the law?  So you

22   don't --

23         MR. STRELKA:  It's my understanding that --

24         THE COURT:  You don't have to really file -- you

25   don't really have to file suit within 90 days so long as you

1  eventually do?  I mean, you can file ten administrative
2  charges with the EEOC and only on the tenth one do you file
3  suit, but that's okay.
4          MR. STRELKA:  Right.  Well, I think that the thrust
5  of the ruling in the cases that we cited, the *Gilliam* case and
6  the *Guessous* case, both from the Fourth.  *Gilliam* was the
7  Fourth Circuit, 2007.  And the *Guessous* was the Fourth, 2016.
8  They embrace these notions of these continuous actions.  They
9  call it the modern continuing violation theory that allows
10  things beyond the 300 days to be actionable if it is a
11  continuous matter.
12          I think, though, Your Honor, like I said earlier, it
13  might be clearer if we put in exactly what allegations were
14  alleged in the first charge, and the second charge, and the
15  third charge, and then what happened with some more
16  specificity.
17          THE COURT:  Well, aren't they all just basically the
18  same?
19          MR. STRELKA:  Well, they are, but I mean, except
20  there is one --
21          THE COURT:  Except that there's one constructive
22  discharge alleged.
23          MR. STRELKA:  The third -- they're very similar.
24  The third one, though, does incorporate the incident with the
25  letter, the lack of response, and then the constructive

1  discharge.

2          So, I mean, the third one basically has, from my

3  perspective, the majority of the ADA claims that ever could be

4  alleged.  So, I mean, to be honest, Your Honor, if the Court

5  was of the mindset that what was in the previous charges may

6  not necessarily be actionable but could be relevant to a jury,

7  you know, and that may have to be argued out later on, you

8  know, I'm fine with that.  The plaintiff is fine with that.

9          But I don't know, does that bring up anything else?

10         THE COURT:  Well, I don't know that I have any other

11  questions, but I'll be glad to hear anything else you'd like

12  to say.  And we're just talking, again, about Mr. Kelly's

13  case.

14         MR. STRELKA:  Sure.  Let me just look at my notes,

15  Your Honor.

16         You're always exceptionally familiar with these

17  cases when they come your way, so.

18         Let's see, no, I don't think I have anything else,

19  Your Honor.  I think you understand the situation.  I

20  appreciate your time today.

21         THE COURT:  Yes, sir.

22         Mr. Bell, any response?

23         MR. BELL:  Just briefly, Your Honor.  And

24  particularly about the discussion about the failure to

25  accommodate, Mr. Strelka's argument is that basically he can

1  say whatever he wants and then it's back on the defendant to

2  say it's an undue hardship.  But the first requirement is that

3  he request a reasonable accommodation that is related to a

4  disability.

5         THE COURT:  Right.  Well, I think he agreed with me

6  that his letter could have just said, treat me nicer, you

7  know, don't make me so upset.

8         MR. BELL:  Right.

9         THE COURT:  And then the burden would have been on

10 you to have -- sit down with his -- with him and say, okay,

11 we'll -- our tone, we'll try to measure our tone.  I don't

12 know how you do that with five members.  But, in any event --

13        MR. BELL:  Well, if we were only talking about --

14        THE COURT:  We won't second guess you.  We won't

15 disagree with you about your facts that you're telling us.

16        MR. BELL:  Sure.  Well, and what I think that we're

17 talking about, and Your Honor alluded to, is filing these

18 earlier charges and sending these letters is just an

19 employment dispute.  We're just talking about getting along

20 with each other and doing your job.

21        Why we're here today, allegedly, is because of

22 discrimination because of disabilities.  We're not talking

23 about that at all.  We're talking about civility and getting

24 along with people and how people communicate with one another.

25 We haven't said one word, and that letter says no words, and

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**98**

1    the complaint says no words, about you need to stop being this

2    way because of my anxiety.  Because of my anxiety you need to

3    act differently to accommodate my anxiety in this way.

4           So I disagree with the notion that you can send a

5    letter of any sort in the case of an employment and say that

6    suddenly any request, be nice, be on time, it somehow makes

7    that into a reasonable accommodation under the law --

8    reasonable accommodation request.

9           THE COURT:  Right.  And I didn't raise this with

10   Mr. Strelka, but the other one was adhere to the code of

11   ethics.  How does that possibly affect a disability?

12          MR. BELL:  Right.  And it doesn't.  And I think in

13   the procedural fashion --

14          THE COURT:  I mean, again, I'm not -- I want to make

15   clear, particularly since this is a matter of public interest,

16   you know, if there is bad things going on in the government of

17   the Town in terms of people getting along with each other or

18   not treating other people in a positive way and belittling

19   them or things like that, that's wrong.  It ought to be

20   changed.  But, as you say, the question is whether those --

21   that type of thing is something that falls within the statutes

22   of the United States --

23          MR. BELL:  Yes, Your Honor.

24          THE COURT:  -- relating to disability.

25          MR. BELL:  Right.  I mean --

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**99**

1    THE COURT:  I mean, there's not a federal statute

2  that says employers have to treat their employees in a kind

3  and pleasant way and have a workplace that's not -- doesn't

4  have some loud voices.  You know, something like that.  That's

5  not the federal statute.  There's not a statute like that.

6    MR. BELL:  And unfortunately --

7    THE COURT:  In particular, here we have this

8  somewhat unique situation in that, you know, this is a public

9  body of people elected by the voters and who are independent,

10  although they act, obviously, as a body, and in some ways,

11  they are liable as a body, but they're individuals.  This is

12  not like the normal business situation where there's a chain

13  of command and so on.  These are individually elected

14  officials who have different interests, have different

15  personalities.  They have -- may like some of the people hired

16  by the majority, as you point out, of the Town, may not like

17  them.  May think I wish we had somebody else in that position.

18  But the majority has appointed that person.

19    So that's another thing that I think makes this case

20  somewhat unique.

21    MR. BELL:  Yes, sir.  And in addition to there not

22  being a statute on that point, the cases, of course, are

23  legion that say that Title 7 is not a civility code.  There is

24  no federal requirement that people be nice to one another.

25  And although that might be admirable, that's not why we're

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**100**

1    here.  And so, I think to the discussion about reasonable

2    accommodation, what would only -- the only thing I think that

3    would trigger a response of that's an undue hardship is first

4    a request.  I have a disability.  These are the things I

5    request to be a reasonable accommodation and those things

6    actually be a reasonable accommodation.  It's not suddenly we

7    receive a letter and then we have to engage in the interactive

8    process.

9        But, also, the complaint itself says we responded.

10   So I'm not sure that goes as far as the argument anyway.

11       But I think to narrow the focus away from what was

12   actually, you know, alleged, and the argument has been was

13   going on in the background of people trying to get along and

14   negotiate with one another through these procedural means and

15   through lawyers, Mr. Kelly himself is a lawyer, is what are we

16   talking about?  Are we really talking about a disability for

17   which claims lie?  Or a protected activity for which

18   retaliation resulted?  Or the failure to accommodate a

19   reasonable accommodation?  And the complaint simply doesn't

20   say those things.  And so, Your Honor, I think that it has to

21   be dismissed.

22       And, again, on the contract claim, you understand

23   our argument.  I don't think that it -- it legally has failed

24   to state a claim.  And even if it gets beyond the legal claim,

25   it's failed to state a meeting of the minds, something that

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**101**

1  was breached in this case to state the claim for breach of

2  contract.  So we'd ask for you to dismiss the complaint.

3          THE COURT:  So before you leave, let's talk about --

4          MR. STRELKA:  Your Honor, I'm so sorry to interrupt.

5  May I just add one thing before we get to Ms. Icenhour's case?

6          THE COURT:  All right.

7          MR. STRELKA:  I'm sorry.  It's just that I think

8  we're losing some of the context of this by looking at that

9  letter in isolation.  Because by the time the letter was

10 received by the Town, they received the September 2017 charge

11 of discrimination and December 2017 charge of discrimination,

12 both highlighting exactly what his disabilities are, both

13 highlighting how his disabilities are exacerbated by this

14 conduct from these individuals, and both indicating that his

15 disabilities and his exacerbation of these disabilities have

16 affected his daily life activities.  So that information was

17 already provided to the Town prior to that January letter.

18         THE COURT:  Right.  Well, you know, unfortunately, I

19 haven't seen those.

20         MR.  STRELKA:  Right.  That's why I said, I think I

21 should add them to the pleadings, Your Honor.  So, anyway,

22 just wanted to mention that.

23         THE COURT:  All right.  Let's take up Ms. Icenhour's

24 case.

25         MR. BELL:  Yes, Your Honor.  Thank you, Your Honor.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**102**

 1          THE COURT:  And I don't think we need to plow the

 2   same ground that we've discussed with Mr. Kelly's case.  But,

 3   obviously, Ms. Icenhour's case is -- makes different claims.

 4          MR. BELL:  Yes, Your Honor.

 5          And I'll start, if Your Honor doesn't mind, with the

 6   state law of defamation and defamation per se claims.

 7          THE COURT:  Right.

 8          MR. BELL:  Our primary argument, as you've seen,

 9   Your Honor, is the absolute immunity afforded to legislative

10   bodies and members of legislative bodies for things that are

11   said during legislative sessions.

12          There is -- the newspaper article that's attached to

13   the complaint in that case, which actually goes into some

14   detail as to what was discussed at that meeting, and I think

15   there was some confusion in the briefing and perhaps in the

16   complaint about what, what meeting was occurring at the time.

17   And if you read the letter closely, then it was actually at a

18   regular meeting of the Town Council.

19          And it references that it would be referred to a

20   work session of the council at a later time to discuss it in

21   further detail.  Legally that doesn't matter.  There is sort

22   of a common misconception that things that are called "work

23   sessions" that legislative bodies can't take action on them

24   because they're just a work session.  But, of course, under

25   the open meeting law, any gathering of more than two of this

1    council would be a meeting, in any event.  And to the specific

2    definition of meetings under the open meeting law in Virginia

3    includes a work session.  So that's of no moment.

4         But the statement that is attributed to

5    Ms. Patterson is the statement about forming a citizen

6    committee related to FOIA requests.  And that was stated

7    during a regular meeting of the Town Council.  There was

8    significant discussion as is detailed in the article that's

9    attached to the complaint about whether they agreed with it or

10   whether they didn't.  Mr. Kelly weighed in.  He said he didn't

11   think there would be any legal reason that you couldn't do

12   that.  So it was obviously a legislative discussion about what

13   this body was going to do.  And as a result, it's absolutely

14   immune.

15        There's a case cited by the plaintiff, some

16   exceptions to intentional torts.  That doesn't apply in this

17   case.  The cases in Virginia say that it's an absolute

18   immunity for things that are said during legislative session.

19        The only argument to the contrary could be that this

20   wasn't actually something that was done as a legislative act.

21   But, clearly, from the article that's attached to the

22   complaint, that's what they were doing.  They were discussing

23   whether this committee would be formed.  Certainly something

24   that was within the power of the council to do.

25        There's some argument in the reply -- in the

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**104**

1  response brief that what was suggested was this body being

2  made, the FOIA officer itself.  That's not what the complaint

3  says.  That's not what the article says.  The discussion

4  that's in the article is that this committee would be formed

5  to look into requests that are made and how they're responded

6  to, et cetera.  So clearly it falls within this absolute

7  immunity.

8          Secondary argument, of course, is qualified immunity

9  that I know Your Honor understands.

10         And then finally is that the statement that is

11 attributed to Ms. Patterson couldn't be defamation.  It's an

12 opinion.  It really is an opinion of other people's opinions.

13         If you read that statement, of course, this is a

14 question of law, it seems to me that other people had an

15 opinion that they don't trust the FOIA officer.  And so in my

16 opinion, the reason that these additional requests are being

17 made is because they don't trust the FOIA officer.  So that's

18 not something that could be a statement of fact.  It's a mere

19 expression of opinion, so it wouldn't be defamation at any

20 point.  I don't think Your Honor needs to go that far because

21 I think it's clearly barred by the immunity.

22         Count 3 is deprivation of liberty interest under

23 Section 1983.  It's related to the defamation claim.  I think,

24 frankly, if there is no defamation, that this claim fails by

25 its own weight.  But the requirements of this 1983 claim are

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**105**

1    that a statement made placed a stigma.  And then the cases say

2    it's a stigma plus.  It has to be a stigma that was made at

3    the time that affected the reputation, and it was made in

4    conjunction with the termination or demotion.

5              The complaint says this statement was made in

6    September.  She did not quit until July the following year.

7    There is no statement that was made in conjunction.

8              THE COURT:  Well, deprivation of liberty interest is

9    when you say bad things about employees publicly and you don't

10   give an opportunity to respond.  That's the liberty interest

11   that's involved.

12             MR. BELL:  That's right.

13             THE COURT:  Mr. Strelka can answer this, but I don't

14   understand how -- where we are.  Raised, angered voices is one

15   of the --

16             MR. BELL:  Yes, sir.

17             THE COURT:  -- facts, so-called facts, to support

18   Count 3.  I don't understand what that --

19             MR. BELL:  And to your point of due process, there's

20   no allegation that there was a grievance procedure that was

21   not gone through where there was no opportunity to respond to

22   that, even if you got past the point that I think that the

23   complaint fails to show, that there was any liberty interest

24   invoked in the first place.  And so we believe that that count

25   should be dismissed.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**106**

1              I won't rehash these other issues that are similar,

2      although I'll come back to those for just a second.  As to the

3      Equal Pay Act claim, Mr. Strelka told me before argument that

4      they had conceded that they would withdraw Count 8.

5              MR. STRELKA:  That's correct.

6              MR. BELL:  Similarly, though, Count 7 is a sex

7      discrimination/sex-based wage claim.  The requirements in

8      those cases are that there is some intentional discrimination

9      based on her sex.  Just a lack of allegations that would

10     support this claim.

11             There is a stray comment allegedly made by Mr. Craig

12     that on two separate occasions, one of which is related to her

13     estrogen level.  Again, Mr. Craig is a single person, not the

14     body -- not the employer acting at all.  There's no causal

15     relationship, no action that's tied to that particular

16     statement.  It happened -- actually, that particular statement

17     is not attributed to a specific time.

18             And then there's another statement that allegedly

19     was said that at a different meeting related to, of course,

20     the overarching point of contention that was alleged in the

21     complaint about this commercial development.  There was a

22     discussion about the commercial development and that the

23     alleged comment was that she was "in bed with the city."  I

24     think the complaint seems to turn that into something based on

25     her sex.  I think, as a matter of law, Your Honor could rule

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**107**

1   it is not.  It's something not related to her gender or sex.

2           There is no allegation, more specifically, that

3   anyone else was treated differently than Ms. Icenhour in this

4   situation to be discrimination of her unlike anybody else.

5   There are two stray comments.  As we've discussed in the other

6   argument, allegedly over a number of years, that allegedly led

7   to this sex discrimination, and they simply fail to state a

8   claim on that.

9           The related sex-based wage claim I think is

10  essentially the same argument that they just conceded that

11  they don't have a claim.  Mr. Bailey that they've alleged was

12  given the co-FOIA officer job, there's no allegations in there

13  that he was similarly situated as the plaintiff in this case

14  or that there was a discrimination based on her sex, based on

15  him being paid for that job, or paid for that particular

16  thing.  It doesn't detail in the complaint what his job was,

17  what he did otherwise, how they were compared to each other to

18  support a discrimination claim.

19          The other claims are what we've mostly just

20  discussed.  I'm happy to discuss some specifics there are to

21  this particular claim, but I think the arguments are

22  essentially the same.  As to the time bar, there's no

23  specificity as to when these things started.  And there's a

24  failure to show how -- what the disability was, how there was

25  retaliation against any protected activity, and that there was

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**108**

1   a failure to reasonably accommodate any reasonable

2   accommodation.  This letter that we've been talking about

3   actually isn't attached to Ms. Icenhour's complaint, so I

4   guess, you know, it may be outside the pleadings technically,

5   but it, as we mentioned --

6           THE COURT:  Well, he mentions it's in the complaint.

7           MR. BELL:  It's in the re line that it refers to her

8   as well.  But similar arguments.  There's no tie to any

9   particular disability that these requests are not a reasonable

10  accommodation.  They just simply fail to state a claim for all

11  these claims, Your Honor.

12          THE COURT:  All right.  Mr. Strelka.

13          MR. STRELKA:  May it please the Court.

14          THE COURT:  So let's start with the defamation

15  claim --

16          MR. STRELKA:  Sure.

17          THE COURT:  -- against Ms. Patterson.

18          So why isn't there immunity there?

19          MR. STRELKA:  Well, Your Honor, I think we need to

20  clarify this perhaps in the pleadings.  But the utterance was

21  not actually -- she may have uttered it in the course of the

22  meeting, but the context of the utterance was in an interview

23  to reporters, either immediately thereafter or before the

24  meeting.  So it is not a legislative function.  This wasn't in

25  any sort of attempt to advance legislation on behalf of the

1   Town.  It was a comment made --

2           THE COURT:  Well, wait a minute.  You say in

3   paragraph 23 --

4           MR. STRELKA:  I may have erred in the complaint,

5   Your Honor.  Ms. Icenhour just wrote a note to me indicating

6   the context of the communication.

7           THE COURT:  Okay.  Well, let's get this straight

8   here.  You say in your complaint, paragraph 23, "During the

9   meeting, Ms. Patterson stated publicly the following:"  And

10  then you quote, "'There have been more FOIA requests in recent

11  years because the citizens don't trust the Town; they don't

12  trust the FOIA officer.  That's obvious.'"

13          MR. STRELKA:  Yes.

14          THE COURT:  So you're now saying, based on a note

15  that your client handed you a moment ago, that that was not

16  stated during the meeting.

17          MR. STRELKA:  I'm not saying it wasn't stated during

18  the meeting.  I'm saying that it was additionally stated

19  thereafter as additional context.  It was additionally stated

20  thereafter and privately in a interview with reporters.  And

21  that that utterance -- let's go back.  Let's go back to, first

22  of all, stated in the meeting.  Okay.  Let's talk about that.

23  So we're actually in a meeting where the comments were stated

24  in the meeting.

25          It doesn't apply, as we would argue, because this

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**110**

1  comment itself is not actively moving toward litigation --

2  excuse me, or legislation.  It's not within the nexus of

3  legislation.

4          The *Isle of Wight* case from the Supreme Court of

5  Virginia specifically held that comments made by board members

6  in a supervisor's meeting that aren't actively working to

7  propel legislation are not immune.  Therefore, we would argue

8  this falls under that.  It falls under one of the independent

9  tests.

10          THE COURT:  Well, why is it -- how is it defamatory?

11  Why isn't it expression of opinion?

12          MR.  STRELKA:  Because it's --

13          THE COURT:  It's not even her opinion.

14          MR. STRELKA:  Right.

15          THE COURT:  It's what she says other people in the

16  town think.

17          MR. STRELKA:  That makes it a fact.  If you're

18  saying what other people believe, not your own self, but she's

19  saying this is what other people believe --

20          THE COURT:  Other people's opinions.

21          MR. STRELKA:  That's obvious.  But it's a fact -- if

22  she's saying that other people have a basis for believing that

23  they have no trust in this individual, that impugns a stigma

24  and a inability to fulfill the functions of her job, which

25  makes it defamation per se.  She's stating, she says -- I

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**111**

1   mean, Mr. Bell added some --

2           THE COURT:  Well, how -- I just don't understand.  I

3   mean, you know, I actually -- I'll admit, I have been a

4   legislator --

5           MR. STRELKA:  Right.

6           THE COURT:  -- in the Senate of Virginia.  And so

7   any legislator, you're saying, cannot criticize a public

8   official without being sued?

9           MR. STRELKA:  No.  I'm saying they can't say

10  anything defamatory that isn't advancing a legislative end in

11  a public meeting that impugns the reputation and the ability

12  to do the job of an appointed employee.  That's what we're

13  saying.  That's still defamation.

14          THE COURT:  Well, but they were talking about, as I

15  understand, the question of this committee to discuss FOIA

16  requests.  Right?

17          MR. STRELKA:  Right.

18          THE COURT:  That's what the newspaper article that

19  you attached says.

20          MR. STRELKA:  Right.

21          THE COURT:  And why isn't that absolutely relevant

22  to what they were talking about?  She may have been wrong.  I

23  don't know.  I have no idea.

24          MR. STRELKA:  Right.

25          THE COURT:  But a legislator can't say something

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**112**

1    like that without being sued?  I mean, we would have silent

2    meetings.  I mean, surely, a legislator has the right to speak

3    their mind to the public, to their constituents, about what

4    they think the state of their particular district or town is.

5            MR. STRELKA:  So a legislator can state that the

6    citizens, the citizens of the town, all the citizens that she

7    knows, they don't trust this particular employee?  I mean,

8    that is -- first off, that's not an opinion.  She then says,

9    "It's obvious."  This is a fact.  If something is obvious,

10   it's not an opinion.  It's a fact.  She's purporting this to

11   be a fact.

12           THE COURT:  Well, it can't be a fact.  I mean, there

13   are 8500 citizens of the Town of Abingdon, or some such.

14           MR. STRELKA:  So we know it's false.

15           THE COURT:  Yeah.  It's a statement of -- it's a

16   rhetorical statement of opinion.  I believe the people of the

17   United States want taxes lowered, and the Secretary of the

18   Treasury is not helping us to lower taxes.

19           MR. STRELKA:  That statement doesn't involve

20   anything regarding the trust of the secretary or of the

21   people's thought of the credibility or the goodwill of the

22   secretary has raised with the people.

23           THE COURT:  Well, and to say something, like, and I

24   don't trust the IRS.

25           MR. STRELKA:  This doesn't say I don't trust.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**113**

1          THE COURT:  I don't trust the IRS commissioner.  And

2     the people of America don't trust, the people of America don't

3     trust the IRS.

4          MR. STRELKA:  I would argue that that statement --

5          THE COURT:  That's defamatory.

6          MR. STRELKA:  Yes.  That impugns -- you're shaking

7     your head.

8          THE COURT:  Man.  Man, what a change in our

9     democracy that would mean.

10         Go ahead.

11         MR. STRELKA:  Well, Your Honor, we can run around in

12    circles all day, but, I mean, from our perspective, this is a

13    statement, knowingly false, not made in the course of

14    advancing a particular piece of legislation within the Town.

15    That is a statement of false fact that impugns the reputation

16    of the plaintiff.  Now all of that takes it away from absolute

17    immunity, qualified immunity, and makes it actionable under

18    defamation per se.

19         THE COURT:  Let me ask you about this deprivation of

20    liberty interest.  I'm not sure, again, as I said, you say in

21    support of that, the facts in support of that were that there

22    raised, angered voices.  She was falsely accused of stealing

23    Town property.  Falsely accused of trespassing on Town

24    property.

25         For one thing, I mean, who?  When?  By whom?

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**114**

```
 1              MR. STRELKA:  Your Honor, I can --

 2              THE COURT:  I mean, is that just, like, somebody?

 3              MR. STRELKA:  Your Honor, I can add context to these

 4   pleadings, if needed.  I would ask for leave to amend to do so

 5   if more specificity is required under the pleading standard.

 6              THE COURT:  What about raised, angered voices?  How

 7   does that fit into liberty violation?

 8              MR. STRELKA:  Well, it gives context, Your Honor.

 9   Raised, angered voice in isolation is not in and of itself a

10   deprivation of a liberty interest, and we both know that.

11   It's just merely providing context for the situation and the

12   environment in which the plaintiff worked.

13              THE COURT:  Well, I mean, isn't the deprivation of

14   liberty interest under 1983, Section 1983, when the employer

15   makes comments about the employee to the public that are

16   detrimental to the employee's ability to obtain other

17   employment?

18              MR. STRELKA:  Absolutely.

19              THE COURT:  And I don't understand, you know, that's

20   why these -- I'm puzzled by these sorts of statements.

21              MR. STRELKA:  Right.

22              THE COURT:  I mean, when she left, did they say, I

23   mean, well, we should have fired her anyway because she was

24   stealing property?  I mean, is that what you're going to say?

25              MR. STRELKA:  It was my understanding after she left
```

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**115**

1  there was concerns or thoughts that she was trespassing on

2  public property, that she might be stealing things.

3  Your Honor, I can add all of this context if the Court

4  believes it's needed.

5        THE COURT:  Okay.  Well, let me ask you about the

6  sex discrimination, gender discrimination claim.  You say that

7  you're willing to withdraw the Equal Pay Act claim.  But what

8  about the other, Count 7, sex discrimination pursuant to

9  Title 7.  And you allege that women, not only Ms. Icenhour,

10 but women in general were discriminated against in policies,

11 and differential treatment, denials of pay raises.  I mean, is

12 there any facts to support any of that?

13        MR. STRELKA:  Sure.  Well, as a easily discernible

14 example of that is the issue with the FOIA officer.  She

15 was -- Ms. Icenhour was the FOIA officer.  This position has

16 been stripped from her, what she considered to be a demotion.

17 The position was then given to a man.  That man was given a

18 pay increase for the accepting of the position.  She never

19 received a pay increase when she took that position, when she

20 was given the position.

21        THE COURT:  Well, I mean, what pay increase?  More

22 than she was making?

23        MR. STRELKA:  I don't believe so because he wasn't

24 the Town Attorney at the time.  The point being is that this

25 is a role that she fulfilled without compensation that was now

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**116**

1  all the sudden given to a man that would be given compensation

2  for these exact same duties as an example of how a woman

3  treated disparately as relates to the --

4      THE COURT:  But the facts you state don't show that.

5  I mean, there's not enough -- I mean, I don't know whether he

6  was, you know, paid way low and, you know, what his job was.

7  I mean, I don't know these facts.  And they're not alleged.

8      MR. STRELKA:  Right.

9      THE COURT:  What his pay was, how it was raised.

10     MR. STRELKA:  Sure.

11     THE COURT:  You know, did he get a $10-a-week pay

12 raise?  Or, you know, did he -- all those things.

13     MR. STRELKA:  Your Honor, I can only say --

14     THE COURT:  Every time, I mean, you know that you're

15 going to get in employment cases a motion to dismiss.  And

16 it's -- it would be so much easier if you could, you know, put

17 some facts in there instead of I'm spending two hours --

18     MR. STRELKA:  Right.

19     THE COURT:  -- talking about this.

20     MR. STRELKA:  Right.  Your Honor, I wish things were

21 otherwise.  But I am happy to add additional context.

22     THE COURT:  Well, I know you are.  But let me --

23 about the -- so she was subject to inappropriate commentary.

24     MR. STRELKA:  Mm-hmm.

25     THE COURT:  Again, Mr. Craig said, allegedly, in

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

117

1    February of 2017, how is your estrogen level?  I mean, these

2    are one of the few facts that are stated in your complaint.

3    And then, in addition, in the fall of 2016 he stated that she

4    was in bed with Food City.  Is that a sexual discrimination?

5            MR. STRELKA:  It has sexual connotation to it on its

6    face.

7            THE COURT:  It is?  In bed with Food City?  I mean,

8    isn't that a common expression that is applicable of men and

9    women?

10           MR. STRELKA:  It could be.  But aren't you, then,

11   giving Mr. Craig the reason of having entitlement to the best

12   interpretation of that statement?

13           I mean, sure the statement could be read in other

14   ways.  But --

15           THE COURT:  With Food City, an organization?  In bed

16   with the organization?

17           MR. STRELKA:  Your Honor, I didn't say the

18   statement.  Mr. Craig said the statement.  And we can depose

19   him and ask exactly what context he meant when he made the

20   statement.  But the point is he is stating that a woman is in

21   bed with Food City.  And, you know, while there is a

22   colloquialism or a turn of phrase for, as you just indicated,

23   you know, that is giving the light most favorable to the

24   defendant on a 12(b)(6) motion.

25           THE COURT:  Because the word "bed" is mentioned.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

118

1      MR. STRELKA:  Yes, Your Honor.

2      THE COURT:  Wow!

3      Okay.  Anything else you want to tell me about

4   Ms. Icenhour's complaint?

5      MR. STRELKA:  Just the lack of comparator.  We are

6   not, you know, addressing the Equal Pay Act claim anymore.

7   We're not going to advance that because she wasn't the only

8   Town Attorney at the time.

9      But I will add, you know, not to retread or replow,

10  as you indicated, everything that happened with Mr. Kelly, but

11  her ADA claims are very similar to Mr. Kelly's.  They follow a

12  similar track.  Multiple EEOC charges filed.  Disabilities

13  indicated within in there.  Notice to the employer, indication

14  of what conduct is exacerbating these disabilities.  What

15  conduct is making these things flare up.  What conduct is

16  making her have, you know, difficulties with daily life

17  activities.

18      And as we get to the January letter for request for

19  an accommodation, all of that context was known to the Town at

20  the time.  They knew she had disabilities.  They knew what she

21  was claiming that this is -- how the disabilities were

22  exacerbated.  They knew she was claiming that daily life

23  activities were affected due to the flare-ups and the

24  activities of these Town employers.

25      And, again, reasonable request for accommodation.

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**119**

1   If they say it's unreasonable, I would love to hear it so we

2   can have a conversation about it.  That never happened.

3   Months passed.  You know, we do say that they responded, but

4   it's a response saying that we will respond, and which they

5   never did.  So, I mean, it's not a meaningful response.  I put

6   it in there for purposes of accuracy of information.  But

7   there was no interactive process.  There was no discussion of

8   any accommodations.  And, therefore, she's -- you know,

9   constructive discharge manifest, along with claims of

10  discrimination and failure to accommodate.

11          But Your Honor, as it relates to these other counts,

12  I only ask, Your Honor, leave to amend to add additional

13  context and details, such that you could be satisfied.

14          THE COURT:  I appreciate that.  I appreciate that.

15          All right.  Mr. Bell, any response?

16          MR. BELL:  Just briefly, Your Honor.

17          On the sex discrimination claim, beyond whether

18  these stray comments -- and, of course, there are a multitude

19  of cases that say that stray comments aren't enough.  It has

20  to be related to an adverse employment action.  There's

21  nothing alleged that said how these two stray comments were

22  related to any adverse employment action by temporal

23  proximity.  They're years apart from when the alleged

24  constructive discharge occurred.  So that just fails to state

25  a claim completely.

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**120**

1          I will note, Your Honor, on the defamation claim as

2    well, I believe that the plaintiffs have abandoned it.

3    There's been no argument that there is an individual capacity

4    claim against Ms. Patterson in this case, even though, of

5    course, we think that both counts should be dismissed.

6          As to the --

7          THE COURT:  Wait a minute.  I'm not sure I

8    understand what you're saying.

9          MR. BELL:  On Counts 1 and 2, in the complaint there

10   is an allegation that Ms. Patterson was sued in her individual

11   capacity.  We --

12         THE COURT:  Right.

13         MR. BELL:  In our motion to dismiss, we, of course,

14   raise that there's no allegations that would give rise to a

15   basis for an individual capacity that she was acting.  She was

16   at a meeting acting as a Town Council member at the time.  The

17   plaintiffs didn't respond to that argument in their response

18   at all, so I assume that is abandon.  But it's moot if both

19   claims are dismissed, but --

20         THE COURT:  Well, I'm not sure.  I mean, individual

21   capacity, I mean, I think this is an individual capacity

22   claim, not an official capacity claim.  I mean, she was

23   acting -- I guess this is a state law claim.  What difference

24   does it make really?

25         MR. BELL:  I think the allegations are that she,

*Donna Prather, CCR, RPR, CCP, CCB*
*Official Court Reporter for the U.S. District Court Western District of Virginia*
*(276) 628-5116*

**121**

1    acting as a Town Council member -- she couldn't have been

2    speaking on the dais as a council member unless she was a

3    council member -- that she takes this comment, as Your Honor

4    stated.

5           THE COURT:  Well, I mean, you know, in 1983-type

6    claims we talk about official capacity, individual capacity,

7    but this is a state law claim.

8           MR. BELL:  Sure.

9           THE COURT:  And, I mean, she's a human being,

10   individual.  And so, I mean, maybe what it means is that

11   she's -- that the Town is responsible for it, too, or

12   something like that.

13          MR. BELL:  Right.

14          THE COURT:  She was acting within the scope of her

15   employment.

16          MR. BELL:  Right.  That's how it was pleaded.  I

17   think that the actions that have been pleaded don't state a

18   claim at all.  I think what has been pleaded is her acting in

19   her official capacity.  Maybe that's of no legal difference at

20   this stage.  But I think personally, frankly, that the claim

21   being dismissed as an individual is proper, but also would be

22   the correct thing to do.

23          Let me address just briefly, Your Honor, the

24   requested amount.  The allegations that we're talking about

25   have been going on for years and years.  The two plaintiffs

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**122**

1  we're talking about, we're talking about Ms. Icenhour's case

2  in this instance, as the Town Attorney.  We've been pressed

3  with responding to all these EEOC charges, now with the

4  federal lawsuit to file a motion to dismiss, and the response

5  from the plaintiff says, well, there's lots and lots and lots

6  of specifics that we can certainly tell you now.

7          Well, this isn't a case where you're having to

8  discover IBM and look into their electronic discovery.  These

9  plaintiffs are saying these things happened to them over a

10 period of years.  And the most specifics that we've gotten at

11 all are these stray comments that aren't related to anything.

12 So I think it's -- we would argue against allowing an

13 amendment in this case.  The plaintiffs had their opportunity,

14 multiple opportunities, to state a claim against the Town.

15 They failed to do so.

16         The result should be that the cases should be

17 dismissed, not a chance at the second bite of the apple or

18 third bite or fourth or fifth bite of the apple.  We think the

19 cases should be dismissed, Your Honor.

20         Thank you.

21         THE COURT:  Yes, sir.  Thank you.

22         Mr. Strelka, anything further you would like to say?

23         I mean --

24         MR. STRELKA:  I think it's interesting --

25         THE COURT:  -- I understand Mr. Bell's argument.

1    Although, of course, you know, I'm always hesitant not to

2    allow amendments.  But it does seem to me passing strange here

3    that, you know, there are three attorneys sitting here.  Okay.

4    Your clients are both lawyers.  And these two long complaints

5    contain so few facts.  As Mr. Bell says, really the facts

6    about what Ms. Patterson said and what Mr. Craig allegedly

7    said are about the only facts that are stated in the whole

8    thing.  I mean, everything else is sort of boilerplate, you

9    know, legal talk and that just is not the way it works

10   anymore.  Because litigation, if you can always do that, if

11   you can just file a piece of paper that has legal talk in it,

12   you know, it costs a lot of resources to prosecute and defend

13   legal cases.  I mean, it's okay with me, except I have a lot

14   to do.  But it's really the clients that suffer when we -- you

15   know, we've spent over two hours here.  You-all spent time

16   preparing.  And, you know, we get these just little tiny bits

17   of facts that support these cases.

18          And I know you're certainly willing to amend to add

19   facts, but I just have to express my concern that we don't

20   have, at this point, when this -- these cases have been going

21   on for so long and there's been -- there has been obviously a

22   concern by the plaintiffs for a long time about these things,

23   that we don't have more to help me decide whether this is a

24   case that should go forward.

25          So I'm really not asking you for any response, I

Donna Prather, CCR, RPR, CCP, CCB
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116

**124**

1    just wanted to get that off my chest.

2          MR. STRELKA:  Thank you, Your Honor.  And your words

3    are well-meant.  And we will seek to amend the complaint to

4    add additional facts and obviously regret that those facts

5    aren't here today.  But they will be there.

6          THE COURT:  Well, I'm going to rule on this.  Don't

7    file anything yet.

8          I'm going to take under advisement the motions to

9    dismiss and certainly consider your request to file an

10   amendment.  But I need to, I need to consider this a little

11   further and make a determination.  And I will do that as soon

12   as I can and issue an opinion and order.

13         If there's nothing further then, we'll recess court.

14      (Proceedings concluded at 3:09 p.m.)

15

16

17

18

19

20

21

22

23

24

25

# REPORTER'S CERTIFICATE

        I, DONNA J. PRATHER, do hereby certify that the

above and foregoing, consisting of the preceding 62 pages,

constitutes a true and accurate transcript of my stenographic

notes and is a full, true, and complete transcript of the

proceedings to the best of my ability.

        Dated this 3rd day of January, 2022.

DONNA J. PRATHER, RMR, CRR, CCP, CBC
Federal Official Court Reporter

Donna Prather, RMR, CRR, CCP, CBC
Official Court Reporter for the U.S. District Court Western District of Virginia
(276) 628-5116 x8119

**126**

**Megan Nichols**

| | |
|---|---|
| **From:** | ecfnoticing@vawd.uscourts.gov |
| **Sent:** | Monday, December 30, 2019 5:07 PM |
| **To:** | vawd_ecf_nef@vawd.uscourts.gov |
| **Subject:** | Activity in Case 1:19-cv-00032-JPJ-PMS Kelly v. Town of Abingdon, Virginia Motion to Amend/Correct |

[WARNING: External sender. Only click links or open attachments from known or trusted sources.]

<span style="color:red">**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**</span>

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

<div align="center">

**U.S. District Court**

**Western District of Virginia**

</div>

## Notice of Electronic Filing

The following transaction was entered on 12/30/2019 at 5:06 PM EST and filed on 12/30/2019

| | |
|---|---|
| **Case Name:** | Kelly v. Town of Abingdon, Virginia |
| **Case Number:** | <u>1:19-cv-00032-JPJ-PMS</u> |
| **Filer:** | Gregory Warren Kelly |
| **Document Number:** | 13(No document attached) |

**Docket Text:**
<span style="color:blue">**ORAL MOTION to Amend [1] Complaint by Gregory Warren Kelly. (lml)**</span>

**1:19-cv-00032-JPJ-PMS Notice has been electronically mailed to:**

Ramesh Murthy     rmurthy@pennstuart.com, etaylor@pennstuart.com, ggibson@pennstuart.com, jhoneycutt@pennstuart.com, jstitt@pennstuart.com

Cameron Scott Bell     cbell@pennstuart.com, crhudy@pennstuart.com, ctalbot@pennstuart.com, jpeters@pennstuart.com

Linda Leigh Strelka     leigh@strelkalaw.com

Thomas Eugene Strelka     thomas@strelkalaw.com, leigh@strelkalaw.com, megan@strelkalaw.com

Norvell Winston West, IV.     winston@strelkalaw.com, leigh@strelkalaw.com, megan@strelkalaw.com, thomas@strelkalaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00032 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, N. Winston West, IV, and Brittany M. Haddox, STRELKA LAW OFFICE, PC, Roanoke, Virginia, for Plaintiff; Ramesh Murthy and Cameron S. Bell, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Defendant.*

In this civil case, the plaintiff, a former Town Manager, asserts claims against his former employer, the Town of Abingdon, Virginia, ("Town"), under the Americans with Disabilities Act ("ADA"), along with a state-law breach of contract claim for failure to honor an alleged severance agreement. The Town has moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. Because the plaintiff has not averred facts sufficient to make out plausible claims of discrimination, retaliation, failure to accommodate, or interference under the ADA, I will grant the Motion to Dismiss as to Counts I through IV. I find that the plaintiff has stated a plausible claim for breach of contract, and I will therefore deny the Motion to Dismiss as to Count V.

**129**

I.

The Complaint alleges the following facts, which I must accept as true for purposes of deciding the Motion to Dismiss.

Kelly worked for the Town from March 2005 until May 17, 2018, when he contends he was constructively discharged.  The Town entered into an employment contract with Kelly on September 7, 2006, approval of which is reflected in Town Council meeting minutes.   In relevant part, the minutes state that Kelly's compensation would include "[n]ine (9) [m]onths severance pay at the current amount of the Town Manager's salary and benefits at the time of departure if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available."  Compl. Ex. B at 2, ECF No. 1-3.  During his employment with the Town, Kelly alleges that his performance met or exceeded the Town's legitimate expectations.

Kelly suffers from high blood pressure, anxiety, and depression, for which he has taken daily medication.   These disabilities affect his various daily life activities including sleeping, eating, and breathing.   Kelly alleges that his conditions were exacerbated by unprofessional and at times outrageous actions of several Town Council members and the Town's Mayor, who were Kelly's supervisors.

Kelly alleges that "he was continuously threatened with termination if he did not do as certain council members directed despite being bound by law and a strict code of local government ethics to implement only the policies enacted by the collective majority of the council."  Compl. ¶ 14, ECF No. 1.  According to Kelly, these threats were pretextual and the unidentified counsel members harbored animus against Kelly because of his disabilities.  Kelly avers that he "has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership and has been publicly ridiculed and defamed on several occasions."  *Id.* ¶ 15.  He filed charges of discrimination with the federal Equal Employment Opportunity Commission ("EEOC") on September 13, 2017, and December 27, 2017, although the contents of those charges are not included in the Complaint.  He states in a conclusory fashion that the Town retaliated against him for filing these charges.

On January 10, 2018, Kelly's counsel sent a letter to counsel for the Town that purported to set forth accommodations requests under the ADA.  The letter was sent on behalf of Kelly and two other Town employees and made the same collective requests on behalf of all three individuals.  The letter did not identify any particular disabilities or tie the requests to limitations associated with disabilities.  The letter states that the "overall aim of these requests is to foster a well-running office, based on the principles of mutual respect, clear communication, and having

well-defined roles within the organization." *Id*. at Ex. C. at 1, ECF No. 1-4.  The

letter sets forth the following requests:

> 1. The Town Charter is a fundamental document that outlines the Council/Manager form of governance. The Charter is the bedrock upon which the Town exists today. Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter. It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter. This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

> 2. The Town Council adopted a Code of Ethics. This is a Request that the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

> 3. This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management. If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

> 4. This is a Request for members of Town Council to cease threatening the termination [of] a Town employee's job on a weekly, sometimes daily basis. It is understood that in the course of management, certain situations do indeed warrant the threat of termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

> 5. This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

6. This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

7. For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management.  Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

8. This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

9. This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

10. This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

11. This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

12. This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

*Id.* at 2–3.  Approximately three months later, counsel representing the Town sent Kelly a letter in response saying that the Town would engage in an interactive process with him.  When Kelly then attempted to communicate with the Town, he received no further reply.

Kelly asserts that "due to the severe and pervasive hostile work environment targeting individuals with disabilities, [he] had no alternative but to resign his employment."  Compl. ¶ 20, ECF No. 1.  He alleges that he "could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function."  *Id.* at ¶ 31.  He does not identify the essential functions of those positions.  He alleges that he "revealed his disabilities to his supervisors" but does not allege the date on which the revelation occurred or indicate which supervisors he informed.  *Id.* at ¶ 33.

Count I of the Complaint is a claim of discrimination in violation of the ADA.  Kelly states that the Town discriminated against him "by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, ultimately denying [his] accommodation requests, threatening and/or harassing him, and treating [him] differently, and less favorably than, similarly situated employees."  *Id.* at ¶ 34.

Count II is a claim for retaliation in violation of the ADA.  In this count, Kelly again states that the Town retaliated against him "by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, ultimately denying [his] accommodation requests, threatening and/or harassing him, and treating [him] differently, and less favorably than, similarly situated employees." *Id.* at ¶ 48.  In addition, Kelly alleges that the Town's failure to pay him a severance was retaliation for his requests for reasonable accommodations.

Count III is a claim for failure to accommodate in violation of the ADA.  In this count, he alleges that he "requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations." *Id.* at ¶ 62. He does not indicate when or to whom he made these requests.

Count IV is a claim for interference under the ADA.  Kelly alleges that "[t]he Town's actions coerced [him] to forego accommodations to which he was otherwise entitled." *Id.* at ¶ 76.  "Specifically, Mr. Kelly did not take short breaks, as a reasonable accommodation, as he feared that he would receive written discipline or be terminated for a pretextual reason." *Id.* at ¶ 77.

Count V is a breach of contract claim under Virginia law.  Kelly asserts that the Town had a contractual obligation to pay him nine months' salary when his employment ended.  The Town never made the severance payment.

The Town has moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Motion to Dismiss has been fully briefed and orally argued and is ripe for decision.

## II.

Federal pleading standards require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In order to survive a motion to dismiss, the plaintiff must "state[] a plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct" based upon its "judicial experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  In evaluating a pleading, the court accepts as true all well-pled facts.  *Id*.  A complaint does not need detailed factual allegations to survive a motion to dismiss; however, it must have more than labels and conclusions or a recitation of the elements of the cause of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.

*A. Timeliness of ADA Claims.*

The Town first argues that to the extent any of Kelly's ADA claims are based on allegations that were contained in his first two EEOC charges, those claims are untimely because Kelly failed to file suit within 90 days of receiving Dismissal and Notice of Rights letters from the EEOC regarding those charges. Kelly responds that all three of his EEOC charges pertained to the same ongoing course of conduct, and the continuing violation doctrine therefore renders his claims timely because he filed suit within 90 days of receiving a Dismissal and Notice of Rights letter regarding his third and final EEOC claim.

An employee who files a charge with the EEOC alleging violation of rights under the ADA must file suit in federal court within 90 days of the date the EEOC notifies the employee that the charge has been dismissed. 42 U.S.C. § 2000e-5(f)(1). The plaintiff concedes that he did not file suit within 90 days of receiving Dismissal and Notice of Rights letters related to his first two EEOC charges. A number of courts have held that when a plaintiff has filed a series of EEOC charges but has not filed suit within 90 days of dismissal of the earlier-filed charges, the notice of dismissal of the final charge does not serve to revive time-barred claims raised in the earlier charges. *See, e.g.*, *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 203 (E.D.N.Y. 2014); *Woods v. Lancaster Indep. Sch. Dist.*, 834 F. Supp. 2d 512, 516

(N.D. Tex. 2011); *Felix v. City & Cty. of Denver*, 729 F. Supp. 2d 1243, 1250–51 (D. Colo. 2010).

"[T]he continuing violation theory does not eliminate the requirement that a plaintiff file a judicial action within ninety days of receipt of notice of the right to sue." *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991). The continuing violation doctrine, which tolls the statute of limitations for filing a claim with the EEOC, is meant to ensure "that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature." *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012).

> This purpose would not be served by extending the 90-day filing period . . . . By the time that she receives a right-to-sue notice, a claimant is necessarily aware of the defendant's discriminatory conduct; she has by then already recognized the occurrence of discrimination and filed her administrative claim.

*Id.*; *see also Gibbs v. Gen. Motors Corp.*, 104 F. App'x 580, 582 (7th Cir. 2004) (unpublished) ("Gibbs cannot avail herself of the continuing-violation doctrine because she obviously believed that the time-barred acts were discriminatory when she filed EEOC charges in early 2001.").

I agree with these decisions and am inclined to conclude that the claims raised in Kelly's first two EEOC charges are now time-barred. The problem is that

the Complaint contains no information about the claims of those two EEOC charges, nor does it set forth the contents of Kelly's third EEOC charge, on which this suit is presumably based.  I therefore cannot rule on whether any or all of Kelly's claims asserted in this case are time-barred.  The plaintiff has not provided the court with the information necessary to find that he timely filed suit on the claims he has asserted here.

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  Therefore, the question of whether a claim is time-barred usually cannot be resolved on a motion to dismiss, except "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint."  *Id.*  Those circumstances are not present here, so I will deny the Motion to Dismiss on statute of limitations grounds.

## B.  Count I:  Discrimination.

The ADA protects qualified individuals with disabilities from discrimination on the basis of their disabilities. 42 U.S.C. § 12112(a); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278-79 (4th Cir. 2004).  A qualified individual is "an individual who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

In this case, Kelly claims that he was constructively discharged. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted). In such a situation, the law will treat the employee's resignation as a discharge. *Id.*

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position

"would have had *no choice* but to resign."  *Perkins v. Int'l Paper Co.*, 936 F.3d

196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted).  This

standard is higher than the severity or pervasiveness required to prove a hostile

environment harassment claim.  *Id.*

Kelly's allegations supporting his constructive discharge theory are vague at

best.  He alleges that he was continuously threatened with termination and was

"subjected to insults, invasions of privacy, disclosure of confidential information,

and profane and obscene messages from Town leadership and has been publicly

ridiculed and defamed on several occasions."  Compl. ¶ 15, ECF No. 1.  He cites

no specific instances in support of these conclusory allegations, nor does he allege

who subjected him to these hardships.  He contends that the Town refused to

engage in an interactive process with him to determine appropriate

accommodations for his disabilities.  Finally, he asserts that the Town

discriminated or retaliated against him either for filing EEOC charges or because

of his disabilities and accommodations requests, or both.

To survive a motion to dismiss, Kelly's "[f]actual allegations must be

enough to raise a right to relief above the speculative level," to one that is

"plausible on its face," rather than merely "conceivable." *Bell Atl. Corp.*, 550 U.S.

at 555, 570.  The sparse, imprecise allegations set forth in the Complaint do not

satisfy that test.  Kelly has not plausibly alleged that he was constructively

discharged.   As this is a required element of his disability discrimination claim under the ADA, I will dismiss Count I for failure to state a claim upon which relief can be granted.

Even if the allegations were sufficient to establish a constructive discharge, Count I would fail because Kelly has not plausibly alleged that his job performance met his employer's legitimate expectations.  Kelly's allegations on this point are entirely conclusory.  A plaintiff must do more than simply recite the elements of his cause of action.  Here, Kelly pleads no facts in support of his claim that he was performing to his employer's expectations.   Similarly, he has not adequately alleged that he could perform the requirements of his job with or without reasonable accommodations.  He therefore has not plausibly alleged that he is a qualified individual with a disability.  Again, he merely recites this legal element without providing any details about the essential functions of his position, how his disabilities affected his ability to perform those essential functions, or how reasonable accommodations might have helped him to perform those functions. For these reasons as well, I will grant the Motion to Dismiss as to Count I.

Finally, aside from conclusory assertions, there are no factual allegations in the Complaint that raise a reasonable inference of disability-based discrimination. Kelly cannot rely solely on his own speculation that he was mistreated due to his disabilities.  He must allege some facts tending to show that the mistreatment he

claims to have suffered was causally related to his disabilities.  Because he has not done so, his claim of disability discrimination must be dismissed.

### C.  Count II:  Retaliation.

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action."  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).  Kelly's retaliation claim suffers from shortcomings similar to those that plague his discrimination claim.

The first adverse action alleged by Kelly is constructive discharge.  As I have already held, the allegations in the Complaint are insufficient to establish the intolerability necessary to establish a constructive discharge.   Kelly next alleges that the Town retaliated against him for requesting reasonable accommodations by failing to pay him the severance money he was owed.  While this could amount to an adverse action supporting a retaliation claim, Kelly must plausibly allege that there was a causal link between his request for accommodations or other protected activity and the Town's refusal to issue a severance payment.  The Complaint contains nothing more than conclusions on this point, stating only that "[t]he Town retaliated against Mr. Kelly regarding the denial of severance" and "would not have denied his severance . . . but for Mr. Kelly's disabilities and/or requests for

reasonable accommodations." Compl. ¶ 53, ECF No. 1. These boilerplate statements do not meet federal pleading standards. Because Kelly has failed to state a plausible claim of retaliation under the ADA, I will grant the Motion to Dismiss as to Count II.

### D.  Count III:  Failure to Accommodate.

The ADA requires an employer to "make reasonable accommodations for an applicant or an employee's disability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008). The applicable regulation provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). To state a claim for failure to accommodate, a plaintiff must plausibly allege "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

Kelly's failure to accommodate claim must be dismissed because he has not alleged facts showing that he could perform the essential functions of his job with

reasonable accommodations.  As noted above, he does not even allege what the essential functions of his job were, nor does he state if or how his disabilities impacted him in the workplace.  While he references a request to take short breaks, he does not explain why short breaks were necessitated by his disabilities or how they would have helped him to perform the essential functions of his job.  *See id.* (explaining that reasonableness of the request is only one part of the inquiry, and the plaintiff "must also show that with this accommodation he was a qualified individual — that is, he could have performed the essential functions of his position").

Kelly suggests that the Town is liable for failure to accommodate simply because it did not engage in an interactive process with him.  The Fourth Circuit has rejected that argument.  "[E]ven if an employer's duty to engage in the interactive process is triggered, the employer's liability for failing to engage in that process may collapse for a number of reasons," including "if the employee cannot identify a reasonable accommodation that would have been possible" or if the employer and employee could not have found a reasonable accommodation that would have allowed the employee to perform the essential job functions.  *Id.* at 347.  "[A]n employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process."  *Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587489, at *4 (4th Cir. Oct. 25,

2000) (unpublished).  Instead, the plaintiff is required to show that "the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." *Id.*

While the January 10, 2018, letter from Kelly's counsel purports to set forth accommodation requests, the requests are not tied to limitations caused by any particular disabilities and are not even specific to Kelly.  Rather, the requests appear to address general workplace grievances.  Kelly has not alleged any facts to suggest that he and the Town could have arrived at reasonable accommodations had they engaged in an interactive process.  He has not alleged the limitations caused by his disabilities or the job functions they affected.  The scant allegations in the Complaint are insufficient to state a plausible failure-to-accommodate claim.  I will grant the Motion to Dismiss as to Count III.

### E.  Count IV:  Interference.

The ADA provides that

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of  his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).  There are few appellate decisions construing this subsection.  The Seventh Circuit has found that a plaintiff alleging ADA discrimination must show:

(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate.

*Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017).

"Protected activities are those statutorily protected under the ADA," including "formal complaints of discrimination." *Id.* at 551. A request for an accommodation is protected activity. *See Haulbrook*, 252 F.3d at 706. The EEOC has issued guidance in which it sets forth several examples of conduct that would be considered interference. The example most applicable here is "coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled." U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, 2016 WL 4688886, at *26 (2016).

As with his other ADA claims, Kelly has not alleged enough facts to raise his interference claim above the speculative level. While he claims he requested short breaks and reduced stress, he does not indicate when or to whom he made those requests. Assuming that those requests qualify as protected activity, the Complaint contains no factual allegations showing that the Town coerced, threatened, intimidated, or interfered on account of Kelly's protected activity. Kelly makes a vague allegation that he was threatened with termination, but that allegation is in no way tied to his request for accommodations, either temporally or

in any other sense.  Kelly's assertion that he did not take short breaks because "he feared that he would receive written discipline or be terminated for a pretextual reason," Compl. ¶ 77, ECF No. 1, speaks only to his own subjective mindset, not to any action of the Town.

Without further details regarding Kelly's alleged request for accommodations and the Town's treatment of him, I cannot find that Kelly has stated a plausible claim for interference under the ADA.  I will therefore grant the Motion to Dismiss as to Count IV.

### F.  Count V:  Breach of Contract.

Because I have dismissed Kelly's ADA claims, which provide the basis for federal question jurisdiction, I could decline to exercise supplemental jurisdiction over the state law breach of contract claim.  28 U.S.C. § 1367(c)(3).  I will exercise supplemental jurisdiction over Count V, however, because plaintiff's counsel indicated several times during oral argument that he intends to move to amend the Complaint to add further factual allegations in support of the ADA claims.  In light of that stated intention, I find that retaining jurisdiction over this case will best conserve judicial and party resources.

Under Virginia law, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff

caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (internal quotation marks and citations omitted). The Town argues that Kelly cannot show a legally enforceable obligation because a Virginia statute states that hiring of employees of localities "shall be without a definite term." Va. Code Ann. § 15.2-1503(A). The Town Charter similarly states that employees may be dismissed at any time.

I am unpersuaded by this argument. The employment agreement as summarized in the Town Council meeting minutes does not purport to set a term of years for Kelly's appointment or to render him anything other than an at-will employee. The agreement does not indicate that Kelly can only be terminated for cause. It simply states that "if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available," Kelly will be entitled to severance pay equal to nine months of his current salary and benefits. Compl. Ex. B at 2, ECF No. 1-3.

It is not clear from the minutes what the parties intended by the phrase "not successful." At oral argument, plaintiff's counsel suggested that the Town possesses a written contract, executed by the Town and Kelly. The actual contract may be more precise than the summary contained in the meeting minutes, and Kelly will presumably gain access to it in discovery. If the written contract is ambiguous, parol evidence gathered during discovery may shed some light on what

the parties intended.   But the meeting minutes clearly indicate that the parties agreed to a severance.  Based on Kelly's resignation and the alleged tensions with his supervisors, it is plausible that Kelly's tenure as Town Manager was not successful and that the Town therefore owed him a severance payment, which it did not pay.  At this early stage of the proceedings, the allegations are enough to support a claim of breach of contract.  I will therefore deny the Motion to Dismiss as to Count V.

<div align="center">III.</div>

In summary, I find that the present Complaint is legally insufficient except for the claim of breach of contract.  Accordingly,  the Motion to Dismiss, ECF No. 3, is GRANTED IN PART and DENIED IN PART.  The Motion is GRANTED as to Counts I, II, III, and IV, and it is DENIED as to Count V.  Any request to amend the Complaint must be sought by a written motion including as an exhibit the proposed Amended Complaint, which motion must be filed within 14 days hereof.

It is so **ORDERED**.

ENTER:  February 3, 2020

/s/  JAMES P. JONES
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| GREGORY WARREN KELLY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No.  1:19CV00032 |
| | ) |
| | ) |
| TOWN OF ABINGDON, VIRGINIA, | ) |
| | ) |
|     Defendant. | ) |

## <u>MOTION FOR LEAVE</u><br><u>TO FILE AMENDED COMPLAINT</u>

COMES NOW, Plaintiff Gregory Warren Kelly, by counsel, pursuant to Federal Rule of Civil Procedure 15, and moves this Court for leave to file a First Amended Complaint. The First Amended Complaint has been appended to this pleading and made part hereof as **EXHIBIT A**.

The First Amended Complaint advances all of the counts pled under federal law in the original Complaint.

1. Plaintiff has added more factual allegations in order to state *prima facie* discrimination and retaliation claims under the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA"). See generally 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(4).

WHEREFORE the Plaintiff, by counsel, moves this Court for the following relief:

a) That the Court grant this Motion and permit the filing of the Amended Complaint for reasons provided in the accompanying supportive Brief.

Respectfully Submitted,

**GREGORY WARREN KELLY**

/s/ Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelklaw.com
winston@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 17th day of February, 2020, I served the forgoing Motion to Amend Complaint and Brief in Support of said Motion, via the Court's CM/ECF system, with notice of electronic filing (NEF) on the following:

Ramesh Murthy, Esquire
Cameron S. Bell, Esquire
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
(276) 628-5151
Fax: (276) 628-5621
cbell@pennstuart.com

*Counsel for Defendants*

/s/ Thomas E. Strelka

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| GREGORY WARREN KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No:  1:19-cv-00032 |
| | ) | |
| TOWN OF ABINGDON, VIRGINIA, | ) | JURY TRIAL DEMAND |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Gregory Warren Kelly (hereinafter, "Mr. Kelly" or "Plaintiff"), by counsel, and states as his First Amended Complaint against Defendant Town of Abingdon, Virginia (hereinafter, "Town" or "Defendant"), the following:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter as it arises from the federal questions presented by the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"), and state law claims, to-wit, a breach of contract.

2. Venue is appropriate as the Plaintiff and Defendant reside in Abingdon, Virginia.

1

3.     Due to its contacts within the Commonwealth of Virginia, and charter by the Virginia General Assembly, Defendant avails itself to the jurisdiction of this Court.

4.     As it relates to Plaintiff's ADA claims, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around July 27, 2018. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated May 22, 2019, attached hereto as **EXHIBIT A**. Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

5.     Mr. Kelly, a resident of Abingdon, Virginia, was hired by The Town in or around March of 2005, and worked on a consistent, full-time basis for The Town for nearly thirteen (13) years, until his unlawful constructive discharge on or about May 7, 2018.

6.     The Town is an incorporated and chartered town under the laws of the Commonwealth of Virginia.

## III. FACTUAL ALLEGATIONS

7.     In or around March 1, 2005, Mr. Kelly was hired by The Town as Town Attorney and later was appointed Town Manager.

8.     At the time of Mr. Kelly's appointment as Town Manager on September 7, 2006, Mr. Kelly and The Town entered into an employment contract. In relevant part, the contract provided that Mr. Kelly was due nine (9) months' severance, calculated based on Mr. Kelly's annual salary at the time he left employment. *See* Sept. 7, 2006 Town Council Meeting Minutes, attached as **EXHIBIT B**.

9.     During his employment with The Town, Mr. Kelly's work performance was excellent, and met or exceeded The Town's legitimate business expectations.

10.     At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

11.     In the alternative, The Town regarded Mr. Kelly as disabled.

12.     These conditions have been exacerbated due to the often unprofessional and occasionally outrageous actions of several of Mr. Kelly's supervisors, the Town Council of Abingdon and the Mayor of Abingdon.

13.    Due to political in-fighting among Council members, Mr. Kelly's disabilities have affected his daily life activities.  Mr. Kelly worked day-to-day in a severe and pervasive hostile working environment.

14.    Mr. Kelly's daily life activities would be adversely affected with the increased stress from Council members' actions. The impacts on Mr. Kelly's job duties included: (a) his inability to concentrate at work, (b) an overall exacerbation of his high blood pressure, causing him to feel faint and (c) suffering panic attacks witnessed by various Town staff members.  These staff members would frequently try to console and comfort Mr. Kelly and would frequently check his blood pressure in the office.  In fact, one Town employee was so concerned for Mr. Kelly's health that she personally purchased a blood pressure monitor to routinely check his blood pressure. On several occasions she and other Town staff, out of concern for his welfare, would plead with Mr. Kelly to go home and/or to Urgent Care or to his personal physician. These same employees routinely witnessed and can attest to the abusive behavior of the Council toward Mr. Kelly and other Town employees.

15.    Despite performing his job exceptionally well, with full knowledge of his disabilities, Mr. Kelly was continuously threatened with termination if he did not do as certain council members directed despite

being bound by law and a strict code of local government ethics to implement only the policies enacted by the collective majority of the council. These threats were a pretext, masking a discriminatory animus towards Mr. Kelly's disabilities.

16.    For example, former Mayor Cathy Lowe and former Vice Mayor Rick Humphreys would come to Mr. Kelly on a regular basis. They would state that Mr. Kelly needed "to get on board" with their agendas or he would be terminated. Ms. Lowe stated that if she was not re-elected or "if you do not support me," Mr. Kelly would lose his job.

17.    Further, Ms. Lowe stated that when Mr. Kelly made necessary decisions for the Town, not necessarily in Ms. Lowe's personal interest, then "it would not go well for you." Ms. Lowe further attempted to influence the hiring of her personal friends and in one case demanded that he rehire an employee that he had terminated, who was a personal friend of Ms. Lowe. Ms. Lowe continuously demanded that her friends within the Town be placed in positions that she desired for them regardless of their educational qualifications or experience in such a job. This type of behavior by Ms. Lowe ultimately led to a department head leaving Town employment because some of his duties were unlawfully taken from the Town Manager by Ms. Lowe in order to create a new position of employment for a friend of hers.

18.   Mr. Kelly has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership and has been publicly ridiculed and defamed on several occasions.

19.   Mr. Humphreys specifically made a number of phone calls to Mr. Kelly, plaintiff Deb Icenhour, and former Town Clerk Cecile Rosenbaum late at night or during early morning hours in a drunken rage. Mr. Humphreys, in a hostile and belligerent manner, and in an often-drunken state of mind and voice would state that if Mr. Kelly did not do things that he wanted done, he would intentionally make Mr. Kelly's, Ms. Icenhour's, and Ms. Rosenbaum's lives miserable. Mr. Humphreys would frequently curse and abuse Mr. Kelly and town employees and often presented himself intoxicated.

20.   As an example, the Town had a no-blow whistle ordinance that operated to prevent trains from blowing their whistles within the Town's limits during certain hours of the night and early morning. Mr. Humphreys owned properties near the railroad tracks and was personally interested in the enforcement of this ordinance.

21.   Mr. Kelly informed Mr. Humphreys that the railroad was in compliance with the ordinance. Mr. Kelly pointed out that the trains blew

their whistles to alert of potential dangers, and that, by law, they are allowed to blow their horns in such situations at any hour of the day.

22.    Every time that Mr. Humphreys or Ms. Lowe made demands or threatened Mr. Kelly, Mr. Kelly would remind them that he worked for the whole Town Council and had to serve a majority of the council.

23.    Further, Mr. Kelly hired a Director of Tourism and Mr. Humphreys constantly ridiculed the man by intentionally mispronouncing his name.

24.    This Director became angered by the constant harassment and threatened to quit.

25.    Mr. Kelly organized a meeting with the Director and Mr. Humphreys to try to mediate the dispute and resolve their differences.

26.    Mr. Humphreys stated to the Director, "listen you little son of a bitch, you start doing things the right way, or I will have your job."

27.    Mr. Kelly intervened by stating, "Rick, you do not have the legal right or authority to take his job, only I have that authority." Mr. Humphreys then retorted, "well, we'll see about that."

28.    Similar to Mr. Kelly, the Director felt as though he had no other choice but to leave his employment with the Town.

29.    Mr. Humphreys, over objection of Mr. Kelly, would frequently belittle and humiliate him and town staff both in private and in public meetings.  Many of the public meetings are documented in the video archives of the Town of Abingdon, namely in Council meetings, Planning Commission Meetings and in the Historic Board of Architectural Review.  On occasion, members of the public who were the subject of agenda items would contact Mr. Kelly threatening legal action against the Town if he did not get Mr. Humphreys under control. In addition, Town staff often complained to Mr. Kelly about the abuse.  Virtually every department head in the Town would console with Mr. Kelly that they did not understand how he was able to cope with the abuse by Council.   These hostile abuses by Mr. Humphreys undermined Mr. Kelly's ability to demonstrate his authority of management over town employees as his managerial actions were often overridden unlawfully by Mr. Humphreys and other Council members.

30.    Current mayor Wayne Craig came to meet with Mr. Kelly, and said, "Greg, you realize that if the Friends of Abingdon (FOA) don't get their way on this project, (The Meadows) you are going to be fired."  Mr. Craig then directed Mr. Kelly to meet with the President of the FOA.  Mr. Craig stated that it was Joe Levine, the President of FOA, who controlled whether

Mr. Kelly would remain employed with the Town. Mr. Craig made a point to make clear to Mr. Kelly, "Greg I am a member of FOA, so take that to heart".

31.    After former employee Ms. Rosenbaum wrote an article in the Virginia Local Government Manager's Association (VLGMA) Newsletter of a sexual harassment incident that she experience in the Town Hall Elevator with a former Town employee, Mr. Craig thereafter approached Mr. Kelly and laughed loudly and  informed him that "Damn Greg, what's her problem? If a female tried to harass me in an elevator, I would welcome it." Mr. Kelly found this statement to be threatening toward the treatment of town employees and highly offensive and unprofessional.

32.    At a Christmas breakfast, Mr. Craig told one employee that he looked like an "idiot" because he wore a winter hat.  Mr. Craig demanded to know in which department the employee worked.  When the employee stated that it was the Director of Public Works, Mr. Craig responded that the Director "was an asshole." This statement was made in front of and witnessed by many town employees who were assembled at this breakfast.

33.    Mr. Craig's comments were indicative of the enmity that he held towards Mr. Kelly and his contempt for Mr. Kelly's hiring decisions. Mr. Craig had further singled out the prior Public Works Director in a meeting with VDOT officials and referred to him as "an asshole". Despite Mr. Kelly's

attempts to disallow and prevent these types of remarks and confrontations with town staff by Mr. Craig and other Council members, such public ridicule of Mr. Kelly and town staff continued to escalate.

34.    Regarding invasion of Mr. Kelly's privacy, Ms. Lowe came to Mr. Kelly's office and stated that she needed to borrow Mr. Kelly's computer. Mr. Kelly believed she began looking for private communications from or to Mr. Kelly and/or to delete digital evidence that existed at the time based on his observations of the computer after her use. On that same day, Ms. Lowe approached the Town Attorney, Deborah Icenhour, and indicated that she needed to have access to her computer as well.

35.    Mr. Kelly believed that his work data was continually under threat of review and/or deletion by Town leaders to serve their own purposes based on Ms. Lowe's and other Town leader's conduct.

36.    As another example, Mr. Kelly, Ms. Icenhour, Mr. Humphreys, and Ms. Lowe traveled to Richmond for a meeting.  Ms. Lowe kept insisting that she sent Mr. Kelly an email and needed to see Mr. Kelly's cell phone while he was driving. Mr. Kelly gave her his phone. Mr. Kelly believed that she again looked for private messages based on his observations after she returned his phone.

37.     Mr. Kelly believed that he had numerous private messages and documentation, including likely, his employment contract, on a digital network drive. This drive was created specifically for Mr. Kelly and was only to be accessible by Mr. Kelly.  The drive also housed Mr. Kelly's legal files from his private practice of law prior to becoming employed by the Town as well as his legal files after he became employed as Abingdon's Town Attorney. After Mr. Kelly filed an EEOC Charge, this digital documentation was suspiciously erased.  Mr. Kelly contacted the Town's IT department who confirmed that the drive had been erased.  Upon information and belief, these documents were erased intentionally by the Town.

38.     Finally, Ms. Lowe asked Mr. Kelly to hand his smart watch to her so that she could search it as well.  Mr. Kelly believed Ms. Lowe began looking for private messages that were stored on the device, based on the appearance of the smart watch upon its return.

39.     Mr. Kelly's working environment became untenable to the point that he was having spikes in his blood pressure at work, resulting in dizzy spells. Mr. Kelly was having difficulty performing some of his work tasks that he previously could perform quickly, such as reading and writing emails and responding to various inquiries.

40.   Mr. Kelly also suffered crippling anxiety due to work stress attributed to the behaviors of Town leadership.  Mr. Kelly experienced disorientation and confusion at times caused by the sheer level of anxiety levelled against him on a daily basis. Additionally, he consistently suffered from insomnia, panic attacks, and feelings of utter hopelessness related to the stress at work. These physical manifestations of Mr. Kelly's disabilities occurred, in part, during working hours.

41.   Mr. Kelly's health issues became threatening enough for his physician to inform him that he should request accommodations or remove himself from his working environment in order to protect himself from worsening and depleting health.

42.   Mr. Kelly continued to suffer from a discriminatory animus towards his disabilities and retaliation due to his disabilities and for filing Charges of Discrimination with the EEOC. The Town knew, based on his Charges of Discrimination, that Mr. Kelly was disabled, as Mr. Kelly identified as disabled.

43.   The Town's attacks on Mr. Kelly increased after the filing of his Charges of Discrimination on September 13, 2017, Charge No. 438-2017-01164 and December 27, 2018, Charge No. 438-2018-00415.

44.   Upon Mr. Kelly's physician's advice to seek reasonable accommodations, on January 10, 2018, Mr. Kelly requested several reasonable accommodations for his disabilities on the basis that the Town's actions had increased the severity of his disabilities' physical manifestations. *See* January 10, 2019 2018 letter, appended to this pleading as **EXHIBIT C**. Twelve possible accommodations were described in the letter as talking points in the interactive process to find an accommodation that could reduce the physical manifestations of Mr. Kelly's disabilities and allow him to complete the essential functions of his job:

a. The Town Charter is a fundamental document that outlines the Council/Manager form of governance. The Charter is the bedrock upon which the Town exists today. Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter. It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter. This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

b. The Town Council adopted a Code of Ethics. This is a Request that the Town Council and Town Management have a

fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

c. This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management. If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

d. This is a Request for members of Town Council to cease threatening the termination a Town employee's job on a weekly, sometimes daily basis. It is understood that in the course of management, certain situations do indeed warrant the threat of termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

e.  This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

f.  This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

g.  For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management. Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

h.  This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

i.  This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

j.  This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff

15

**169**

members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

k.  This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

l.  This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

45.  The Town refused to engage in the interactive process in any meaningful way in order to find accommodations for Mr. Kelly's disabilities. The Town's refusal to engage in the interactive process resulted in the failure to identify an appropriate accommodation. *See Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587498, at *4 (4th Cir. Oct. 25, 2000).

46.     Mr. Kelly only received a token communication from The Town's legal counsel several months later, in or about April of 2018, stating that The Town would engage in the interactive process. When Mr. Kelly attempted to further communicate with the Town concerning the interactive process and finding reasonable accommodations that would benefit him, he did not receive any further reply from the Town or the Town's legal counsel. The Town, after requests for accommodations were made, in fact escalated its defiant behavior regarding each of the requested accommodations in an open and flamboyant manner to state to Mr. Kelly that they, as elected officials, were not subject to the requirements of ordinary business employers. In short, they thumbed their nose at Mr. Kelly's request, regardless of his health or welfare.

47.     Upon the separation of employment of Cecile Rosenbaum who had filed similar EEOC complaints against the Town, Ms. Lowe approached Mr. Kelly and said "we got rid of one big problem and now its time to get the Town under control.  We expect you to be in the office and not at the other departments or visiting work sites."  After this statement was made, instead of offering Mr. Kelly any accommodations for his disabilities as he had requested, Ms. Lowe, Mr. Humphreys, Mr. Craig and Ms. Patterson demanded more of Mr. Kelly on a daily basis and began interfering much

more severely in his abilities to exercise his managerial duties of his staff. Accordingly, Mr. Kelly's health became worse and he was ridiculed for parking away from the Town Hall and walking to work. Mr. Kelly defended this as an attempt to help with his health. Nonetheless, even in this slightest of attempts to improve his health, Mr. Kelly was ridiculed and humiliated by the Town Council. Instead of offering the slightest of help for his disabilities, the Council created an environment so hostile and life threatening to Mr. Kelly that Mr. Kelly was left with no alternative but to leave employment with the Town in order to salvage his health.

48.    As matters continued to worsen at the workplace, Mr. Kelly disclosed to Ms. Lowe, Mr. Humphreys, Mr. Craig, Council members, Cindy Patterson Bob Howard and former Mayor Ed Morgan that he suffered a high blood pressure condition that was exacerbated by the stresses and pressures of the workplace. He also detailed his panic attacks and anxiety, which led to disorientation and confusion. Each of these conversations occurred in one-on-one conversations between Mr. Kelly and the above-mentioned Town leaders.

49.    While at work, all of the department heads became aware of Mr. Kelly's EEOC filings. It was well known in the office that Mr. Kelly had filed charges with the EEOC. Mr. Kelly felt that his filings were a well-discussed

18

**172**

subject matter at the office.  Many times, department heads, especially after public meetings such as Council meetings or Planning Commission meetings, would congregate in Mr. Kelly's office to console him for the abuse that he and the staff had endured.  In fact, the day after Council meetings was routinely termed by the staff as the "Council Hangover". And of course, Ms. Lowe and Mr. Humphreys would either show up or call in to try to influence the Clerk to draft the minutes in a way most favorable to them regardless of truth.

50.    Mr. Craig, in a meeting of engineers and in front of Mr. Kelly, stated that Mr. Kelly was an "asshole." Mr. Kelly took umbrage at this comment as he believed it reflected poorly on both the Town and Mr. Kelly's personal reputation.  As previously stated above, such comment of referring to Town employees as "assholes" was not uncommon by Mr. Craig.

51.    Mr. Kelly believed that the Town leaders' attacks on him became more severe and pervasive due to his disclosures of his disabilities and because of his EEOC filings. These attacks further became more prevalent after the Town separated the employment of Cecile Rosenbaum who had also filed similar EEOC complaints as Mr. Kelly.

52.    On or about May 7, 2018, due to the severe and pervasive hostile work environment targeting individuals with disabilities, Mr. Kelly had no

alternative but to resign his employment. Mr. Kelly attempted to work in an untenable work environment. However, because of the abusive nature of that work environment, Mr. Kelly suffered a constructive discharge.

53.    Mr. Kelly suffered through repeated threats to terminate his employment, all made by individuals without the legal justification or authority to do so.  Mr. Kelly could have been terminated by a majority of the Town Council.   However, Mr. Humphreys, Ms. Lowe and Mr. Craig repeatedly misrepresented their authority and insisted that Mr. Kelly would be replaced.   These threats increased with each filing of Mr. Kelly's charges of discrimination and increased in frequency leading up to his termination.

54.    Greg Kelly was frequently undermined by Cathy Lowe, Cindy Patterson, Mr. Craig and Mr. Humphreys.  Despite the authority to direct Town personnel resting with Mr. Kelly, these four Town leaders consistently and intentionally went around Mr. Kelly to give individual directives to employees of the Town.  On numerous occasions, department heads and staff would contact Mr. Kelly to inform him of these directives by the aforesaid Council members.  Some of these directives were not Town business related and personal to these Council members in order that they might personally gain from their undue influence.

55.    Mr. Kelly consistently informed these individuals that they could not direct Town employees as they had no authority to do so.

56.    These Town leaders' actions were taken in spite of their knowledge of Mr. Kelly's physical manifestations of his disabilities, high blood pressure, depression, and anxiety, and in spite of Mr. Kelly requesting reasonable accommodations for these Town leaders to cease the activities that caused Mr. Kelly's issues.

57.    Upon information and belief, no business-related legitimate reason justified the actions The Town took against Mr. Kelly, as Mr. Kelly's work performance was excellent and, until he requested federally protected disability accommodations to manages his disabilities, he never received any discipline from his employer.

58.    Accordingly, Mr. Kelly's constructive discharge was merely a pretext to unlawful discrimination and retaliation by The Town, as Mr. Kelly's constructive discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or reasonable accommodations.

59.    Indeed, the short temporal proximity between the time Mr. Kelly requested accommodations related to his disability and his constructive discharge supports Mr. Kelly's claims for discrimination and retaliation.

60.    Mr. Kelly suffered a constructive discharge, in violation of the ADA, because The Town:

- discriminated and/or retaliated against Mr. Kelly for filing previous EEOC Charges;

- discriminated and/or retaliated against Mr. Kelly because of his disabilities and/or because of his requests for disability-related accommodations; and/or

- failed to properly accommodate Mr. Kelly's disabilities.

61.    The Town never paid Mr. Kelly the severance he was due under the September 2006 employment agreement. The official minutes of the Town Council signed by then Mayor Lois Humphreys and attested by then Clerk, Linda Wilson clearly establishes a binding and enforceable severance agreement.  On numerous occasions Ms. Lowe and Mr. Humphreys would frequently state in front of Mr. Kelly to other Council members that "you do know that if Greg leaves here, we have to pay him nine months of severance pay".

62.    Because the actions taken by the Mayor, the Town Council, and other Town employees were taken within the scope of their employment and/or role as the statutory decision-makers for The Town, The Town is responsible for the actions of employees based upon the doctrine of

22

**176**

*respondeat superior* and strictly liable for the actions of statutory decision-makers, such as the Mayor and Town Council.

## IV. CLAIMS

### COUNT I: CLAIM FOR DISCRIMINATION IN VIOLATION OF THE ADA

63.   Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

64.   At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

65.   At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

66.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

67.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function. Mr. Kelly's essential job functions included answering

emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs.

68.   Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

69.   Mr. Kelly revealed his disabilities to his supervisors at The Town and requested the reasonable accommodations.

70.   The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations to determine what reasonable accommodations Mr. Kelly might benefit from. The Town ultimately denied Mr. Kelly's accommodation requests out of hand, threatened and/or harassed him, and treated Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

71.   The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

72.    Mr. Kelly's requested reasonable accommodations would have decreased the severity of the physical manifestations of his disabilities and restored his ability to complete the essential functions of his job as efficiently as he had before the Town leaders' actions.

73.    Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

74.    Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

75.    As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

76.    At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

77.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified

under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT II: CLAIM FOR RETALIATION
## IN VIOLATION OF THE ADA

78.   Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

79.   At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

80.   At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

81.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

82.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function. Mr. Kelly's essential job functions included answering

emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs.

83.   Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

84.   Mr. Kelly revealed his disabilities to his supervisors at The Town and requested the reasonable accommodations.

85.   The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations to determine what reasonable accommodations Mr. Kelly might benefit from. The Town ultimately denied Mr. Kelly's accommodation requests out of hand, threatened and/or harassed him, and treated Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

86.   The Town's leaders increased the severity of their attacks on Mr. Kelly after Mr. Kelly filed his Charges of Discrimination with the EEOC and requested reasonable accommodations.

**181**

87.   The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

88.   Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

89.   Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

90.   Moreover, after his termination, The Town refused to provide Mr. Kelly his severance as referenced in the September 7, 2016 minutes.

91.   The Town retaliated against Mr. Kelly regarding the denial of severance.  The Town would not have denied his severance, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations

92.   As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

93.    At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

94.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT III: CLAIM FOR FAILURE
## TO ACCOMMODATE IN VIOLATION OF THE ADA

95.    Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

96.    At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

97.    Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

98.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

99.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

100.  Mr. Kelly revealed his disabilities to his supervisors at The Town, and requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations. Short breaks and reduced stress, had the Town even considered these accommodation requests, would have lowered the likelihood of Mr. Kelly becoming faint at work due to his high blood pressure, for example.

101.  Prior to his request for disability accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town, as he had not received negative performance reviews except in retaliation for revealing his disabilities and/or requesting reasonable accommodations.

102. The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation

requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

103.  The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

104.  Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

105.  Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodation.

106.  As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

107.  At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

108.   The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute failure to accommodate in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT IV: INTERFERENCE IN VIOLATION OF THE ADA

109.   Plaintiff incorporates by reference herein the preceding paragraphs of his complaint.

110.   At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

111.   Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

112.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

113.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

114.   Mr. Kelly sought accommodations for his various disabilities. Mr. Kelly sent these accommodations requests to the Town via Mr. Kelly's legal counsel. *See* **EXHIBIT C**. However, The Town's actions coerced Mr. Kelly to forgo accommodations to which he was otherwise entitled.

115.   Specifically, Mr. Kelly did not take short breaks, as a reasonable accommodation, as he feared that he would receive written discipline or be terminated for a pretextual reason.

116.   Mr. Kelly's belief that he would receive unwarranted discipline for unilaterally implementing his requested reasonable accommodations was well founded. As stated previously, Mr. Kelly was continually threatened with termination if he did not do exactly as individual Town Council members commanded. Therefore, Mr. Kelly's belief that he would be terminated for something much less severe, such as leaving his duty station for a few minutes to walk around, was reasonable.

117.   Town Council members did not engage in the interactive process with Mr. Kelly, so Mr. Kelly had no authorization to take short breaks, for example.

118.   The EEOC has provided in Enforcement Guidance on ADA Interference claims that, "a threat does not have to be carried out in order to violate the interference provision, and an individual does not actually have

to be deterred from exercising or enjoying ADA rights in order for the interference to be actionable." Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004 (August 25, 2016), *available at* https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=#III._ADA. An employee only needs an objectively reasonable belief that some adverse action might happen if he uses an accommodation. Again, Mr. Kelly was not offered any accommodations by the Town, as the Town refused to engage in the interactive process to find reasonable accommodations for Mr. Kelly.

119.   The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

120.   The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

121.   Any reasons given by the Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

122.   Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful interference based upon his disabilities and/or requests for accommodation.

123.   As a direct and proximate result of the Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

124.   At all times material hereto, the Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

125.   The Equal Employment Opportunity Commission has issued guidance, pursuant to its authority under 42 U.S.C. § 12203(b), finding that the interference provision of the Americans with Disabilities Act is wider in scope than the anti-retaliation provision, and is, therefore, proven by a similar set of facts as the anti-retaliation provision. *See* Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004 (August 25, 2016), *available at* https://www.eeoc.gov/laws/guidance/retaliation-

**189**

guidance.cfm?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=#III._ADA.

126.   The above-described acts by the Town and employees and/or statutory decision-makers of The Town constitute interference with Mr. Kelly's ADA rights in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT V: BREACH OF CONTRACT

127.   Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

128.   Plaintiff and Defendant entered into a legally binding employment contract on September 7, 2006.

129.   The employment contract had been offered by The Town and duly adopted by The Town's statutory decision-makers.

130.   Among several provisions of the employment contract, Mr. Kelly was due to receive nine (9) months' severance, based upon his current annual wage at the time he left The Town's employ.

131.   Mr. Kelly was not paid the severance he was due at the time of his constructive discharge from employment with The Town.

36

**190**

WHEREFORE, Plaintiff Gregory Warren Kelly prays for judgment against Defendant Town of Abingdon, Virginia and for equitable relief, compensatory, incidental, liquidated and/or punitive damages, together with prejudgment interest from the date of Mr. Kelly's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**GREGORY WARREN KELLY**

/s/ Thomas E.
Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA 24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 17th day of February, 2020, I served the forgoing

First Amended Complaint, via the Court's CM/ECF system, with notice of

electronic filing (NEF) on the following:

Ramesh Murthy, Esquire
Cameron S. Bell, Esquire
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
(276) 628-5151
Fax: (276) 628-5621
cbell@pennstuart.com

*Counsel for Defendants*

/s/ Thomas E. Strelka

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gregory W. Kelly | From: | Richmond Local Office<br>400 North 8th Street<br>Suite 350<br>Richmond, VA 23219 |
|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 438-2018-01524 | Stephanie Hadden,<br>Investigator | (804) 771-2163 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Daron L. Calhoun,_
**Daron L. Calhoun,**
**Director**

MAY 2 2 2019

*(Date Mailed)*

Enclosures(s)

cc:
| Edward Craig<br>Mayor<br>TOWN OF ABINGDON<br>133 West Main Street<br>Abingdon, VA 24210 | Thomas E. Strelka<br>STRELKA LAW OFFICE, PC<br>Warehouse Row<br>119 Norfolk Avenue, S.W., Suite 330<br>Roanoke, VA 24011 |
|---|---|

**194**

Enclosure with EEOC
Form 161 (11/16)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**195**

Enclosures(s)

cc:     **Ramesh Murthy**
        **PENN STUART**
        **PO Box 2288**
        **Abingdon, VA 24212**

**196**

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**  The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

***Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.***  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**197**

2006- 77
September 7, 2006

TOWN OF ABINGDON, VIRGINIA
SPECIAL CALLED COUNCIL MEETING
THURSDAY, SEPTEMBER 7, 2006 – 8:30 P.M.
MUNICIPAL BUILDING

A special called meeting of the Abingdon Town Council was held on Thursday, September 7, 2006 at 8:30 P.M. in the upstairs conference room at the Municipal Building.

A.    ROLL CALL

Members of Council present:    Mayor Lois H. Humphrey
Mr. Robert M. Howard, Vice Mayor
Dr. French H. Moore, Jr.
Mr. Edward B. Morgan
Mrs. Cathy Lowe

Comprising a quorum of the Council

Administrative Staff:    Greg Kelly, Town Attorney

B.    Closed Session Pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

The motion was duly made and seconded to go into closed session pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

The roll call vote was:    Mr. Morgan – Aye      Mrs. Lowe – Aye        Dr. Moore – Aye
Mr. Howard – Aye      Mayor Humphreys – Aye

The motion carried.

* * * * * * *

The motion was duly made and seconded to reconvene in regular session.

The roll call vote was:    Mr. Morgan – Aye      Mrs. Lowe – Aye        Dr. Moore – Aye
Mr. Howard – Aye      Mayor Humphreys – Aye

The motion carried.

The following certification was adopted:

Whereas, the Town Council of Abingdon, Virginia has convened in closed meeting on this date pursuant to an affirmative recorded vote and in accordance with the provisions of the Virginia Freedom of Information Act; and Whereas, Section 2.2-3712(D) of the Code of Virginia requires a certification by the Town Council that such closed meeting was conducted in conformity with Virginia law;

Now, therefore, be it resolved that the Town Council of Abingdon, Virginia hereby certifies that to the best of each member's knowledge (i) only public business matters lawfully exempted from open meeting requirement by Virginia law were discussed in closed meeting to which this certification resolution applies and (ii) only such public business matters as were identified in the motion convening the closed meeting were heard, discussed or considered by Council.

The roll call vote was:    Mr. Morgan – I so certify   Mrs. Lowe – I so certify   Dr. Moore – I so certify
Mr. Howard – I so certify        Mayor Humphreys – I so certify

2006- 78
September 7, 2006

The motion carried.

Mr. Morgan made the motion to appoint Greg Kelly to the position of Town Manager, effective November 1, 2006.  Mr. Howard seconded the motion.

The roll call vote was:     Mr. Morgan – Aye        Mrs. Lowe – Aye        Dr. Moore – Aye
                            Mr. Howard – Aye        Mayor Humphreys – Aye

The agreed terms of the employment between Greg Kelly as Town Manager and the Town of Abingdon include the following

I.     **Compensation**
       a. $100,000.00 base salary with standard Town employee benefits.
          Salary to be reviewed at least yearly upon the adoption of each year's annual budget.
       b. $3,100.00 (or such amount representative of the annual cost of health insurance) to be paid into an ICMA, VRS or equivalent retirement plan as designated by the Town Manager on November 1, 2006 and each fiscal year thereafter.
       c. The guarantee to return to the position of Town Attorney should serving in the capacity of Town Manager not be successful.
       d. Nine (9) Months severance pay at the current amount of the Town Manager's salary and benefits at the time of departure if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available.

II.    **Education Expenses**

       a. The Town will pay all educational and incidental expenses in the pursuit of a Master's Degree in Public Administration or related field.
       b. The cost of all annual Continuing Legal Education and incidental expenses required by the Virginia State Bar to remain actively licensed to practice law in Virginia.
       c. All membership fees, conference costs and incidental expenses for LGA, IMLA, ICMA and VML.

With no further business the meeting was adjourned.

_Lois F. Humphreys_
Lois H. Humphreys, Mayor

_Linda F. Wilson_
Linda F.  Wilson, Clerk

**199**

**STRELKA**
LAW OFFICE, PC

Thomas E. Strelka
thomas@strelkalaw.com
540.283.0775

L. Leigh R. Strelka
leigh@strelkalaw.com
540.283.0776

www.strelkalaw.com

January 10, 2018

**VIA UNITED STATES MAIL AND EMAIL**

Ramesh Murthy, Esq.
PennStuart
208 E. Main Street
Abingdon, Virginia 24210

    Re:    *Proceeding Forward Kelly, Rosenbaum, Icenhour / Town of Abingdon;*
             *Accommodations Requests*

Dear Mr. Murthy,

In furtherance of our discussions and in accordance with the Americans with Disabilities Act, my clients hereby submit the following accommodations requests. These requests are made collectively herein for purposes of efficiency of implementation. Should these requests warrant further discussion for any reason, I am available to you at your convenience.

**Accommodation Requests in Theme**

The following are a number of requests regarding the daily office environment. The overall aim of these requests is to foster a well-running office, based on the principles of mutual respect, clear communication, and having well-defined roles within the organization. These are the three tenants in which these requests are rooted.

Mutual respect is an easily accomplished goal, and Mr. Kelly, Ms. Icenhour, and Ms. Rosenbaum shall continue to faithfully serve the Town with professional attitudes, tones of voice and choice of words. Despite their best efforts, professional respect has not been mutually received at times during their employment with the Town. At times, they have felt harassed or that they work in a hostile environment. Sometimes, issues of professional respect can be fixed with knowledge of appropriate boundaries and utilizing effective communication systems.

Clear communication is essential to the fundamental health and well-being of an efficient and productive office environment. The following requests outline options for establishing methods or practices of communication to ensure that all of the parties

equally understand one another.  We have all experienced a bad result in a situation at one time or another that began as a small miscommunication or misunderstanding. These requests aim to reduce the incidents of miscommunication and misunderstanding between the parties.

Defining the roles of individuals within an office environment can lead to improvements in both communication and mutual respect.  When an employee is armed with knowledge, typically in the form of clearly written policies or well-known practices, regarding how to deal with a variety of issues as they emerge, that employee is not only a better worker, but a better co-worker.  Thus, the following requests seek to flesh out the roles, duties and responsibilities of the parties in order to facilitate a better overall office environment.

### The Requests

1.      The Town Charter is a fundamental document that outlines the Council/Manager form of governance.  The Charter is the bedrock upon which the Town exists today.  Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter.  It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter.  This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

2.      The Town Council adopted a Code of Ethics.  This is a Request that the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

3.      This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management.  If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

4.      This is a Request for members of Town Council to cease threatening the termination a Town employee's job on a weekly, sometimes daily basis.  It is understood that in the course of management, certain situations do indeed warrant the threat of

2

**201**

termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

5.     This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

6.     This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

7.     For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management. Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

8.     This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

9.     This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

10.    This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

11.    This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

12.    This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

3

**202**

I look forward to hearing your thoughts on the above requests.

Sincerely,

Tommy Strelka

cc:    L. Leigh R. Strelka  (via electronic mail at _leigh@strelkalaw.com_)
       Gregory Kelly     (via electronic mail)
       Cecile Rosenbaum  (via electronic mail)
       Deborah Icenhour  (via electronic mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| GREGORY WARREN KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:19CV00032-JPJ-PMS |
| | ) | |
| | ) | |
| TOWN OF ABINGDON, VIRGINIA, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF DEFENDANT
IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE
TO FILE AMENDED COMPLAINT**

Defendant Town of Abingdon, Virginia ("Town"), by counsel, states the following

in opposition to the Motion for Leave to File Amended Complaint.

### I.   Introduction

In his Motion for Leave to File Amended Complaint ("Motion for Leave"), Greg

Kelly ("Kelly") alleges that he "has added more factual allegations in order to state *prima*

*facie* discrimination and retaliation claims" under the relevant statutes. (Mot. For Leave, at

1.) Kelly attached his proposed First Amended Complaint ("Proposed Complaint") to his

Motion for Leave.

Kelly's Proposed Complaint fails to state claims upon which relief can be granted

under Federal Rule of Civil Procedure 12(b)(6). This Court should deny Kelly's Motion

**204**

for Leave as futile because his Proposed Complaint fails to remedy the issues set forth in this Court's Memorandum and Order.[1]

**II.**    ***Kelly Fails to State Plausible Claims for Disability Discrimination and Retaliation (Counts I and II) Under The ADA Because He Failed To Plead Sufficient Facts to Establish Constructive Discharge.***

This Court granted the Defendant's Motion to Dismiss as to Counts I and II (Disability Discrimination and Retaliation) because "Kelly's assertions supporting his constructive discharge theory are vague at best" and that plaintiff's "sparse, imprecise allegations set forth in the Complaint do not satisfy" pleading standards.  (Op., at 13.)

In his Proposed Complaint, Kelly still fails to allege facts that are causally related to his supposed constructive discharge. Kelly outlines a number of incidents in his "Facts" section, but Kelly fails to articulate how these incidents would have led to the conclusion that conditions were so intolerable that a reasonable person would resign.

Difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position would have had *no choice* but to resign. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019). This standard is higher than the severity or pervasiveness required to prove a hostile work environment claim. *Id.  See also Williams v. Giant Food Inc.*, 370 F.3d 423 (4th Cir. 2004) (unfair criticisms and unpleasant working conditions are insufficient) and

---

[1] Defendant reiterates its previously stated argument that the plaintiff's claims are time-barred.

**205**

*Bowen v. Maryland, Department of Public Safety and Correctional Services*, 2018 WL 1784463 (D. Md. 2018) (even where plaintiff alleged anxiety, yelling at and belittling plaintiff was insufficient to allege constructive discharge.)

In this case, even taking everything that Kelly says as true, his Proposed Complaint still does not give rise a constructive discharge claim.

First, Kelly again alleged random facts with no dates of when they supposedly occurred.  Again, Kelly has failed to allege that his employer, the Town Council, as opposed to individual Council members, acted against him at all.

Again, Kelly fails to allege any facts (even if true) that rise above the types of purported "yelling and belittling" that the Fourth Circuit has ruled is insufficient to state a claim.  And again, most importantly in this supposed disability suit, Kelly has not alleged how the Town's alleged actions related to his disability. He alleges in a conclusory manner that his disability were affected by the "increased stress" from Council members' actions, but he provides no causal connection. Kelly merely pleads what he claims was a stressful work environment. But interpersonal workplace grievances, stress, friction, and pointed criticism do not create constructive discharge as a matter of law.

Kelly has also failed to remedy the failure of the previous Complaint because he did not plausibly allege that his job performance met his employer's legitimate expectations. (Op., at 14.)  Kelly instead relies on the same vague assertions as the initial Complaint.

Likewise, Kelly has not alleged that any actions were related to his disability. (Op., at 14-15.)  Of all the new allegations purporting to show "abuse" of Kelly, there is no single fact or alleged statement that ties any of those statements to Kelly's alleged

3

disability.   To the contrary, of the various, undated scenarios the Proposed Complaint alleges, the purported statements apparently show that Kelly was not meeting the Council's expectations of him and in any event the anecdotal incidents were related to train whistles, hats, and disagreements with Kelly over other employees' job performances.[2]

Kelly's Proposed Complaint fails to state a claim for disability discrimination and retaliation. This Court should, therefore, deny Kelly's Motion for Leave.

### III.   *Kelly Fails to State Plausible Claim for Retaliation Under the ADA Because He Failed to Plead a Causal Link Between the Protected Activity and Alleged Adverse Action.*

This Court granted the Defendant's Motion to Dismiss as to Count II (Retaliation) because Kelly failed to establish a constructive discharge and because Kelly failed to plausibly allege that "there was a causal link between his request for accommodations or other protected activity and the Town's refusal to issue a severance payment." (Op., at 15.)

In his Proposed Complaint, Kelly pleads no new facts that would establish a causal link between his protected activity and the termination of his employment. Mr. Kelly alleges only that:

- "Mr. Kelly continued to suffer from discriminatory animus towards his disabilities and retaliation due to his disabilities and for filing Charges of Discrimination with the EEOC. The Town knew, based on his Charges of Discrimination, that Mr. Kelly was disabled, as Mr. Kelly identified as disabled." (Am. Compl. ¶ 42.)

- "The Town's attacks on Mr. Kelly increased after the filing of his Charges of Discrimination…" (Am. Compl. ¶ 43.)

---

[2] Kelly also apparently admits that he improperly stored non-Town related material, such as his private law practice documents, upon Town devices and servers.

4

- "Mr. Kelly believed that the Town leaders' attacks on him became more severe and pervasive due to his disclosures of his disabilities and because of his EEOC filings. These attacks further became more prevalent after the Town separated the employment of Cecile Rosenbaum who had also faced similar EEOC complaints as Mr. Kelly. (Am. Compl. ¶ 51.)

Kelly's Proposed Complaint does not explain or provide any support for how these assertions provide the necessary causal link between his protected activity and the adverse employment action. Kelly's Proposed Complaint likewise fails to explain how any of the other incidents he describes within the "Facts" portion of his Proposed Complaint are relevant to his retaliation claim.

The only additional assertion is the repetition of the verbatim assertion in his Complaint at Paragraph 85. (Compl. ¶ 48.) This Court addressed Kelly's attempt to make this assertion into a retaliation claim, finding that "boilerplate statements do not meet federal pleading standards." (Op., at 16.)

Kelly's Proposed Complaint fails to state a claim for retaliation. This Court should, therefore, deny Kelly's Motion for Leave.

### IV. *Kelly Fails to State Claims for Discrimination and Failure to Accommodate Under the ADA (Counts I and III) Because He Did Not Plead That He Was A Qualified Individual With A Disability.*

This Court granted the Defendant's Motion to Dismiss as to Counts I and III (Disability Discrimination and Failure to Accommodate) because Kelly failed to allege facts that he could perform the essential functions of his job with reasonable accommodations because he did not even allege what the essential functions of the job were. (Op. at 14, 16.)  Kelly also failed to allege that his job performance met his employer's legitimate expectations. (*Id.*)

Abingdon: 1111636-1

In his Proposed Complaint, Kelly once again relies on conclusory statements of fact to support his argument that he was a qualified individual. Kelly pleads no factual content as to the essential functions, requirements, or qualifications of his job. Kelly likewise pleads no facts as to how his disability affected his ability to perform his job. He likewise fails to plead how "reasonable" accommodations would have allowed him to perform the essential functions of the job.

Instead, Kelly merely alleges, as follows:

- Kelly's "daily life activities would be adversely affected with the increased stress from Council members' actions." (Am. Compl. ⁋ 14.) Notably, Kelly did not plead that his disability would be adversely affected.

- "Despite performing his job exceptionally well…" (Am. Compl. ⁋ 15.)

- "Mr. Kelly's work performance was excellent…" (Am. Compl. ⁋ 57.)

- "At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions." (Am. Compl. ⁋ 101.)

Kelly thus fails to plead any additional facts, such that would survive a Motion to Dismiss because the additional "facts" are primarily conclusions, but regardless he has not pleaded how he could have performed his essential functions with reasonable accommodations. This Court should deny Kelly's Motion For Leave Because Kelly still fails to state a claim upon which relief may be granted.

### V.   *Kelly Fails to State a Claim for Failure to Accommodate Under the ADA Because He Did Not Plead that He Requested a Reasonable Accommodation.*

This Court also granted the Defendant's Motion to Dismiss as to Count III (Failure to Accommodate) because the Kelly failed to show that the Town's failure to engage in the

6

interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee. (Op., at 18.)  In his Proposed Complaint, Kelly fails to provide anything more than conclusory statements that the Town's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation. In fact, Kelly states merely that:

- "The Town refused to engage in the interactive process in any meaningful way to find accommodations for Mr. Kelly's disabilities. The Town's refusal to engage in the interactive process resulted in the failure to identify an appropriate accommodation." (Am. Compl. ⁋ 45.)

- "Mr. Kelly only received token communication from the Town's legal counsel…stating that the Town would engage in the interactive process…" (Am. Compl. ⁋ 45.)

But as this Court noted in its opinion, the Fourth Circuit has found that, "Even if an employer's duty to engage in the interactive process is triggered, the employer's liability for failing to engage in that process may collapse for a number of reasons," including "if the employee cannot identify a reasonable accommodation would have been possible" or if the employer and employee could not have found a reasonable accommodation that would have allowed the employee to perform the essential job functions. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). "An employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in the interactive process." *Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587489, at *4 (4th Cir. Oct. 25, 2000) (unpublished).

In this case, Kelly's accommodations were nothing more than a list of intangible notions such as following the Town Code of Ethics and requesting the Town Council

consider greater diversity. In its Opinion, this Court already found that these requests are insufficient to establish a plausible failure-to-accommodate claim, stating:

> While the January 10, 2018 letter from Kelly's counsel purports to set forth accommodation requests, the requests are not tied to limitations caused by any particular disability and are not even specific to Kelly. Rather, the requests appear to address general workplace grievances. Kelly has not alleged any facts to suggest that he and the Town could have arrived at reasonable accommodations had they engaged in an interactive process. He has not alleged the limitations caused by his disabilities or the job functions they affected. The scant allegations in the Complaint are insufficient to sate a plausible failure-to-accommodate claim.

(Op., at 18.)

Thus, Kelly relies on the same facts that this Court has already found insufficient.

In addition to the January 10 "accommodations," Kelly pleaded in his Proposed Complaint that he, at some unknown point, requested "reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations. Short breaks and reduced stress … would have lowered the likelihood of Mr. Kelly becoming faint at work due to his high blood pressure." (Am. Compl. ¶ 100.)  This naked allegation was not pleaded in the fact section of the Proposed Complaint and actually contradicts the earlier allegations at paragraph 44 that in response to a physician's statement (which apparently was not communicated to the Town), Kelly's lawyer sent the list that the Court has already ruled was insufficient.  That list did not include any request for short breaks or other similar accommodation.  Kelly alleges that he told individual Council members separately at undisclosed times that he suffered issues due to stress, but did not allege that he requested accommodations at those times.

But Kelly still fails to meet the federal pleading standard with this allegation, as he failed to state how "short breaks" could have helped him perform any essential element of his job. Additionally, as this Court notes in its Opinion, Kelly "does not indicate when or to whom he made those requests." (Op., at 19.)

It is thus impossible for this court to determine whether there is "sufficient factual detail for the court to draw the reasonable inference that [Kelly] could have performed the essential function of h[is] position with the requested accommodation." *See Advanced Home Care*, 305 F. Supp. at 675.

Kelly fails to plead any additional facts, such that would survive a Motion to Dismiss. This Court should deny Kelly's Motion For Leave Because Kelly still fails to state a claim upon which relief may be granted.

### VI.    *Kelly Fails To State A Claim For Interference Under the ADA.*

This Court granted the Defendant's Motion to Dismiss as to Count IV (Interference Under the ADA) because Kelly's Complaint contained "no factual allegations showing that the Town coerced, threatened, intimidated, or interfered on account of Kelly's protected activity. Kelly makes a vague allegation that he was threatened with termination, but that allegation is in no way tied to his request for accommodations, either temporally or in any other sense." (Op., at 19-20.)

In his Proposed Complaint, Kelly again pleads no factual allegations that the Town coerced, threatened, intimidated, or interfered on account of Kelly's **protected activity.** Kelly pleads numerous examples of poor conduct by the Town, but Kelly fails to relate any of that poor conduct to his protected activity. As before, Kelly makes no allegations that

**212**

any of the "threats" against him were tied to his request for accommodations, either temporally or in any other sense.

For example, Kelly pled that his "belief that he would receive unwarranted discipline for unilaterally implementing his requested reasonable accommodations was well founded. As stated previously, Mr. Kelly was continually threatened with termination if he did not do exactly as individual Town Council members commanded." (Am. Compl. P 116.) But Kelly does not plead how this is related in any manner to his request for accommodations. It is simply (allegedly) threatening behavior, which in and of itself does not invoke protections under the ADA.

Ultimately, Kelly again fails to plead any additional facts, such that would survive a Motion to Dismiss. This Court should deny Kelly's Motion For Leave Because Kelly still fails to state a claim upon which relief may be granted.

**VII.    Kelly Failed to Allege a Breach of Contract.**

The Town reiterates its prior arguments that Kelly was an employee at will and as a result, has failed to state a claim for breach of contract.  But in addition, Kelly has failed to allege that the supposed contract was breached.

The only basis for a "contract" is located in minutes from a Town Council meeting on September 7, 2006.  Those minutes state that Kelly would be entitled to nine months' severance pay if serving in the capacity of Town Manager is "not successful" and the Town Attorney position was not available.   (Comp., Ex. C.) Kelly never pleaded that his employment with the Town was unsuccessful after over a decade in that position.   In

addition, he failed to allege that the Town Attorney position was not available. Consequently, he has failed to state a claim.

<div align="center">CONCLUSION</div>

Kelly fails to state a claim upon which relief may be granted in his Proposed Complaint. This Court should thus deny Kelly's Motion for Leave to File Amended Complaint, as granting the Motion for Leave would prove futile.

Abingdon: 1111636-1

**214**

TOWN OF ABINGDON

By Counsel

Ramesh Murthy
  VSB No. 31801
Cameron S. Bell
  VSB No. 47685
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia  24212
Telephone:  276/628-5151
Facsimile:  276/628-5621
cbell@pennstuart.com
By  */s/ Cameron S. Bell*
     Cameron S. Bell
     Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2020, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to counsel of record.

*/s/ Cameron S. Bell*
Cameron S. Bell

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00032 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, N. Winston West, IV, and Brittany M. Haddox, STRELKA LAW OFFICE, PC, Roanoke, Virginia, for Plaintiff; Ramesh Murthy and Cameron S. Bell, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Defendant.*

In this employment-related civil case asserting claims under the Americans with Disabilities Act ("ADA") along with a state law breach of contract claim, I previously granted the defendant's Motion to Dismiss as to the ADA claims. *Kelly v. Town of Abingdon, Va.*, No. 1:19CV00032, 2020 WL 525296 (W.D. Va. Feb. 3, 2020). The plaintiff has now filed a Motion for Leave to File Amended Complaint, which the defendant opposes. For the reasons that follow, the motion will be granted in part and denied in part.

I.

The plaintiff, Gregory Warren Kelly, was hired by the Town of Abingdon, Virginia ("Town"), on March 1, 2005, to serve as the Town Attorney. On September 7, 2006, he was appointed Town Manager, a position he held until May 7, 2018. He

claims he was constructively discharged.  He suffers from anxiety, high blood pressure, and depression, for which he takes daily medication, and which have affected his daily life activities of sleeping, eating, breathing, and having "normal circulation."  First Am. Compl. ¶ 10, ECF No. 15-1.

The allegations of the original Complaint are summarized in my earlier Opinion.  2020 WL 525296, at *1–3.  To those allegations, the proposed First Amended Complaint adds the following factual averments, which I must accept as true at this stage of the proceedings.[1]

Kelly alleges that actions by members of the Town Council, to whom he reported, caused him increased stress and aggravated his disabilities.  He avers that Town Council members' actions impaired his ability to concentrate at work; exacerbated his high blood pressure, causing him to feel faint; and triggered panic attacks.  Various Town staff members who viewed these panic attacks would frequently check his blood pressure in the office and urge him to seek medical help or go home because they were concerned for his health.

Kelly asserts that former Mayor Cathy Lowe and former Vice Mayor Rick Humphreys regularly told Kelly that he "needed to 'get on board' with their agendas or he would be terminated.  Ms. Lowe stated that if she was not re-elected or 'if you

---

[1]  These factual allegations have yet  to be proved by the plaintiff and of course I make no prediction as to whether the plaintiff can ultimately prevail.

do not support me,' Mr. Kelly would lose his job." First Am. Compl. ¶ 16, ECF No. 15-1. Lowe warned Kelly that making certain decisions contrary to her interests "'would not go well for [him].'" *Id.* at ¶ 17. Kelly also alleges that Lowe continually demanded that Kelly appoint Lowe's personal friends to positions for which they were unqualified.

Kelly asserts that Humphreys on several occasions called him and two other Town officials, former Town Attorney Deborah Icenhour and former Town Clerk Cecile Rosenbaum, "late at night or during early morning hours in a drunken rage." *Id.* at ¶ 19. Humphreys belligerently stated that "if Mr. Kelly did not do things that he wanted done, he would intentionally make Mr. Kelly's, Ms. Icenhour's, and Ms. Rosenbaum's lives miserable." *Id.* Humphreys often appeared intoxicated and used profanity toward Kelly and other Town employees. His requests were motivated by personal interests. For instance, Humphreys owned property near railroad tracks that pass through Abingdon and wanted the Town's no-blow whistle ordinance to be enforced. The ordinance prohibited trains from blowing their whistles within Town limits at certain hours. Kelly told Humphreys that the railroad was complying with the ordinance and blowing whistles only to warn of potential dangers, as allowed by law. Kelly repeatedly reminded Lowe and Humphreys that he worked for the Town Council as a body and had to serve a majority of the council rather than individual members.

Kelly hired a Director of Tourism, and Humphreys constantly intentionally mispronounced his name. This angered the employee, who threatened to quit. Kelly organized a meeting with Humphreys and the employee in order to mediate the dispute. Humphreys stated to the employee, "'listen you little son of a bitch, you start doing things the right way, or I will have your job.'" *Id.* at ¶ 26. When Kelly told Humphreys that he did not have the authority to terminate the employee and that only Kelly possessed that authority, Humphreys responded, "'well, we'll see about that.'" *Id.* at ¶ 27.

Kelly alleges that Humphreys frequently belittled and humiliated him and Town staff in private and in public meetings. "On occasion, members of the public who were the subject of agenda items would contact Mr. Kelly threatening legal action against the Town if he did not get Mr. Humphreys under control. In addition, Town staff often complained to Mr. Kelly about the abuse." *Id.* at ¶ 29. "These hostile abuses by Mr. Humphreys undermined Mr. Kelly's ability to demonstrate his authority of management over town employees as his managerial actions were often overridden unlawfully by Mr. Humphreys and other Council members." *Id.*

Kelly alleges that Lowe, Patterson, Craig, and Humphreys repeatedly made demands directly of Town employees, despite Kelly's supervisory authority over the employees. Some of the directives were not related to Town business and were instead related to personal interests of the Council members.

Current Town Mayor Wayne Craig was a member of a group called the Friends of Abingdon ("FOA"), which opposed a major shopping center project known as the Meadows.  Craig told Kelly that if FOA did not get its way regarding the Meadows, "'you are going to be fired.'"  *Id.* at ¶ 30.  Craig directed Kelly to meet with the president of FOA and stated that the FOA president controlled whether Kelly would be terminated, reminding Kelly that Craig was a member of FOA.

Town Clerk Rosenbaum wrote an article for a local government manager's newsletter regarding a personal experience of sexual harassment by a former Town employee.  Craig then approached Kelly laughing and stated, "'Damn Greg, what's her problem?  If a female tried to harass me in an elevator, I would welcome it.'"  *Id.* at ¶ 31.  Kelly pleads that he "found this statement to be threatening toward the treatment of town employees and highly offensive and unprofessional."  *Id.*

Craig made demeaning comments to other Town employees as well, and Kelly asserts that these comments "were indicative of the enmity that he held towards Mr. Kelly and his contempt for Mr. Kelly's hiring decisions."  *Id.* at ¶ 33.  Craig told an employee "he looked like an 'idiot' because he wore a winter hat" to a Christmas breakfast.  *Id.* at ¶ 32.  Craig asked the employee's department, and the employee replied that he was the Director of Public Works.  Craig then called him an "'asshole'" in front of other Town employees.  *Id.*  Craig had called the prior Director of Public Works the same name in a meeting with officials of the Virginia

Department of Transportation.  Kelly alleges that he attempted to discourage these types of remarks, but public ridicule of Town employees by Craig and other Town Council members escalated.  Kelly alleges that Craig called him an "'asshole'" in a meeting of engineers at which Kelly was present.  *Id.* at ¶ 50.  Kelly believed this comment reflected poorly on the Town and Kelly's reputation.

Former Mayor Lowe asked to borrow Kelly's computer on one occasion, and Kelly "believed she began looking for private communications from or to Mr. Kelly and/or to delete digital evidence that existed at the time based on his observations of the computer after her use." *Id.* at ¶ 34.  Lowe sought access to Icenhour's computer on the same day.  "Mr. Kelly believed that his work data was continually under threat of review and/or deletion by Town leaders to serve their own purposes based on Ms. Lowe's and other Town leader's conduct." *Id.* at ¶ 35.  Kelly cites another example when Lowe insisted on seeing Kelly's phone while he was driving the two of them to a meeting in Richmond.  "Mr. Kelly believed that she again looked for private messages based on his observations after she returned his phone." *Id.* at ¶ 36.  On another occasion, Lowe asked Kelly to hand her his smart watch.  "Mr. Kelly believed Ms. Lowe began looking for private messages that were stored on the device, based on the appearance of the smart watch upon its return." *Id.* at ¶ 38.

Kelly alleges that he stored private messages and communications, including his employment contract and legal files from his prior private law practice, on a

Town network drive that was created for him and was only to be accessible by him. "After Mr. Kelly filed an EEOC Charge, this digital documentation was suspiciously erased. Mr. Kelly contacted the Town's IT department who confirmed that the drive had been erased." *Id.* at ¶ 37.

Kelly claims that his work environment caused spikes in his blood pressure and dizzy spells while he was at work. He began to have difficulty performing work tasks such as reading and writing emails and responding to inquiries. He also experienced anxiety due to the behaviors of Town leaders, which caused disorientation, confusion, insomnia, panic attacks, and feelings of hopelessness. His physician told him "he should request accommodations or remove himself from his working environment in order to protect himself from worsening and depleting health." *Id.* at ¶ 41.

Kelly alleges that after he filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on September 13, 2017, and December 27, 2018, he continued to experience discrimination due to his disabilities and in retaliation for filing EEOC charges. He further alleges that the Town's actions against him worsened after he filed the charges.

Upon his doctor's advice to seek accommodations for his disabilities, Kelly directed his lawyer to send a letter to the Town on January 10, 2018, purporting to seek reasonable accommodations. The specific requests in the letter are set forth in

my earlier Opinion and Order.  2020 WL 525296, at *2–3.  As I noted previously, "The letter was sent on behalf of Kelly and two other Town employees and made the same collective requests on behalf of all three individuals. The letter did not identify any particular disabilities or tie the requests to limitations associated with disabilities."  *Id.* at *2.  Rather, it had the stated goals of fostering respect and communication.  In response to the letter, the Town did not attempt to engage Kelly in an interactive process to find reasonable accommodations for Kelly's disabilities. "The Town's refusal to engage in the interactive process resulted in the failure to identify an appropriate accommodation."  First Am. Compl. ¶ 45, ECF No. 15-1. "The Town, after requests for accommodations were made, in fact escalated its defiant behavior regarding each of the requested accommodations in an open and flamboyant manner to state to Mr. Kelly that they, as elected officials, were not subject to the requirements of ordinary business employers."  *Id.* at ¶ 46.

Town Clerk Rosenbaum had filed EEOC charges similar to those filed by Kelly.  After her employment terminated, Lowe told Kelly, "'we got rid of one big problem and now it's time to get the Town under control.  We expect you to be in the office and not at the other departments or visiting work sites.'"  *Id.* at ¶ 47.  Lowe, Humphreys, Craig, and Town Council member Cindy Patterson then "demanded more of Mr. Kelly on a daily basis and began interfering much more severely in his abilities to exercise his managerial duties of his staff."  *Id.*  Kelly's health worsened.

Kelly disclosed his disabilities in individual conversations with Lowe, Humphreys, Craig, Patterson, Town Council Member Bob Howard, and former Mayor Ed Morgan. He explained that his blood pressure condition was exacerbated by workplace stress and that he was experiencing panic attacks and anxiety that led to disorientation and confusion.

When Kelly began parking away from Town Hall and walking to work in an effort to improve his health, Town Council members ridiculed him for doing so. Kelly contends that "the Council created an environment so hostile and life threatening to Mr. Kelly that Mr. Kelly was left with no alternative but to leave employment with the Town in order to salvage his health." *Id.*

Word of Kelly's EEOC filings spread throughout Town Hall, and department heads would often congregate in Kelly's office the day after Town Council or Planning Commission meetings to console him because of how he had been treated at the meetings. Kelly alleges that after these meetings, Lowe and Humphreys would appear or call the Town Clerk to influence her drafting of the meeting minutes to appear more favorable to them.

According to the proposed First Amended Complaint, Humphreys, Lowe, and Craig each individually threatened to terminate Kelly's employment without authority or legal justification. The threats of termination increased after each EEOC charge Kelly filed.

Kelly resigned his employment on May 7, 2018.  He contends that he could perform the essential functions of his position as Town Manager, or his prior position as Town Attorney, either with or without accommodation.  "Mr. Kelly's essential job functions included answering emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs."  *Id.* at ¶ 67. He asserts that he was meeting or exceeding the Town's legitimate business expectations and "did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations."  *Id.* at ¶ 68.  Kelly avers that his "requested reasonable accommodations would have decreased the severity of the physical manifestations of his disabilities and restored his ability to complete the essential functions of his job as efficiently as he had before the Town leader's actions."  *Id.* at ¶ 72.  He alleges that he "requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations.  Short breaks and reduced stress . . . would have lowered the likelihood of Mr. Kelly becoming faint at work due to his high blood pressure, for example."  *Id.* at ¶ 100.  He feared taking short breaks on his own initiative because he thought he would be fired for doing so, based on council members' past statements and threats of termination.

Kelly's proposed First Amended Complaint asserts the same four claims under the ADA as his original Complaint: disability discrimination, retaliation,

failure to accommodate, and interference.[2]   The Town argues that the new allegations remain insufficient to state viable claims for relief under the ADA.

## II.

Federal Rule of Civil Procedure 15 provides that in order to amend his Complaint at this juncture, Kelly must obtain either the defendant's consent or leave of court.  The court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, "a district court has discretion to deny a motion to amend a complaint, so long as the court does not 'outright refus[e] to grant the leave without any justifying reason.'"  *Howard v. Lakeshore Equip. Co.*, 482 F. App'x 809, 811 (4th Cir. 2012) (unpublished) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Denial of leave to amend is appropriate "when the amendment would be prejudicial to the opposing party," when the plaintiff has acted in bad faith, or when the amendment would be futile.  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (internal quotation marks and citations omitted).  "A proposed amendment is futile when it is clearly insufficient or frivolous on its face," or "if the claim it presents would not survive a motion to dismiss."  *Save Our Sound OBX, Inc. v. N.C.*

---

[2] The proposed First Amended Complaint in Count V also continues to assert a state law breach of contract claim based on the Town's failure to make a severance payment. Because I previously denied the Town's Motion to Dismiss as to that claim, I do not address it here.

*Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (internal quotation marks and citations omitted).

### A.   Count I:  Discrimination.

The ADA protects qualified individuals with disabilities from discrimination on the basis of their disabilities. 42 U.S.C. § 12112(a); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278-79 (4th Cir. 2004).  A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

In this case, Kelly claims that he was constructively discharged.  "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted).  In such a situation, the law will treat the employee's resignation as a discharge.  *Id.*

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position "would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted). This standard is higher than the severity or pervasiveness required to prove a hostile environment harassment claim. *Id.*

I conclude that the new allegations, if true, could amount to sufficiently intolerable working conditions to support a constructive discharge theory. I also find that Kelly has alleged enough facts to overcome a motion to dismiss as to whether he was meeting his employer's legitimate expectations. He has therefore satisfied the first three elements of his disability discrimination claim.

Count I still fails to state a viable claim, however, because the new allegations do not raise a reasonable inference of disability-based discrimination. While the alleged actions and statements by Humphreys and Lowe are regrettable if true, the First Amended Complaint suggests that they were driven by political and personal

-13-

**228**

motivations unrelated to Kelly's disabilities.  These alleged motivations include opposition to the Meadows development, a desire to be reelected, personal concerns about noise from train whistles, and an interest in having personal friends appointed to positions within the Town.  The First Amended Complaint alleges that improper and unsavory behaviors were directed at other Town officials and employees who are not alleged to have suffered from disabilities.   The new allegations simply do not give rise to an inference that the Town treated Kelly less favorably than others due to his disabilities.

Because Kelly's claim of disability discrimination would not survive a motion to dismiss, I conclude that amendment would be futile as to Count I.  I will therefore deny the motion to amend as to that count.

### B.  Count II:  Retaliation.

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

Requesting a reasonable accommodation and filing a charge of discrimination with the EEOC are both protected conduct under the ADA.  Kelly has now alleged sufficient facts to render his constructive discharge theory plausible and has thus pled that he suffered an adverse action.  In addition, I find that he has stated facts

which, if true, could demonstrate a causal link between his filing of EEOC charges and his constructive discharge.

In the proposed First Amended Complaint, Kelly asserts that the Town's mistreatment of him worsened after he filed EEOC charges. He specifically alleges that threats of termination increased after the filing of his charges. He also avers that data was deleted from his computer drive after he filed a charge of discrimination. These allegations, if believed, could support a viable claim of retaliation under the ADA. I will therefore grant the motion to amend as to Count II.

### C.  Count III:  Failure to Accommodate.

The ADA requires an employer to "make reasonable accommodations for an applicant or an employee's disability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008). The applicable regulation provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). To state a claim for failure to accommodate, a plaintiff must plausibly allege "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position;

-15-

**230**

and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

I previously held that the January 10, 2018, letter from Kelly's counsel to the Town could not support his failure to accommodate claim. *Kelly*, 2020 WL 525296, at *7. I adhere to that ruling, but I find that Kelly has now alleged enough facts that, if true, would support a failure to accommodate claim based on his request for short breaks and reduced stress. He has now "explain[ed] why short breaks were necessitated by his disabilities" and "how they would have helped him to perform the essential functions of his job." *Id.* These new allegations are enough to survive a motion to dismiss as to the failure to accommodate claim. Kelly has pleaded facts that would satisfy all four of the elements set forth above. I therefore will grant the motion to amend as to Count III.

### D. Count IV:  Interference.

The ADA provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). There are few appellate decisions construing this subsection. The Seventh Circuit has found that a plaintiff alleging ADA interference must show:

> (1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate.

*Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017). "Protected activities are those statutorily protected under the ADA," including "formal complaints of discrimination." *Id.* at 551. A request for an accommodation is protected activity. *See Haulbrook*, 252 F.3d at 706.

The EEOC has issued guidance in which it sets forth several examples of conduct that would be considered interference. The example most applicable here is "coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled." U.S. Equal Emp't Opportunity Comm'n, *Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, 2016 WL 4688886, at *26 (2016).

I find that the new allegations do not state a cognizable claim for interference under the ADA. The First Amended Complaint contains no suggestion that the Town attempted to dissuade Kelly from seeking accommodations or filing EEOC charges. Although Kelly avers that certain Town Council members threatened to terminate him, the First Amended Complaint gives no indication that the threats were designed to coerce Kelly into forgoing reasonable accommodations or to prevent him from filing charges of discrimination. *See Brown v. City of Tucson*, 336

F.3d 1181, 1192-93 (9th Cir. 2003) (noting that the ADA's anti-interference provision "clearly prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the individual foregoes a statutorily protected accommodation").  Rather, Kelly alleges that the Town essentially ignored his accommodation requests and later retaliated against him for filing EEOC charges.

While those allegations may support his claims of retaliation and failure to accommodate, they are inadequate to support his interference claim, which is a separate and distinct legal theory.  To allow Kelly's interference claim to proceed based on the allegations in the First Amended Complaint would result in a complete blurring of the lines between his interference claim and his retaliation claim.[3]  I do not believe that is what Congress intended in drafting the statute, and I thus conclude that the proposed amendment would be futile as to Kelly's claim of ADA interference.  I will therefore deny the motion to amend as to Count IV.

## III.

For the foregoing reasons, the Motion for Leave to File Amended Complaint, ECF No. 15, is GRANTED IN PART and DENIED IN PART.  The motion is

---

[3]   *But see Stewart v. Ross*, Nos. 1:18-CV-1369 (LMB/TCB), 1:16-CV-213 (LMB/JFA), 2020 WL 1907471, at *17 (E.D. Va. Apr. 17, 2020) (concluding that ADA interference and retaliation claims entirely overlap, and analyzing both types of claims in the same manner).

DENIED as to Counts I (ADA Discrimination) and IV (ADA Interference) and

GRANTED as to Counts II (ADA Retaliation) and III (ADA Accommodation).  The

case will proceed hereafter only as to Counts II (ADA Retaliation), III (ADA

Accommodation), and V (Breach of Contract).  The Clerk shall refile the First

Amended Complaint now filed at ECF No. 15-1.  The defendant shall respond in

accord with the Federal Rules of Civil Procedure.

It is so **ORDERED**.

ENTER:  May 20, 2020

/s/  *JAMES P. JONES*
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 1:19-cv-00032** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA,** | ) | **JURY TRIAL DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Gregory Warren Kelly (hereinafter, "Mr. Kelly" or "Plaintiff"), by counsel, and states as his First Amended Complaint against Defendant Town of Abingdon, Virginia (hereinafter, "Town" or "Defendant"), the following:

### I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter as it arises from the federal questions presented by the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA")*,* and state law claims, to-wit, a breach of contract.

2.    Venue is appropriate as the Plaintiff and Defendant reside in Abingdon, Virginia.

3.      Due to its contacts within the Commonwealth of Virginia, and charter by the Virginia General Assembly, Defendant avails itself to the jurisdiction of this Court.

4.      As it relates to Plaintiff's ADA claims, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or around July 27, 2018. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated May 22, 2019, attached hereto as **EXHIBIT A**. Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

5.      Mr. Kelly, a resident of Abingdon, Virginia, was hired by The Town in or around March of 2005, and worked on a consistent, full-time basis for The Town for nearly thirteen (13) years, until his unlawful constructive discharge on or about May 7, 2018.

6.      The Town is an incorporated and chartered town under the laws of the Commonwealth of Virginia.

## III. FACTUAL ALLEGATIONS

7.      In or around March 1, 2005, Mr. Kelly was hired by The Town as Town Attorney and later was appointed Town Manager.

8.     At the time of Mr. Kelly's appointment as Town Manager on September 7, 2006, Mr. Kelly and The Town entered into an employment contract. In relevant part, the contract provided that Mr. Kelly was due nine (9) months' severance, calculated based on Mr. Kelly's annual salary at the time he left employment. *See* Sept. 7, 2006 Town Council Meeting Minutes, attached as **EXHIBIT B**.

9.     During his employment with The Town, Mr. Kelly's work performance was excellent, and met or exceeded The Town's legitimate business expectations.

10.    At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

11.    In the alternative, The Town regarded Mr. Kelly as disabled.

12.    These conditions have been exacerbated due to the often unprofessional and occasionally outrageous actions of several of Mr. Kelly's supervisors, the Town Council of Abingdon and the Mayor of Abingdon.

13.     Due to political in-fighting among Council members, Mr. Kelly's disabilities have affected his daily life activities.  Mr. Kelly worked day-to-day in a severe and pervasive hostile working environment.

14.     Mr. Kelly's daily life activities would be adversely affected with the increased stress from Council members' actions. The impacts on Mr. Kelly's job duties included: (a) his inability to concentrate at work, (b) an overall exacerbation of his high blood pressure, causing him to feel faint and (c) suffering panic attacks witnessed by various Town staff members.  These staff members would frequently try to console and comfort Mr. Kelly and would frequently check his blood pressure in the office.  In fact, one Town employee was so concerned for Mr. Kelly's health that she personally purchased a blood pressure monitor to routinely check his blood pressure. On several occasions she and other Town staff, out of concern for his welfare, would plead with Mr. Kelly to go home and/or to Urgent Care or to his personal physician. These same employees routinely witnessed and can attest to the abusive behavior of the Council toward Mr. Kelly and other Town employees.

15.     Despite performing his job exceptionally well, with full knowledge of his disabilities, Mr. Kelly was continuously threatened with termination if he did not do as certain council members directed despite

being bound by law and a strict code of local government ethics to implement only the policies enacted by the collective majority of the council. These threats were a pretext, masking a discriminatory animus towards Mr. Kelly's disabilities.

16.     For example, former Mayor Cathy Lowe and former Vice Mayor Rick Humphreys would come to Mr. Kelly on a regular basis. They would state that Mr. Kelly needed "to get on board" with their agendas or he would be terminated. Ms. Lowe stated that if she was not re-elected or "if you do not support me," Mr. Kelly would lose his job.

17.     Further, Ms. Lowe stated that when Mr. Kelly made necessary decisions for the Town, not necessarily in Ms. Lowe's personal interest, then "it would not go well for you." Ms. Lowe further attempted to influence the hiring of her personal friends and in one case demanded that he rehire an employee that he had terminated, who was a personal friend of Ms. Lowe. Ms. Lowe continuously demanded that her friends within the Town be placed in positions that she desired for them regardless of their educational qualifications or experience in such a job. This type of behavior by Ms. Lowe ultimately led to a department head leaving Town employment because some of his duties were unlawfully taken from the Town Manager by Ms. Lowe in order to create a new position of employment for a friend of hers.

18.     Mr. Kelly has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership and has been publicly ridiculed and defamed on several occasions.

19.     Mr. Humphreys specifically made a number of phone calls to Mr. Kelly, plaintiff Deb Icenhour, and former Town Clerk Cecile Rosenbaum late at night or during early morning hours in a drunken rage. Mr. Humphreys, in a hostile and belligerent manner, and in an often-drunken state of mind and voice would state that if Mr. Kelly did not do things that he wanted done, he would intentionally make Mr. Kelly's, Ms. Icenhour's, and Ms. Rosenbaum's lives miserable. Mr. Humphreys would frequently curse and abuse Mr. Kelly and town employees and often presented himself intoxicated.

20.     As an example, the Town had a no-blow whistle ordinance that operated to prevent trains from blowing their whistles within the Town's limits during certain hours of the night and early morning. Mr. Humphreys owned properties near the railroad tracks and was personally interested in the enforcement of this ordinance.

21.     Mr. Kelly informed Mr. Humphreys that the railroad was in compliance with the ordinance. Mr. Kelly pointed out that the trains blew

their whistles to alert of potential dangers, and that, by law, they are allowed to blow their horns in such situations at any hour of the day.

22.    Every time that Mr. Humphreys or Ms. Lowe made demands or threatened Mr. Kelly, Mr. Kelly would remind them that he worked for the whole Town Council and had to serve a majority of the council.

23.    Further, Mr. Kelly hired a Director of Tourism and Mr. Humphreys constantly ridiculed the man by intentionally mispronouncing his name.

24.    This Director became angered by the constant harassment and threatened to quit.

25.    Mr. Kelly organized a meeting with the Director and Mr. Humphreys to try to mediate the dispute and resolve their differences.

26.    Mr. Humphreys stated to the Director, "listen you little son of a bitch, you start doing things the right way, or I will have your job."

27.    Mr. Kelly intervened by stating, "Rick, you do not have the legal right or authority to take his job, only I have that authority." Mr. Humphreys then retorted, "well, we'll see about that."

28.    Similar to Mr. Kelly, the Director felt as though he had no other choice but to leave his employment with the Town.

29.    Mr. Humphreys, over objection of Mr. Kelly, would frequently belittle and humiliate him and town staff both in private and in public meetings.  Many of the public meetings are documented in the video archives of the Town of Abingdon, namely in Council meetings, Planning Commission Meetings and in the Historic Board of Architectural Review.  On occasion, members of the public who were the subject of agenda items would contact Mr. Kelly threatening legal action against the Town if he did not get Mr. Humphreys under control. In addition, Town staff often complained to Mr. Kelly about the abuse.  Virtually every department head in the Town would console with Mr. Kelly that they did not understand how he was able to cope with the abuse by Council.   These hostile abuses by Mr. Humphreys undermined Mr. Kelly's ability to demonstrate his authority of management over town employees as his managerial actions were often overridden unlawfully by Mr. Humphreys and other Council members.

30.    Current mayor Wayne Craig came to meet with Mr. Kelly, and said, "Greg, you realize that if the Friends of Abingdon (FOA) don't get their way on this project, (The Meadows) you are going to be fired."  Mr. Craig then directed Mr. Kelly to meet with the President of the FOA.  Mr. Craig stated that it was Joe Levine, the President of FOA, who controlled whether

Mr. Kelly would remain employed with the Town. Mr. Craig made a point to make clear to Mr. Kelly, "Greg I am a member of FOA, so take that to heart".

31.    After former employee Ms. Rosenbaum wrote an article in the Virginia Local Government Manager's Association (VLGMA) Newsletter of a sexual harassment incident that she experience in the Town Hall Elevator with a former Town employee, Mr. Craig thereafter approached Mr. Kelly and laughed loudly and  informed him that "Damn Greg, what's her problem? If a female tried to harass me in an elevator, I would welcome it." Mr. Kelly found this statement to be threatening toward the treatment of town employees and highly offensive and unprofessional.

32.    At a Christmas breakfast, Mr. Craig told one employee that he looked like an "idiot" because he wore a winter hat.  Mr. Craig demanded to know in which department the employee worked.  When the employee stated that it was the Director of Public Works, Mr. Craig responded that the Director "was an asshole." This statement was made in front of and witnessed by many town employees who were assembled at this breakfast.

33.    Mr. Craig's comments were indicative of the enmity that he held towards Mr. Kelly and his contempt for Mr. Kelly's hiring decisions. Mr. Craig had further singled out the prior Public Works Director in a meeting with VDOT officials and referred to him as "an asshole". Despite Mr. Kelly's

attempts to disallow and prevent these types of remarks and confrontations with town staff by Mr. Craig and other Council members, such public ridicule of Mr. Kelly and town staff continued to escalate.

34.    Regarding invasion of Mr. Kelly's privacy, Ms. Lowe came to Mr. Kelly's office and stated that she needed to borrow Mr. Kelly's computer. Mr. Kelly believed she began looking for private communications from or to Mr. Kelly and/or to delete digital evidence that existed at the time based on his observations of the computer after her use. On that same day, Ms. Lowe approached the Town Attorney, Deborah Icenhour, and indicated that she needed to have access to her computer as well.

35.    Mr. Kelly believed that his work data was continually under threat of review and/or deletion by Town leaders to serve their own purposes based on Ms. Lowe's and other Town leader's conduct.

36.    As another example, Mr. Kelly, Ms. Icenhour, Mr. Humphreys, and Ms. Lowe traveled to Richmond for a meeting.  Ms. Lowe kept insisting that she sent Mr. Kelly an email and needed to see Mr. Kelly's cell phone while he was driving. Mr. Kelly gave her his phone. Mr. Kelly believed that she again looked for private messages based on his observations after she returned his phone.

37.    Mr. Kelly believed that he had numerous private messages and documentation, including likely, his employment contract, on a digital network drive. This drive was created specifically for Mr. Kelly and was only to be accessible by Mr. Kelly.  The drive also housed Mr. Kelly's legal files from his private practice of law prior to becoming employed by the Town as well as his legal files after he became employed as Abingdon's Town Attorney. After Mr. Kelly filed an EEOC Charge, this digital documentation was suspiciously erased.  Mr. Kelly contacted the Town's IT department who confirmed that the drive had been erased.  Upon information and belief, these documents were erased intentionally by the Town.

38.    Finally, Ms. Lowe asked Mr. Kelly to hand his smart watch to her so that she could search it as well.  Mr. Kelly believed Ms. Lowe began looking for private messages that were stored on the device, based on the appearance of the smart watch upon its return.

39.    Mr. Kelly's working environment became untenable to the point that he was having spikes in his blood pressure at work, resulting in dizzy spells. Mr. Kelly was having difficulty performing some of his work tasks that he previously could perform quickly, such as reading and writing emails and responding to various inquiries.

40.   Mr. Kelly also suffered crippling anxiety due to work stress attributed to the behaviors of Town leadership.   Mr. Kelly experienced disorientation and confusion at times caused by the sheer level of anxiety levelled against him on a daily basis. Additionally, he consistently suffered from insomnia, panic attacks, and feelings of utter hopelessness related to the stress at work. These physical manifestations of Mr. Kelly's disabilities occurred, in part, during working hours.

41.   Mr. Kelly's health issues became threatening enough for his physician to inform him that he should request accommodations or remove himself from his working environment in order to protect himself from worsening and depleting health.

42.   Mr. Kelly continued to suffer from a discriminatory animus towards his disabilities and retaliation due to his disabilities and for filing Charges of Discrimination with the EEOC. The Town knew, based on his Charges of Discrimination, that Mr. Kelly was disabled, as Mr. Kelly identified as disabled.

43.   The Town's attacks on Mr. Kelly increased after the filing of his Charges of Discrimination on September 13, 2017, Charge No. 438-2017-01164 and December 27, 2018, Charge No. 438-2018-00415.

44.   Upon Mr. Kelly's physician's advice to seek reasonable accommodations, on January 10, 2018, Mr. Kelly requested several reasonable accommodations for his disabilities on the basis that the Town's actions had increased the severity of his disabilities' physical manifestations. *See* January 10, 2019 2018 letter, appended to this pleading as **EXHIBIT C**. Twelve possible accommodations were described in the letter as talking points in the interactive process to find an accommodation that could reduce the physical manifestations of Mr. Kelly's disabilities and allow him to complete the essential functions of his job:

  a. The Town Charter is a fundamental document that outlines the Council/Manager form of governance. The Charter is the bedrock upon which the Town exists today. Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter. It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter. This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

  b. The Town Council adopted a Code of Ethics. This is a Request that the Town Council and Town Management have a

fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

c.  This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management. If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

d.  This is a Request for members of Town Council to cease threatening the termination a Town employee's job on a weekly, sometimes daily basis. It is understood that in the course of management, certain situations do indeed warrant the threat of termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

e.  This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

f.  This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

g.  For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management. Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

h.  This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

i.  This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

j.  This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff

members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

k. This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

l. This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

45.   The Town refused to engage in the interactive process in any meaningful way in order to find accommodations for Mr. Kelly's disabilities. The Town's refusal to engage in the interactive process resulted in the failure to identify an appropriate accommodation. *See Walter v. United Airlines, Inc.*, No. 99-2622, 2000 WL 1587498, at *4 (4th Cir. Oct. 25, 2000).

46.   Mr. Kelly only received a token communication from The Town's legal counsel several months later, in or about April of 2018, stating that The Town would engage in the interactive process. When Mr. Kelly attempted to further communicate with the Town concerning the interactive process and finding reasonable accommodations that would benefit him, he did not receive any further reply from the Town or the Town's legal counsel. The Town, after requests for accommodations were made, in fact escalated its defiant behavior regarding each of the requested accommodations in an open and flamboyant manner to state to Mr. Kelly that they, as elected officials, were not subject to the requirements of ordinary business employers. In short, they thumbed their nose at Mr. Kelly's request, regardless of his health or welfare.

47.   Upon the separation of employment of Cecile Rosenbaum who had filed similar EEOC complaints against the Town, Ms. Lowe approached Mr. Kelly and said "we got rid of one big problem and now its time to get the Town under control.  We expect you to be in the office and not at the other departments or visiting work sites."  After this statement was made, instead of offering Mr. Kelly any accommodations for his disabilities as he had requested, Ms. Lowe, Mr. Humphreys, Mr. Craig and Ms. Patterson demanded more of Mr. Kelly on a daily basis and began interfering much

more severely in his abilities to exercise his managerial duties of his staff. Accordingly, Mr. Kelly's health became worse and he was ridiculed for parking away from the Town Hall and walking to work.  Mr. Kelly defended this as an attempt to help with his health.  Nonetheless, even in this slightest of attempts to improve his health, Mr. Kelly was ridiculed and humiliated by the Town Council.  Instead of offering the slightest of help for his disabilities, the Council created an environment so hostile and life threatening to Mr. Kelly  that Mr. Kelly was left  with no alternative but to leave employment with the Town in order to salvage his health.

48.    As matters continued to worsen at the workplace, Mr. Kelly disclosed to Ms. Lowe, Mr. Humphreys, Mr. Craig, Council members, Cindy Patterson Bob Howard and former Mayor Ed Morgan that he suffered a high blood pressure condition that was exacerbated by the stresses and pressures of the workplace. He also detailed his panic attacks and anxiety, which led to disorientation and confusion. Each of these conversations occurred in one-on-one conversations between Mr. Kelly and the above-mentioned Town leaders.

49.    While at work, all of the department heads became aware of Mr. Kelly's EEOC filings.  It was well known in the office that Mr. Kelly had filed charges with the EEOC.  Mr. Kelly felt that his filings were a well-discussed

subject matter at the office.  Many times, department heads, especially after public meetings such as Council meetings or Planning Commission meetings, would congregate in Mr. Kelly's office to console him for the abuse that he and the staff had endured.  In fact, the day after Council meetings was routinely termed by the staff as the "Council Hangover". And of course, Ms. Lowe and Mr. Humphreys would either show up or call in to try to influence the Clerk to draft the minutes in a way most favorable to them regardless of truth.

50.    Mr. Craig, in a meeting of engineers and in front of Mr. Kelly, stated that Mr. Kelly was an "asshole." Mr. Kelly took umbrage at this comment as he believed it reflected poorly on both the Town and Mr. Kelly's personal reputation.  As previously stated above, such comment of referring to Town employees as "assholes" was not uncommon by Mr. Craig.

51.    Mr. Kelly believed that the Town leaders' attacks on him became more severe and pervasive due to his disclosures of his disabilities and because of his EEOC filings. These attacks further became more prevalent after the Town separated the employment of Cecile Rosenbaum who had also filed similar EEOC complaints as Mr. Kelly.

52.    On or about May 7, 2018, due to the severe and pervasive hostile work environment targeting individuals with disabilities, Mr. Kelly had no

alternative but to resign his employment. Mr. Kelly attempted to work in an untenable work environment. However, because of the abusive nature of that work environment, Mr. Kelly suffered a constructive discharge.

53.   Mr. Kelly suffered through repeated threats to terminate his employment, all made by individuals without the legal justification or authority to do so.  Mr. Kelly could have been terminated by a majority of the Town Council.   However, Mr. Humphreys, Ms. Lowe and Mr. Craig repeatedly misrepresented their authority and insisted that Mr. Kelly would be replaced.   These threats increased with each filing of Mr. Kelly's charges of discrimination and increased in frequency leading up to his termination.

54.   Greg Kelly was frequently undermined by Cathy Lowe, Cindy Patterson, Mr. Craig and Mr. Humphreys.  Despite the authority to direct Town personnel resting with Mr. Kelly, these four Town leaders consistently and intentionally went around Mr. Kelly to give individual directives to employees of the Town.  On numerous occasions, department heads and staff would contact Mr. Kelly to inform him of these directives by the aforesaid Council members.  Some of these directives were not Town business related and personal to these Council members in order that they might personally gain from their undue influence.

55.   Mr. Kelly consistently informed these individuals that they could not direct Town employees as they had no authority to do so.

56.   These Town leaders' actions were taken in spite of their knowledge of Mr. Kelly's physical manifestations of his disabilities, high blood pressure, depression, and anxiety, and in spite of Mr. Kelly requesting reasonable accommodations for these Town leaders to cease the activities that caused Mr. Kelly's issues.

57.   Upon information and belief, no business-related legitimate reason justified the actions The Town took against Mr. Kelly, as Mr. Kelly's work performance was excellent and, until he requested federally protected disability accommodations to manages his disabilities, he never received any discipline from his employer.

58.   Accordingly, Mr. Kelly's constructive discharge was merely a pretext to unlawful discrimination and retaliation by The Town, as Mr. Kelly's constructive discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or reasonable accommodations.

59.   Indeed, the short temporal proximity between the time Mr. Kelly requested accommodations related to his disability and his constructive discharge supports Mr. Kelly's claims for discrimination and retaliation.

60.     Mr. Kelly suffered a constructive discharge, in violation of the ADA, because The Town:

- discriminated and/or retaliated against Mr. Kelly for filing previous EEOC Charges;

- discriminated and/or retaliated against Mr. Kelly because of his disabilities and/or because of his requests for disability-related accommodations; and/or

- failed to properly accommodate Mr. Kelly's disabilities.

61.     The Town never paid Mr. Kelly the severance he was due under the September 2006 employment agreement. The official minutes of the Town Council signed by then Mayor Lois Humphreys and attested by then Clerk, Linda Wilson clearly establishes a binding and enforceable severance agreement.  On numerous occasions Ms. Lowe and Mr. Humphreys would frequently state in front of Mr. Kelly to other Council members that "you do know that if Greg leaves here, we have to pay him nine months of severance pay".

62.     Because the actions taken by the Mayor, the Town Council, and other Town employees were taken within the scope of their employment and/or role as the statutory decision-makers for The Town, The Town is responsible for the actions of employees based upon the doctrine of

*respondeat superior* and strictly liable for the actions of statutory decision-makers, such as the Mayor and Town Council.

## IV. CLAIMS

### COUNT I: CLAIM FOR DISCRIMINATION
### IN VIOLATION OF THE ADA

63.    Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

64.    At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

65.    At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

66.    In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

67.    At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function. Mr. Kelly's essential job functions included answering

emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs.

68.    Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

69.    Mr. Kelly revealed his disabilities to his supervisors at The Town and requested the reasonable accommodations.

70.    The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations to determine what reasonable accommodations Mr. Kelly might benefit from. The Town ultimately denied Mr. Kelly's accommodation requests out of hand, threatened and/or harassed him, and treated Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

71.    The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

72.    Mr. Kelly's requested reasonable accommodations would have decreased the severity of the physical manifestations of his disabilities and restored his ability to complete the essential functions of his job as efficiently as he had before the Town leaders' actions.

73.    Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

74.    Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

75.    As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

76.    At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

77.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified

under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT II: CLAIM FOR RETALIATION IN VIOLATION OF THE ADA

78.   Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

79.   At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

80.   At all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

81.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

82.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation, depending on the specific essential function. Mr. Kelly's essential job functions included answering

emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs.

83.   Prior to his requests for accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town. Mr. Kelly did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations.

84.   Mr. Kelly revealed his disabilities to his supervisors at The Town and requested the reasonable accommodations.

85.   The Town discriminated and retaliated against Mr. Kelly by refusing to appropriately engage in a dialogue with him with regard to disability accommodations to determine what reasonable accommodations Mr. Kelly might benefit from. The Town ultimately denied Mr. Kelly's accommodation requests out of hand, threatened and/or harassed him, and treated Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

86.   The Town's leaders increased the severity of their attacks on Mr. Kelly after Mr. Kelly filed his Charges of Discrimination with the EEOC and requested reasonable accommodations.

87.   The Town would not have terminated Mr. Kelly's employment, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations.

88.   Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

89.   Mr. Kelly's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodations.

90.   Moreover, after his termination, The Town refused to provide Mr. Kelly his severance as referenced in the September 7, 2016 minutes.

91.   The Town retaliated against Mr. Kelly regarding the denial of severance.  The Town would not have denied his severance, nor taken the other discriminatory and retaliatory actions against him, but for Mr. Kelly's disabilities and/or requests for reasonable accommodations

92.   As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

93.    At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

94.    The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

### COUNT III: CLAIM FOR FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA

95.    Mr. Kelly incorporates herein by reference the preceding paragraphs of this Complaint.

96.    At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

97.    Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

98.    In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

99.    At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

100.   Mr. Kelly revealed his disabilities to his supervisors at The Town, and requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations. Short breaks and reduced stress, had the Town even considered these accommodation requests, would have lowered the likelihood of Mr. Kelly becoming faint at work due to his high blood pressure, for example.

101.   Prior to his request for disability accommodations, Mr. Kelly was performing his work at a satisfactory level and meeting or exceeding the legitimate business expectations of The Town, as he had not received negative performance reviews except in retaliation for revealing his disabilities and/or requesting reasonable accommodations.

102.   The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation

requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

103.  The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

104.  Any reasons given by The Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

105.  Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination and retaliation based upon his disabilities and/or requests for accommodation.

106.  As a direct and proximate result of The Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

107.  At all times material hereto, The Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

108.   The above-described acts by The Town and employees and/or statutory decision-makers of The Town constitute failure to accommodate in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments Act of 2008 ("ADA").

## COUNT IV: INTERFERENCE IN VIOLATION OF THE ADA

109.   Plaintiff incorporates by reference herein the preceding paragraphs of his complaint.

110.   At all times relevant to this Complaint, Mr. Kelly was a qualified individual with a disability, pursuant to the ADA.

111.   Specifically, at all times relevant, Mr. Kelly suffered from ADA-recognized disabilities, to-wit, anxiety, high blood pressure and depression for which he has been required to take daily medication. These disabilities affected his various daily life activities, including, but not limited to, sleeping, eating, breathing, and having normal circulation.

112.   In the alternative, Mr. Kelly was regarded by The Town as having such impairments.

113.   At all times relevant, however, Mr. Kelly could perform the essential functions of his job as Town Attorney or Town Manager, as the case may be, with or without an accommodation with respect to specific essential job functions.

114.   Mr. Kelly sought accommodations for his various disabilities. Mr. Kelly sent these accommodations requests to the Town via Mr. Kelly's legal counsel. *See* **EXHIBIT C**. However, The Town's actions coerced Mr. Kelly to forgo accommodations to which he was otherwise entitled.

115.   Specifically, Mr. Kelly did not take short breaks, as a reasonable accommodation, as he feared that he would receive written discipline or be terminated for a pretextual reason.

116.   Mr. Kelly's belief that he would receive unwarranted discipline for unilaterally implementing his requested reasonable accommodations was well founded. As stated previously, Mr. Kelly was continually threatened with termination if he did not do exactly as individual Town Council members commanded. Therefore, Mr. Kelly's belief that he would be terminated for something much less severe, such as leaving his duty station for a few minutes to walk around, was reasonable.

117.   Town Council members did not engage in the interactive process with Mr. Kelly, so Mr. Kelly had no authorization to take short breaks, for example.

118.  The EEOC has provided in Enforcement Guidance on ADA Interference claims that, "a threat does not have to be carried out in order to violate the interference provision, and an individual does not actually have

33

**267**

to be deterred from exercising or enjoying ADA rights in order for the interference to be actionable." Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004 (August 25, 2016), *available at* https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=#III._ADA. An employee only needs an objectively reasonable belief that some adverse action might happen if he uses an accommodation. Again, Mr. Kelly was not offered any accommodations by the Town, as the Town refused to engage in the interactive process to find reasonable accommodations for Mr. Kelly.

119.   The Town failed to accommodate Mr. Kelly's disabilities by refusing to appropriately engage in a dialogue with him with regard to disability accommodations, effectively denying Mr. Kelly's accommodation requests, threatening and/or harassing him, and treating Mr. Kelly differently, and less favorably than, similarly situated employees – ultimately resulting in Mr. Kelly's unlawful constructive discharge from employment.

120.   The Town would not have constructively discharged Mr. Kelly from employment, nor failed to accommodate him, but for his disabilities.

121. Any reasons given by the Town for its treatment of Mr. Kelly were pretextual, as Mr. Kelly's work performance was excellent.

122. Mr. Kelly's constructive discharge from employment occurred under circumstances that raise a reasonable inference of unlawful interference based upon his disabilities and/or requests for accommodation.

123. As a direct and proximate result of the Town's actions, Mr. Kelly has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

124. At all times material hereto, the Town engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Kelly so as to support an award of punitive damages.

125. The Equal Employment Opportunity Commission has issued guidance, pursuant to its authority under 42 U.S.C. § 12203(b), finding that the interference provision of the Americans with Disabilities Act is wider in scope than the anti-retaliation provision, and is, therefore, proven by a similar set of facts as the anti-retaliation provision. *See* Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on Retaliation and Related Issues*, Number 915.004 (August 25, 2016), *available at* https://www.eeoc.gov/laws/guidance/retaliation-

guidance.cfm?utm_content=&utm_medium=email&utm_name=&utm_so
urce=govdelivery&utm_term=#III._ADA.

126.  The above-described acts by the Town and employees and/or
statutory decision-makers of The Town constitute interference with Mr.
Kelly's ADA rights in violation of the Americans with Disabilities Act, as
codified under Title 42 U.S.C. §§ 12101 *et seq*., and the ADA Amendments
Act of 2008 ("ADA").

## <u>COUNT V: BREACH OF CONTRACT</u>

127.  Plaintiff  incorporates  by  reference  herein  the  preceding
paragraphs of this Complaint.

128.  Plaintiff  and  Defendant  entered  into  a  legally  binding
employment contract on September 7, 2006.

129.  The employment contract had been offered by The Town and
duly adopted by The Town's statutory decision-makers.

130.  Among several provisions of the employment contract, Mr. Kelly
was due to receive nine (9) months' severance, based upon his current annual
wage at the time he left The Town's employ.

131.  Mr. Kelly was not paid the severance he was due at the time of
his constructive discharge from employment with The Town.

WHEREFORE, Plaintiff Gregory Warren Kelly prays for judgment against Defendant Town of Abingdon, Virginia and for equitable relief, compensatory, incidental, liquidated and/or punitive damages, together with prejudgment interest from the date of Mr. Kelly's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY IS DEMANDED.

Respectfully Submitted,

**GREGORY WARREN KELLY**

/s/ Thomas E.
Strelka_____
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA 24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on the 17th day of February, 2020, I served the forgoing

First Amended Complaint, via the Court's CM/ECF system, with notice of

electronic filing (NEF) on the following:

Ramesh Murthy, Esquire
Cameron S. Bell, Esquire
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia 24212
(276) 628-5151
Fax: (276) 628-5621
cbell@pennstuart.com

*Counsel for Defendants*

/s/ Thomas E. Strelka

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gregory W. Kelly | From: | Richmond Local Office<br>400 North 8th Street<br>Suite 350<br>Richmond, VA 23219 |
|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 438-2018-01524 | Stephanie Hadden,<br>Investigator | (804) 771-2163 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Daron L. Calhoun,*
Director

MAY 2 2 2019

*(Date Mailed)*

Enclosures(s)

cc:
| Edward Craig<br>Mayor<br>TOWN OF ABINGDON<br>133 West Main Street<br>Abingdon, VA 24210 | Thomas E. Strelka<br>STRELKA LAW OFFICE, PC<br>Warehouse Row<br>119 Norfolk Avenue, S.W., Suite 330<br>Roanoke, VA 24011 |
|---|---|

**274**

Enclosure with EEOC
Form 161 (11/16)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

**275**

Enclosures(s)

cc:   **Ramesh Murthy**
      **PENN STUART**
      **PO Box 2288**
      **Abingdon, VA 24212**

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**  The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.
➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
➢ **Only one** major life activity need be substantially limited.
➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**
➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).
➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.
➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:  Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*  For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

2006- 77
September 7, 2006

TOWN OF ABINGDON, VIRGINIA
SPECIAL CALLED COUNCIL MEETING
THURSDAY, SEPTEMBER 7, 2006 – 8:30 P.M.
MUNICIPAL BUILDING

A special called meeting of the Abingdon Town Council was held on Thursday, September 7, 2006 at 8:30 P.M. in the upstairs conference room at the Municipal Building.

A.      ROLL CALL

        Members of Council present:        Mayor Lois H. Humphrey
                                           Mr. Robert M. Howard, Vice Mayor
                                           Dr. French H. Moore, Jr.
                                           Mr. Edward B. Morgan
                                           Mrs. Cathy Lowe

                                           Comprising a quorum of the Council

        Administrative Staff:              Greg Kelly, Town Attorney

B.      Closed Session Pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

The motion was duly made and seconded to go into closed session pursuant to Code of Virginia Sec. 2.2-3711(A)(1) Discussion, consideration or interviews of prospective candidates for employment.

The roll call vote was:    Mr. Morgan – Aye      Mrs. Lowe – Aye        Dr. Moore – Aye
                           Mr. Howard – Aye      Mayor Humphreys – Aye

The motion carried.

* * * * * * *

The motion was duly made and seconded to reconvene in regular session.

The roll call vote was:    Mr. Morgan – Aye      Mrs. Lowe – Aye        Dr. Moore – Aye
                           Mr. Howard – Aye      Mayor Humphreys – Aye

The motion carried.

The following certification was adopted:

Whereas, the Town Council of Abingdon, Virginia has convened in closed meeting on this date pursuant to an affirmative recorded vote and in accordance with the provisions of the Virginia Freedom of Information Act; and Whereas, Section 2.2-3712(D) of the Code of Virginia requires a certification by the Town Council that such closed meeting was conducted in conformity with Virginia law;

Now, therefore, be it resolved that the Town Council of Abingdon, Virginia hereby certifies that to the best of each member's knowledge (i) only public business matters lawfully exempted from open meeting requirement by Virginia law were discussed in closed meeting to which this certification resolution applies and (ii) only such public business matters as were identified in the motion convening the closed meeting were heard, discussed or considered by Council.

The roll call vote was:    Mr. Morgan – I so certify   Mrs. Lowe – I so certify   Dr. Moore – I so certify
                           Mr. Howard – I so certify        Mayor Humphreys – I so certify

2006- 78
September 7, 2006

The motion carried.

Mr. Morgan made the motion to appoint Greg Kelly to the position of Town Manager, effective November 1, 2006.  Mr. Howard seconded the motion.

The roll call vote was:   Mr. Morgan – Aye      Mrs. Lowe – Aye       Dr. Moore – Aye
                          Mr. Howard – Aye      Mayor Humphreys – Aye

The agreed terms of the employment between Greg Kelly as Town Manager and the Town of Abingdon include the following

I.   **Compensation**
   a. $100,000.00 base salary with standard Town employee benefits. Salary to be reviewed at least yearly upon the adoption of each year's annual budget.
   b. $3,100.00 (or such amount representative of the annual cost of health insurance) to be paid into an ICMA, VRS or equivalent retirement plan as designated by the Town Manager on November 1, 2006 and each fiscal year thereafter.
   c. The guarantee to return to the position of Town Attorney should serving in the capacity of Town Manager not be successful.
   d. Nine (9) Months severance pay at the current amount of the Town Manager's salary and benefits at the time of departure if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available.

II.  **Education Expenses**

   a. The Town will pay all educational and incidental expenses in the pursuit of a Master's Degree in Public Administration or related field.
   b. The cost of all annual Continuing Legal Education and incidental expenses required by the Virginia State Bar to remain actively licensed to practice law in Virginia.
   c. All membership fees, conference costs and incidental expenses for LGA, IMLA, ICMA and VML.

With no further business the meeting was adjourned.

Lois H. Humphreys, Mayor

Linda F.  Wilson, Clerk

**279**

Thomas E. Strelka
thomas@strelkalaw.com
540.283.0775

L. Leigh R. Strelka
leigh@strelkalaw.com
540.283.0776

www.strelkalaw.com

# STRELKA
## LAW OFFICE, PC

January 10, 2018

**VIA UNITED STATES MAIL AND EMAIL**

Ramesh Murthy, Esq.
PennStuart
208 E. Main Street
Abingdon, Virginia 24210

     Re:   *Proceeding Forward Kelly, Rosenbaum, Icenhour / Town of Abingdon;
Accommodations Requests*

Dear Mr. Murthy,

In furtherance of our discussions and in accordance with the Americans with Disabilities Act, my clients hereby submit the following accommodations requests. These requests are made collectively herein for purposes of efficiency of implementation. Should these requests warrant further discussion for any reason, I am available to you at your convenience.

### Accommodation Requests in Theme

The following are a number of requests regarding the daily office environment. The overall aim of these requests is to foster a well-running office, based on the principles of mutual respect, clear communication, and having well-defined roles within the organization. These are the three tenants in which these requests are rooted.

Mutual respect is an easily accomplished goal, and Mr. Kelly, Ms. Icenhour, and Ms. Rosenbaum shall continue to faithfully serve the Town with professional attitudes, tones of voice and choice of words. Despite their best efforts, professional respect has not been mutually received at times during their employment with the Town. At times, they have felt harassed or that they work in a hostile environment. Sometimes, issues of professional respect can be fixed with knowledge of appropriate boundaries and utilizing effective communication systems.

Clear communication is essential to the fundamental health and well-being of an efficient and productive office environment. The following requests outline options for establishing methods or practices of communication to ensure that all of the parties

equally understand one another.  We have all experienced a bad result in a situation at one time or another that began as a small miscommunication or misunderstanding. These requests aim to reduce the incidents of miscommunication and misunderstanding between the parties.

Defining the roles of individuals within an office environment can lead to improvements in both communication and mutual respect.  When an employee is armed with knowledge, typically in the form of clearly written policies or well-known practices, regarding how to deal with a variety of issues as they emerge, that employee is not only a better worker, but a better co-worker.  Thus, the following requests seek to flesh out the roles, duties and responsibilities of the parties in order to facilitate a better overall office environment.

### The Requests

1.      The Town Charter is a fundamental document that outlines the Council/Manager form of governance.  The Charter is the bedrock upon which the Town exists today.  Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter.  It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter.  This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

2.      The Town Council adopted a Code of Ethics.  This is a Request that the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

3.      This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management.  If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

4.      This is a Request for members of Town Council to cease threatening the termination a Town employee's job on a weekly, sometimes daily basis.  It is understood that in the course of management, certain situations do indeed warrant the threat of

termination.  However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

5.     This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

6.     This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

7.     For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management. Trust appears to be an issue.  Town Management works faithfully on behalf of the Town and members of Town Council.  This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

8.     This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management.  Consider tone of voice and word choice.

9.     This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

10.     This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure.  Staff members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment.  Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

11.     This is a Request that the Town Council acknowledge that this is a team.  It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

12.     This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town Management, work in conjunction to draft written standing policies that provide guidance to all individuals.

I look forward to hearing your thoughts on the above requests.

Sincerely,

Tommy Strelka

cc:     L. Leigh R. Strelka   (via electronic mail at *leigh@strelkalaw.com*)
        Gregory Kelly          (via electronic mail)
        Cecile Rosenbaum       (via electronic mail)
        Deborah Icenhour       (via electronic mail)

4

**283**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **GREGORY WARREN KELLY**, | ) | |
| | ) | |
| | ) | Case No. 1:19CV00032 |
| Plaintiff, | ) | |
| | ) | **JUDGMENT IN A** |
| v. | ) | **CIVIL CASE** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA**, | ) | |
| | ) | |
| Defendant. | ) | |

     This action came before the Court for a trial by jury.   The issues have been tried and the jury has rendered its verdict.   It is **ORDERED AND ADJUDGED** that in accordance with the jury verdict, judgment is granted to the defendant Town of Abingdon, Virginia.

     Nothing further to be done herein, the Clerk is directed to close the case.

                  ENTER: October 7, 2021

                  /s/ JAMES P. JONES          
                  Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:19-cv-032** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that Plaintiff Gregory Warren Kelly, by counsel, hereby appeals to

the United States Court of Appeals for the Fourth Circuit from these Orders entered by the United

States District Court for the Western District, Abingdon Division: (1) Order of February 3, 2020

(Dkt. No. 14) (granting Defendant's Motion to Dismiss as to Counts I, II, III, and IV[1]); and (2)

Order of May 20, 2020 (Dkt. No. 20) (denying in part and granting in part Plaintiff's Motion for

Leave to File Amended Complaint).  These orders became appealable upon the granting of

judgment to Defendant via the Court's October 7, 2021, final Order (Dkt. # 117).

<div style="margin-left: 45%;">

Respectfully submitted,

/s/ Thomas E. Strelka
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Monica L. Mroz, Esq. (VSB # 65766)
Brittany M. Haddox, Esq. (VSB # 86416)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330

</div>

---

[1] Count I, Discrimination in violation of the Americans with Disabilities Act; Count II, Retaliation in violation of the Americans with Disabilities Act; Count III, Failure to Accommodate in violation of the Americans with Disabilities Act; Count IV, Interference in Violation of the Americans with Disabilities Act.

Roanoke, VA  24011
Tel:  540-283-0802
brittany@strelkalaw.com
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
monica@strelkalaw.com
*Counsel for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of November, 2021, the foregoing was

sent to the following attorneys for the Defendants via the Court's electronic CM/ECF system.

Ramesh Murthy
  VSB No. 31801
Cameron S. Bell
 VSB No. 47685
PENN, STUART & ESKRIDGE
P.O. Box 2288
Abingdon, Virginia  24212
Telephone:  276/628-5151
Facsimile:  276/628-5621
<u>cbell@pennstuart.com</u>
rmurthy@pennstuart.com

*Counsel for Defendants*

/s/Thomas E. Strelka